**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| EMPIRE TECHNOLOGY DEVELOPMENT LLC<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Defendants. | Case No. 2:23-cv-00427-JRG-RSP<br><br>[redacted] |

**PLAINTIFF EMPIRE TECHNOLOGY DEVELOPMENT LLC'S
OPENING CLAIM CONSTRUCTION BRIEF**

[redacted]

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..... 1

II. LEVEL OF ORDINARY SKILL IN THE ART ..... 2

III. DISPUTED CLAIM TERMS OR PHRASES ..... 2

A. The ’120 Patent ..... 2

1. “wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a multiple-input multiple-output (MIMO) mode … and a single-input multiple-output (SIMO) mode …” ..... 2

a. The Specification Supports Empire’s Construction. ..... 4

b. The Claim Language Supports Empire’s Construction. ..... 7

c. The Court Should Disregard Samsung’s Extrinsic Evidence and Proposed Construction. ..... 8

d. The Claims Are Not Indefinite. ..... 9

2. “a power consumption of the first and second circuitry” ..... 9

a. The Claims and Specification Support Empire’s Construction. ..... 10

b. Samsung’s Proposed Construction Is Incorrect. ..... 11

3. “an idle power consumption of the mobile station” ..... 14

a. The Claims, Specification, and Prosecution History Support Empire’s Construction. ..... 15

b. Samsung’s Proposed Construction Is Incorrect. ..... 16

B. The ’331 Patent ..... 18

1. “pilot symbol” ..... 18

a. The Claims and Specification Support Empire’s Construction. ..... 18

b. Samsung’s Proposed Construction Is Incorrect. ..... 19

c. Samsung’s Proposed Construction Contradicts Its IPR Position. ..... 22

[redacted]


2. "a channel matrix of the communications channel" .................................... 22

a. The Claims and Specification Support Empire's Construction. ............... 22

b. Samsung's Proposed Construction Is Incorrect. ...................................... 24

3. "replicated data" ..................................................................................... 25

a. The Claims Support Empire's Construction. ........................................... 26

b. The Specification Supports Empire's Construction. ................................ 27

c. Samsung's Proposed Construction Is Incorrect. ...................................... 29

[redacted]

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams Respiratory Therapeutics, Inc. v. Perrigo, Co.*,
616 F.3d 1283 (Fed. Cir. 2010)........7

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)........26-27

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
659 F.3d 1345 (Fed. Cir. 2011)........12

*Ecolab, Inc. v. Envirochem, Inc.*,
264 F.3d 1358 (Fed. Cir. 2001)........24

*Fromson v. Advance Offset Plate, Inc.*,
720 F.2d 1565 (Fed. Cir. 1983)........11-12

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014)........13, 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)........8

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021)........26

*Key Pharms v. Hercon Labs. Corp.*,
161 F.3d 709 (Fed. Cir. 1998)........8

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009)........12, 29

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
814 F.3d 1343 (Fed. Cir. 2016)........13, 20, 21, 25

*Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*,
839 F.3d 1111 (Fed. Cir. 2016)........14, 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)........3, 26

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)........12, 29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)........4, 21

[redacted]

*Phoenix Licensing, L.L.C. v. Advance Am.*,
No. 2:15-CV-1367-JRG-RSP, 2016 WL 6217180 (E.D. Tex. Oct. 25, 2016) ........................24

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
305 F.3d 1318 (Fed. Cir. 2002)..........................................................................................13

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)......................................................................................3, 30

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013)............................................................................................7

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).........................................................4, 9, 10, 14, 18, 21, 22, 25

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*,
573 F.3d 1290 (Fed. Cir. 2009)..........................................................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)........................................................................................4, 8

**Statutes**

35 U.S.C. § 112, ¶ 2 .......................................................................................................3

[redacted]

Pursuant to P.R. 4-5(a) and the Court's Docket Control Order (Dkt. 25), Plaintiff Empire Technology Development LLC ("Empire") hereby submits its Opening Claim Construction Brief for U.S. Patent No. 8,798,120 (the "'120 Patent," Ex.[1] A) and U.S. Patent No. 8,565,331 (the "'331 Patent," Ex. B) (collectively, the "Asserted Patents"). This brief is supported by the expert declaration of Robert Akl, D.Sc. *See* Ex. C.

## I. INTRODUCTION

Empire proposes plain-and-ordinary-meaning constructions of the disputed terms in light of the surrounding claim language, the specifications, and the rest of the intrinsic evidence. The claims are directed to innovations in wireless communications and include terms well-understood by persons of ordinary skill in the art ("POSITA"). The intrinsic record is devoid of lexicography or disavowal. Empire's plain-and-ordinary-meaning constructions thus follow the canons of claim construction set forth by the Federal Circuit.

In contrast, Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s (collectively, "Samsung") proposed constructions (i) run afoul of basic claim construction principles by adding language to claim terms based on an embodiment in the specification, or (ii) inject negative limitations into the claims even though the intrinsic evidence does not support such restrictions. Samsung also contends that certain well-understood and commonly used terms are not readily ascertainable to a skilled artisan. Each of Samsung's arguments fails.

Overviews of the Asserted Patents and related technology are set forth in Empire's technology tutorial and in Ex. C ¶¶ 33-40. The '120 Patent is directed to "Methods and Communication Systems Having Adaptive Mode Selection" and concerns "methods, systems, devices, and/or apparatus generally related to *selecting a transmit mode* in a communications

[1] "Ex. __" refers to an exhibit to the Declaration of Nathaniel Browand, filed herewith.

[redacted]

system." Ex. A at 2:12-14 (emphasis added). The '331 Patent is directed to "methods, systems, devices, and/or apparatus generally related to *use of replicated data as a pilot symbol* in a communications system." Ex. B at 4:3-5 (emphasis added). Empire asserts claims 25 and 29 of the '120 Patent and claims 1 and 5 of the '331 Patent.

## II. LEVEL OF ORDINARY SKILL IN THE ART

Empire adopts Samsung's definition of a POSITA for both Asserted Patents, Ex. C ¶ 31, as Empire has also done in its preliminary responses to Samsung's IPR Petitions challenging the Asserted Patents. For the '120 Patent, Samsung offered a definition of a POSITA at the relevant time as one who had "a bachelor's degree in electrical engineering, computer science, computer engineering, or a related field, and two-to-three years of experience in the research, design, development, or testing of wireless data communication systems at the physical and media access control (MAC) layer, with additional education substituting for experience and vice versa." Ex. D, '120 IPR Pet. at 8. For the '331 Patent, Samsung offered a definition of a POSITA at the relevant time as one who had "a bachelor's degree in electrical engineering, computer science, computer engineering, or a related field, and two-three years of experience in the research, design, development, or testing of wireless data communication systems at the physical layer, with additional education substituting for experience and vice versa." Ex. E, '331 IPR Pet. at 8.

## III. DISPUTED CLAIM TERMS OR PHRASES

### A. The '120 Patent

#### 1. "wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a multiple-input multiple-output (MIMO) mode … and a single-input multiple-output (SIMO) mode …"

[redacted]

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a multiple-input multiple-output (MIMO) mode … and a single-input multiple-output (SIMO) mode …"**<br><br>**(Claims 25, 29)** | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) | "wherein the controller is configured to receive a control signal and to select between a MIMO mode and a SIMO mode as indicated by the control signal"<br><br>Alternatively, the term is indefinite.[2] |

This phrase appears in both asserted claims of the '120 Patent. Claims 25 and 29 recite, in relevant part, a "mobile station for use in a communications system comprising . . . a controller coupled to the first and second circuitry, wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between" MIMO and SIMO modes.

The plain language of the claims confirms that ***the controller*** is configured to receive a control signal and, in accordance with such signal (and any other relevant signal), to select between a MIMO mode and a SIMO mode. A POSITA would have understood this claim term as written and interpreted the phrase according to its ordinary meaning. Ex. C ¶¶ 41-54.

Samsung's proposed construction seeks to rewrite the claims by using a subordinate clause "in accordance with the control signal" to require the controller to only be able to select a mode that *the control signal* (one of many signals processed by the controller) indicates to the controller. This construction is erroneous because it contradicts the plain language of the claims and intrinsic evidence, all of which confirm that *the controller* is configured to select between a MIMO mode

[2] 35 U.S.C. § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

[redacted]

and SIMO mode while operating in accordance with the control signal. Ex. A at 7:30-33, 11:36-56, 19:10-17, 20:12-20, Fig. 4.

Moreover, Samsung fails to identify evidence compelling a construction that strays from the plain and ordinary meaning. As the Court well knows, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996)).

**a. The Specification Supports Empire's Construction.**

The specification of the '120 Patent does not disavow or redefine the scope of this phrase and, instead, uses it consistently with its plain and ordinary meaning.

The disputed claim term relates to the selection of MIMO or SIMO transmission mode in the uplink direction. The '120 Patent explains that "MIMO or SIMO mode operation may be adaptively selected during operation of the communications system" and "[d]ata may be transmitted from a transceiver in the communications system using the selected mode." Ex. A at 2:23-24, 2:45-47. The specification explains that a "controller **475** may be coupled to the encoder **470** and configured to provide a signal to the encoder **470** to operate in a MIMO mode or a SIMO mode." *Id.* at 7:30-33.

Figure 4 of the '120 Patent, shown below, and its corresponding description further support the plain and ordinary meaning of the disputed phrase by evidencing the *controller's* selection of

[redacted]

SIMO or MIMO mode while operating *in accordance with* the control signal. Figure 4 depicts a "schematic illustration of some example communications systems" and includes "a base station **405** and three mobile stations **410**, **415**, and **420**." *Id.* at 7:1-5.



Figure 4

With reference to Figure 4, the specification describes various embodiments for performing MIMO/SIMO selection. As ***one*** example, the specification explains that the base station **405** may provide the mobile station **410** with information including, *e.g.*, a signal indicative of the selected MIMO or SIMO mode, and the controller **475** may provide a signal to configure the encoder for operation accordingly:

> A feedback decoder **477** may be coupled to the antennas **450** and **452** and configured to decode feedback signals ***received from the base station*** **405**. The feedback signals may include control signals corresponding to a selected mode, selected rate, selected antenna for use in SIMO mode, or combinations of those, as generally described above . . . .
> ***The controller 475 may be provided with a signal indicative of the selected mode, selected rate, selected antenna, or combinations thereof.*** Based on the received

[redacted]

> signals, the controller may configure the encoder **470** to encode data using the selected mode, selected rate, 40 selected antenna, or combinations thereof. ***That is, as described above, the base station 405 may be configured to communicate a selected mode of MIMO or SIMO mode to the mobile station*** **410**. If the selected mode is a MIMO mode, the controller **475** may provide a control signal to the encoder **470** to configure the encoder **470** for MIMO operation using both the antennas **450** and **452**.

*Id.* at 11:25-47 (emphasis added). As ***another*** example, the specification explains that the controller may override the base station's MIMO/SIMO selection based on parameters of the mobile station:

> In some examples, the controller **475** may not configure the encoder **470** in accordance with the mode selected by the base station **405**, ***but may override that selection based on some other criteria***. For example, if a battery power at the mobile station **410** is too low to implement a mode selection made by the base station **405**, the controller **475** may implement a different mode.

*Id.* at 11:50-56 (emphasis added).

In ***both*** examples, the controller ultimately is configured to select the transmission mode. Furthermore, in the second example, where the controller of the mobile station overrides the mode indicated by the base station, the mobile station takes that mode into account while also considering "other criteria," such as parameters of the mobile station. A POSITA thus would recognize that the controller is configured to select a transmission mode while operating "in accordance with" the control signal. Ex. C ⁋ 49 ("[A] controller configured to select a transmission mode when the controller has the capability to override a mode selection by the base station would still be in accordance with the control signal.").

The proper claim construction includes ***both*** examples. By contrast, Samsung's proposed construction improperly ***excludes*** both examples, *i.e.*, an embodiment where ***the controller*** configures the encoder following the base station's mode indication, and an embodiment where the controller does not follow the base station's mode indication. "A claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive

[redacted]

evidentiary support.'" *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013) (quoting *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)). Here, Samsung identifies no evidence, let alone "***highly persuasive***" evidence, justifying a construction that excludes described embodiments.

### b. The Claim Language Supports Empire's Construction.

According to the plain language of claims 25 and 29, ***the controller*** is configured to select between MIMO and SIMO modes while operating in accordance with a received control signal. The claim language does not state or suggest that ***the control signal*** performs mode selection. Nor does the claim language state or suggest that the controller must follow the mode indicated by the control signal. The control signal simply must be received and considered by the controller.

The grammatical structure of the claim language further supports Empire because the location of the subordinate clause "in accordance with the control signal" confirms that it is meant to modify the overall operation of the *controller*, not mode selection. Indeed, if the clause "in accordance with the control signal" was meant to modify mode selection, it would have been placed immediately after the word "select," so that the claims would have read "…and to select, in accordance with the control signal, between a MIMO and SIMO mode." Instead, placing the clause immediately after the introduction of the control signal and before the words "to select" confirms that the control signal is used in the controller's mode selection. But the controller need not do more than act "in accordance with" the control signal.

Independent claims 16 and 24 further support Empire's construction. Both claims are directed to a "base station for use in communicating over a communications channel" comprising a mode selector "configured to receive the first and second signals, ***and select a transmission mode***." Ex. A at 17:36-60, 18:31-67 (emphasis added). In other words, in base station claims 16

[redacted]

and 24, the mode selector selects between a MIMO mode and SIMO mode. The parallel language of selecting a mode in mobile station claims 25 and 29 confirms that in those claims, the ***controller*** of the mobile station does the selecting. *Id.* at 19:1-20, 20:3-25. And importantly, the mode selector of claims 16 and 24 is ***not*** required to operate "in accordance with a control signal," whereas the controller of asserted claims 25 and 29 operates "in accordance with a control signal" while still selecting between a MIMO and SIMO mode. *See* Ex. C ¶¶ 44, 49. The express inclusion of "in accordance with" in claims 25 and 29 (and its exclusion from claims 16 and 24) confirms that the meaning of the phrase is tied to general operation of the controller of claims 25 and 29 (and not the mode selection performed in all of these claims). *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim."). It also confirms that "in accordance with" is not the same as "always selected directly by," as Samsung incorrectly proposes.

**c. The Court Should Disregard Samsung's Extrinsic Evidence and Proposed Construction.**

Since the meaning of this claim term is clear from the intrinsic evidence, extrinsic evidence[3] should not be used to inform or revise the meaning of the disputed term. *Vitronics*, 90 F.3d at 1583; *Key Pharms v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) ("[I]f the meaning of the disputed claim term is clear from the intrinsic evidence—the written record—that meaning, and no other, must prevail; it cannot be altered or superseded by witness testimony or other external sources simply because one of the parties wishes it were otherwise.").

[3] *See* Ex. F, Samsung Constructions (Dkt. 50-2) at 1-7.

[redacted]

**d. The Claims Are Not Indefinite.**

Dr. Cabric, for Samsung, contends that "if the selected mode is only required to be compatible (or in agreement or conformity) with the control signal, as opposed to 'as indicated by' the control signal, . . . it is unclear when, how, or why the MIMO/SIMO mode selection would ever *not* be compatible (or in agreement or conformity) with the control signal." Ex. G, Cabric Decl. ¶ 56. But, as explained above, a POSITA would readily understand that selecting a mode after considering the control signal would be compatible with the control signal, but selecting a mode without consideration of the control signal at all would not. *See supra* Section A.1.a. As Dr. Akl confirmed, "a controller configured to select a transmission mode when the controller has the capability to override a mode selection by the base station would still be in accordance with the control signal." Ex. C ¶ 49. Accordingly, the claim term informs a POSITA, when read in the context of the claim language and specification, about the scope of the claimed invention with reasonable certainty.

**2. "a power consumption of the first and second circuitry"**

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"a power consumption of the first and second circuitry"**<br><br>**(Claims 25, 29)** | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) | power used by the first and second physical transceiver circuitry, not the signal energy |

This term should be construed according to its plain and ordinary meaning because no evidence of disavowal or lexicography exists to support Samsung's proposed narrowing or proposed negative limitation. *Thorner*, 669 F.3d at 1365.

[redacted]

**a. The Claims and Specification Support Empire's Construction.**

The claims and specification use this claim term consistently with its plain and ordinary meaning. Ex. C ¶¶ 55-64. Neither the claim language nor the specification state or suggest that the circuitry is limited to physical transceiver circuitry. Nor does the claim language or specification state or suggest that the power consumption of circuitry excludes signal energy. Furthermore, the '120 Patent does not provide a definition of this claim term, disclaim the scope of the term, or otherwise suggest a meaning that differs from its ordinary meaning. In the absence of definition or disclaimer, the examples in the specification are not a basis to limit the claims. *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that.").

The '120 Patent offers examples of the first and second circuitry, *i.e.*, items that include certain circuit components. More specifically, in connection with Figure 4, the specification explains that the first circuitry **454** "may include a digital-to-analog converter **455**, filter **456**, mixer **457**, filter **458**, and power amplifier **459**" and the second circuitry **460** "may include a digital-to-analog converter **461**, filter **462**, mixer **463**, filter **464**, and power amplifier **465**." Ex. A at 7:20-27. And the "power consumption of the circuitry may include any of a variety of circuit components, including power consumption of one or more digital-to-analog converters, mixers, filters, and frequency synthesizers." *Id.* at 3:48-52, 4:31-34. Thus, the power consumption of the circuitry is, *e.g.*, nothing more than the power consumed by these various circuit components. There is no mention of "physical transceiver circuitry" or "not the signal energy."

The specification explains that the power consumption of the circuitry is one of several variables (i) used to calculate transmission rates (which may impact mode selection) or (ii) sent to

[redacted]

the base station (which may impact mode selection). For example, the specification states that "power consumption of the circuitry **454** and **460** may be used to calculate the MIMO and SIMO transmission rates," and "a signal indicative of the power consumption of the circuitry **454** and **460** may in some examples be communicated to the base station **405**." *Id.* at 11:8-24.

**b. Samsung's Proposed Construction Is Incorrect.**

Nothing in the claims or specification suggest that "a power consumption of the first and second circuitry" is "power used by the first and second physical transceiver circuitry, not the signal energy." Absent a clear definition or disclaimer of scope, the plain meaning should not be limited. Samsung's proposal is unsupported for several reasons.

***First***, Samsung seeks to substitute "power consumption" with "power used." But a POSITA would "understand that the words 'consumption' and 'use' though related are not necessarily equivalent." Ex. C ¶ 65. Furthermore, a POSITA "would not interpret 'consumption' to mean 'use' where the patent claims and specification employ the term 'power consumption' and do not use the terms 'consumption' and 'use' interchangeably." *Id.*

***Second***, nothing in the claims or specification supports Samsung's attempt to narrow "circuitry" to ***transceiver*** circuitry. The '120 Patent does not say that the first and second circuitry is limited to transceiver circuitry; "transceiver circuitry" does not even appear in the specification. *See generally* Ex. A. Certain of the unasserted independent and dependent claims include limitations tying certain circuitry to a transceiver in the context of calculating transmission rates. *See, e.g.*, *id.* at 15:50-54, 16:6-51, 17:65-18:4, 18:9-16, 18:31-67. But unlike those unasserted claims, asserted claims 25 and 29 do ***not*** contain limitations directed to transmission rate calculation and ***omit*** mention of a transceiver. Accordingly, a transceiver limitation should not be read into claims 25 and 29. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.

[redacted]

Cir. 1983) (declining to read a limitation into an asserted claim where the limitation was expressly included in another claim); *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1354 (Fed. Cir. 2011) ("That claims 1–30 contain a receiver sleeve limitation and claims 31–36 do not is telling[.]").

***Third,*** Samsung's attempt to limit "circuitry" to only "***physical***" transceiver circuitry, or hardware, is also unsupported by the intrinsic evidence. The specification explains that "power consumption of the circuitry ***may include any of a variety of*** circuit components, including power consumption of one or more digital-to-analog converters, mixers, filters, and frequency synthesizers." Ex. A at 3:48-52 (emphasis added); *see also id.* at 3:31-34. The specification also explains that "it will be understood by those within the art that each function and/or operation within such . . . examples can be implemented . . . by a wide range of ***hardware***, ***software***, firmware, or virtually any combination thereof." *Id.* at 13:61-14:2 (emphasis added).

***Fourth***, Samsung's proposed construction introduces an ambiguous negative limitation—"not the signal energy"—found ***nowhere*** in the patent. But the law is clear that a negative limitation must find support either in "the words of the claim" or through an "express disclaimer or independent lexicography in the written description that would justify adding that negative limitation." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009) (declining to add a negative limitation to a claim term where "there is no basis in the patent specification").

Here, the genesis of Samsung's construction appears to be text the Patent Office Examiner wrote in an interview summary found in the prosecution history of the '120 Patent. Ex. H, Prosecution History Excerpts at Empire_0000374 (referencing an agreement to amend claim 1 "to explicitly state that the power consumption is with regards to the physical transceiver circuitry, not

[redacted]

the signal energy"). To the extent Samsung contends that the interview summary constituted a disavowal during prosecution, that argument fails. Applicants made no disavowal. "The standards for finding … disavowal are 'exacting.'" *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (quoting *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)). For there to be disavowal, the specification or prosecution history must be "clear that the invention does not include a particular feature." *Id*. Furthermore, disavowal "must be clear and unmistakable." *Id.* "Prosecution history may not be used to limit the scope of a claim unless the applicant took a position before the Patent Office that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1296 (Fed. Cir. 2009) (citing *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324–25 (Fed. Cir. 2002)).

Here, there could be no clear and unmistakable attempt to disavow coverage of this claim term, for at least five reasons:

1) The language Samsung uses as a basis for its proposed negative limitation ***was authored by the Patent Office's Examiner, not by the inventors or their counsel***. Ex. H at Empire_0000374.
2) The Examiner's summary found in the prosecution history summarized an interview that was about subject matter entirely unrelated to the asserted claims and disputed claim term here. The interview concerned then-pending claim 1, ***a claim unlike issued claims 25 and 29, and a claim that did not include the claim term in dispute here***. *See id.* at Empire_0000028, 32-33, 374, 384 ("Allowability of amended claim 1 over the Xu reference was discussed.").
3) After the interview, the applicants amended *only* then-pending claim 1 to add a reference to the "transceiver" but did not add such a limitation to then-pending claims 27, 28, and 32 (now

[redacted]

issued claim 25) that contain the term disputed here. *Compare id.* at Empire_0000028, 32-33, *with id.* at Empire_0000378, 382-83.

4) Even the applicants' amendment to unrelated claim 1 did ***not*** include words concerning power consumption (only energy consumption, which is different) and did ***not*** include words distinguishing "signal energy" from "power consumption" (or energy consumption). *Id.* at Empire_0000378.

5) ***Before*** the interview that led to the Examiner's summary, the Examiner had already indicated that the subject matter found in now-issued asserted claims 25 and 29 ***was allowable if written in independent form***. *Id.* at Empire_0000355. The applicants could not have disavowed claim scope because their two claims asserted in this case had already been allowed to issue without the need for further amendment or discussion.

Thus, none of the applicants' statements could be properly understood as a disclaimer of claim scope. *See Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119-20 (Fed. Cir. 2016) (finding no disclaimer resulting from a sentence in an interview summary that was in the context of different claims that did not include the disputed claim term).

**3. "an idle power consumption of the mobile station"**

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"an idle power consumption of the mobile station"**<br><br>**(Claim 25)** | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) | power used by the mobile station when it is not sending data over the communications channel |

This term should be construed according to its plain and ordinary meaning because no evidence of disavowal or lexicography exists to support Samsung's proposed narrowing. *Thorner*, 669 F.3d at 1365.

[redacted]

**a. The Claims, Specification, and Prosecution History Support Empire's Construction.**

The '120 Patent uses this term according to its plain and ordinary meaning. For example, in claim 25, "an idle power consumption of the mobile station" forms part of the basis for the control signal, which the controller is configured to receive and, in accordance therewith, to select between MIMO and SIMO modes.

In connection with Figure 4, shown above, the '120 Patent explains:

> Various data or other information associated with a power consumption of the mobile station **410** during an idle time, or other mobile stations in the communications system **400** may be stored in the parameter storage **435.** ***Recall the idle time may include times during which the mobile station 410 is waiting to send data over the communications channel, such as waiting for a scheduled time to begin transmission.*** Alternatively or in addition to storing information related to the power consumption of the mobile station **410** during an idle time, a signal indicative of the power consumption during an idle time may be provided to the rate selector **430,** without necessarily storing the parameter.

Ex. A at 8:52-63 (emphasis added).

Based on these descriptions in the '120 Patent, a POSITA would understand that the plain and ordinary meaning of "idle" refers to times when the circuitry of the device is powered on and waiting to transmit data over the communications channel. Ex. C ¶ 75. This term does not have a special meaning in the field of wireless communications, and a POSITA would understand the term based on the use of the term in the claims and specification. *Id.* at ¶¶ 69-75, 80, 82.

The prosecution history further supports a plain-and-ordinary-meaning construction of this term. During prosecution, and as a reason for allowance, the Examiner stated multiple times that the prior art failed to "anticipate or render obvious the limitations regarding the consideration of power during idle periods in the mode selection processing," including in issued claim 25. Ex. H at Empire_0000355, 410, 449. This inadequate prior art included the disclosure of a "sleep mode" in which "all the circuits in the signal path are shut down for energy saving." *Id.* at

[redacted]

Empire_0000096; *accord id.* at Empire_0000109. Therefore, a POSITA at the time of the invention would have understood that the "sleep mode" referenced in the prior art is distinct from the "idle time" and "idle power consumption" limitations found in the asserted claim 25. Ex. C ¶¶ 76-79. Moreover, a POSITA would have understood that while circuitry is powered ***off*** in sleep mode, the plain and ordinary meaning of idle mode refers to circuitry that is powered ***on***. *Id.*

**b. Samsung's Proposed Construction Is Incorrect.**

Samsung's proposed construction of "power used by the mobile station when it is not sending data over the communications channel" is overbroad. That construction would improperly capture situations where the mobile station is fully powered off and not waiting to transmit data, and Samsung's claim construction expert acknowledges this scope. Ex. G ¶ 83 (explaining that the '120 Patent "does not require all circuitry to be 'powered on' when evaluating idle power consumption"). Samsung's broad construction of this term is contrary to the claims, specification, and prosecution history of the '120 Patent.[4] It also defies a plain meaning of the concept of idling—a state characterized and understood as powered on but waiting.

To support Samsung's conclusion that idle power consumption does not require circuitry to be powered on, its expert relies on the following passage of the specification: "Even if the idling transceivers turn off their transmission chains, some idle power may be consumed due to leakage current or other effects." Ex. G ¶ 83 (citing Ex. A at 3:2-10). But Samsung's expert erroneously conflates transmission chains being turned off with power being turned off. The cited passage does not state that ***power*** is turned off—instead, it references ***transmission chains*** that are turned off. *See* Ex. A at 3:2-10. And when transmission chains are turned off, the transceivers are not

[4] As discussed with respect to the preceding term, a POSITA would "understand that the words 'consumption' and 'use' though related are not necessarily equivalent" and "would not interpret 'consumption' to mean 'use' where the patent claims and specification employ the term 'power consumption' and do not use the terms 'consumption' and 'use' interchangeably." Ex. C ¶ 65.

[redacted]

transmitting but remain powered on, as evidenced by the fact that idle power may still be consumed. *See id.* at 2:58-62, 3:5-7.

Samsung's IPR Petition and supporting prior art further undermine its proposed construction. Samsung's Petition acknowledges that "the claimed 'idle' mode" has "***circuits powered on*** but not transmitting." Ex. D at 46 (emphasis added). The Petition states at least three further times that "idle power consumption means that ***the circuits are powered*** but have nothing to transmit or receive." *Id.* at 25, 41, 49 (emphasis added). Samsung's expert in the IPR offers the exact same testimony. Ex. I, Valenti Decl. ¶¶ 86, 120, 134, 144. Further, Samsung's Petition recognizes that when circuits are powered off, "they ***no longer contribute to station idle power consumption***." Ex. D at 41 (emphasis added).

Furthermore, Samsung's IPR prior art demonstrates that "idle mode" is distinct from "sleep mode." For example, references disclosing "sleep mode" explain that power consumption in sleep mode is approximately zero. Ex. J, Cui-2003 at Empire_0093684; Ex. K, Cui-2005 at Empire_0093903; Ex. L, Cui-2004 at Empire_0093917. A POSITA would readily understand that these states are distinct. Ex. C ¶ 77. Additionally, U.S. Patent Publication No. 2005/0250452 ("Walton") explains that a wireless device may operate in and "transition" between distinct idle and sleep states. Ex. M, Walton at Figs. 3A-3B, ¶¶ 45-61. Figure 3A of Walton shows that in the idle state, unlike the sleep state, the device is awake.

A POSITA would not have understood "an idle power consumption of the mobile station" to be "power used by the mobile station when it is not sending data over the communications channel" because that construction is overbroad and erroneously includes times in which the circuitry would be powered off. Instead, a POSITA would have recognized that an idling mobile station is powered on but not transmitting. Ex. C ¶¶ 82-84. Accordingly, the Court should construe

[redacted]

this claim term according to its plain and ordinary meaning and reject Samsung's proposed construction.

## B. The '331 Patent

### 1. "pilot symbol"

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"pilot symbol"**<br><br>**(Claims 1, 5)** | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) | a reference symbol known by the transmitting and receiving devices of a communications system |

Claim 1 recites, in relevant part, a "method of decoding a signal transmitted over a communications channel" that comprises "receiving a pilot symbol over the communications channel" and "estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol." Ex. B at 15:42-16:7. This term should be construed according to its plain and ordinary meaning because no evidence of disavowal or lexicography exists to support Samsung's proposed narrowing. *Thorner*, 669 F.3d at 1365.

#### a. The Claims and Specification Support Empire's Construction.

"Pilot symbol" is used in the claims and specification of the '331 Patent consistently with the term's plain meaning: a data symbol known to the receiver. *See* Ex. C ¶ 92 (explaining that "pilot symbol" is well understood in the field of wireless communications). The '331 Patent does not provide a definition of "pilot symbol," nor does it disclaim the scope of the term or otherwise suggest a meaning that differs from its ordinary meaning. For example, claim 1 describes the term according to its customary usage and states that a pilot symbol is received over the communications channel and forms part of the basis for estimating a channel matrix of the communications channel. Ex. B at 15:42-16:7. Similarly, the specification explains:

> One way to measure properties of the communications channel is to insert pilot symbols into the transmitted data streams. The pilot symbols may be known to the

[redacted]

> receiver and the known pilot symbols may be compared with the received signals to generate an estimate of one or more properties of the communications channel.

*Id.* at 1:66-2:4.

The specification further describes pilot symbols as data. *Id.* at Fig. 7, 9:43-44. The method for receiving signals over a communications channel in Figure 7 includes a step for receiving a pilot symbol over a communications channel, which is described as follows:

> The symbol may be received by any suitable receiver of a communications device. Signals may generally be received that encode the known pilot symbol. The received signals may also provide an indication that the encoded symbol is a pilot symbol.

*Id.* at 9:66-10:3.

Moreover, the specification explains: "Known pilot symbols may be stored at the communications device or otherwise communicated to the communications device for comparison with decoded pilot symbols received over the communications channel." *Id.* at 10:10-13. The specification also describes pilot symbols as a type of program data that may be useful for generating channel estimates. *Id*. at 11:29-33. These passages confirm that a pilot symbol is a data symbol known to the receiver. All of the patent's usage and explanation of "pilot symbol" accords with the plain and ordinary meaning of that term, as understood by a person of ordinary skill at the time of the invention. Ex. C ¶¶ 87-91.

**b. Samsung's Proposed Construction Is Incorrect.**

Samsung's proposed construction is erroneous for at least two reasons. ***First***, Samsung's proposed construction introduces an ambiguous additional limitation, "reference symbol," that is found nowhere in the '331 Patent. And a POSITA would not equate "pilot symbol" and "reference symbol." *Id.* at ¶ 94. More specifically, a POSITA would "recognize that whether a 'pilot symbol' is also a 'reference symbol' may depend on context or particular circumstances." *Id.*

[redacted]

Samsung's construction seeks to alter the straight-forward claim language of "pilot symbol" by introducing extraneous text taken out of context from the prosecution history of the '331 Patent. Ex. G ⁋ 90 (citing Ex. N, Mar. 18, 2013 Response at Empire_0000777-78). Specifically, Samsung identifies the applicants' response to an office action that cited a prior-art reference, U.S. Publication No. 2010/0202559 ("Luo"), in which the applicants described various disclosures in Luo as including "a first reference signal" and a "second reference signal." *Id.* Applicants' description of Luo does not constitute a clear and unmistakable intent to depart from the ordinary meaning of this term. *See Luminara*, 814 F.3d at 1353. In fact, the applicants were merely describing the disclosures in Luo using Luo's own terminology, and a POSITA would not reasonably discern an attempt to disavow coverage of "pilot symbol" from simply repeating words that appear in a prior-art reference. None of the applicants' statements, individually or taken together, could be properly understood as a disclaimer of claim scope, let alone a disclaimer resulting in Samsung's proposed construction. *See Massachusetts. Inst. of Tech.*, 839 F.3d at 1120 ("A skilled artisan would not read these statements in context as limiting the invention . . . .").

***Second***, Samsung's proposed construction impermissibly adds a ***second*** limitation to "pilot symbol" that requires it be "known by the transmitting and receiving devices of a communications system" (*i.e.*, ***known by the transmitting device (or devices) and more than one receiving device***). Claim 1 is a method claim directed to decoding a signal that requires receiving a pilot symbol ***over the communications channel*** and makes no reference to "transmitting and receiving devices of a communications system." A POSITA would understand that a "communications channel" does not require multiple transmitting and receiving devices. Ex. C ¶ 95.

Contrary to Samsung's proposed construction, the specification discloses pilot symbols transmitted by a single transmitting device and multiple transmitting devices and received by a

[redacted]

single receiving device and multiple receiving devices. Ex. B at 1:24-26, 6:47-48, 6:64-65, 9:65-67. In fact, the specification refers to a transmitter, receiver, and one or more antennas associated with each. *See id.* at 1:31-33 ("The signals received by ***a receiver*** over the communications channel may be related to the transmitted signals by a channel matrix H." (emphasis added)), 3:3-5, 30 (listing exemplary communications devices, including a transmitter and a receiver), 4:64-67 ("***The transmitter*** **160** may be configured to transmit the encoded data over the communications channel **105** via the cooperative operation of the transmitter **160** and ***one or more of antennas*** **112** and/or **114**." (emphasis added)), 5:7-8, 13-17 ("***The receiver*** **172** is configured to cooperate with antenna **119** to receive signals over the communications channel **105** and provide the received signals to decoder **174**. Although not shown in FIG. 1, in some examples, ***multiple antennas*** may be provided at the communications device **115**." (emphasis added)), 5:21-23 ("***Any suitable receiver may be used and the receiver*** **172** may be implemented in hardware, software, or combinations thereof." (emphasis added)).

Samsung's construction seeks to import a single, isolated statement from the specification that "pilot symbols correspond to symbols known by the transmitting and receiving devices of a communication system." *Id.* at 8:55-57. But this statement is not an express or implied definition because "[t]he standards for finding lexicography . . . are 'exacting.'" *Luminara*, 814 F.3d at 1353 (quoting *GE Lighting Sols.*, 750 F.3d at 1309). "To act as a lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' and 'clearly express an intent to redefine the term.'" *Id.* (quoting *Thorner*, 669 F. 3d at 1365). That is simply not the case here. This single sentence is not meant to describe anything other than a POSITA's customary understanding of the term and thus a POSITA would not recognize this description in the specification as a special definition. *See Phillips*, 415 F.3d at 1313-16; Ex. C ¶ 98. This sentence should also be understood

[redacted]

in context and not divorced from the rest of the specification, as the next sentence refers to a single receiving device: "By decoding signals encoding a known pilot symbol, ***a receiving device*** may generate an estimate of the channel matrix . . . ." Ex. B at 8:57-60 (emphasis added).

**c. Samsung's Proposed Construction Contradicts Its IPR Position.**

In its IPR petition, Samsung stated that the terms do not require express construction. Ex. E at 9. Samsung also quoted a prior-art reference for the proposition that "known data" is the "main feature of pilots" and thereby conceded that pilot symbols are data—a position Samsung now appears to dispute. *Id.* at 21, 27. In addition, Samsung never stated in its Petition that more than one transmitting device and more than one receiving device are required to disclose the pilot symbol limitation. *See id*. at 10, 46-47; *see also id.* at 16-17, 24, 51, 55-56.

**2. "a channel matrix of the communications channel"**

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"a channel matrix of the communications channel"**<br><br>**(Claims 1, 5)** | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) | a matrix of data representing the operation of the communications channel on the transmitted data symbols |

This term should be construed according to its plain and ordinary meaning because no evidence of disavowal or lexicography exists to support Samsung's proposed construction. *Thorner*, 669 F.3d at 1365.

**a. The Claims and Specification Support Empire's Construction.**

The term "a channel matrix of the communications channel" is used in the claims and specification of the '331 Patent consistently with its plain meaning. The specification of the '331 Patent does not disavow or redefine the scope of this term.

The claims identify that certain data is used to estimate a channel matrix of the communications channel and describe how the channel matrix is used. For example, claim 1 recites

[redacted]

that a channel matrix of the communications channel is estimated based, at least in part, on the pilot symbol. Ex. B at 15:42-16:7. Claim 1 also makes clear that the channel matrix is used to decode replicated data. *Id.* Additionally, an updated estimate of the channel matrix is generated based, at least in part, on the replicated data, and used to decode subsequently received signals over the communications channel. *Id.* No claim language refers to "*the operation of* the communications channel *on the transmitted data symbols*."

The specification provides further details about a channel matrix and a communications channel. It explains that a communications channel "may introduce a variety of non-idealities to a transmitted signal" that "may be caused by . . . properties of a communications channel," and received signals "may be related to the transmitted signals by a channel matrix H." *Id.* at 1:27-33. The specification further explains that the "channel matrix H may provide a representation of effects such as reflections in the communication channel," "may vary over time, and may be calculated periodically in some examples." *Id.* at 6:5-9.

The '331 Patent describes estimating a channel matrix using pilot symbols. For example, the specification explains that "[b]y decoding signals encoding a known pilot symbol, a receiving device may generate an estimate of the channel matrix of the communications channel." *Id.* at 8:57-60. In connection with Figure 1, the '331 Patent states that "channel estimator **178** may be configured to estimate all or a portion of a channel matrix H associated with the communications channel **105**" and "may utilize pilot symbols to estimate the channel matrix." *Id.* at 5:43-47.

The specification further discusses estimating a channel matrix using replicated data symbols and using that estimate to decode subsequently received data. For example, the specification explains that replicated data can be used to "improve estimates of a channel matrix associated with a communications channel," and "accuracy of the channel matrix estimate may

[redacted]

increase" when more replicated data is inserted into a data stream. *Id.* at 9:20-24; *see also id.* at 7:14-16, 7:36-39, 7:43-46. A POSITA would recognize that Figure 7 and its description further demonstrate the specification's use of the plain and ordinary meaning of this claim term. *See id.* at Fig. 7, 9:43-44, 10:8-10, 10:36-37, 10:40-44; Ex. C ¶¶ 103, 107.

**b. Samsung's Proposed Construction Is Incorrect.**

Samsung presents no valid reason for narrowing this term beyond its ordinary meaning. Samsung's proposed construction confuses rather than provides clarity, because it purports to limit or redefine the claim term by reciting a function of the channel matrix, namely "the operation of the communications channel on the transmitted data symbols." Dr. Akl confirms a POSITA would "recognize that Samsung's proposed construction appears to describe the term based on its functionality as opposed to providing its meaning." Ex. C ¶¶ 108, 110. Case law is clear that claim terms are not construed to mean their function. *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation."); *Phoenix Licensing, L.L.C. v. Advance Am.*, No. 2:15-CV-1367-JRG-RSP, 2016 WL 6217180, at *21-22 (E.D. Tex. Oct. 25, 2016) (finding that "Defendants have failed to provide a persuasive reason for redrafting the disputed phrase" where they sought "to emphasize that the software routine executed on the processor serves to automatically, and without human intervention, prepare a first electronic communication").

Samsung's construction also improperly incorporates isolated statements from the specification. For example, the specification states that "communications channel **105** may be characterized by the channel matrix H describing the operation of the communications channel **105** on transmitted symbols" and "the channel matrix generally refers to a matrix of data which may represent the operation of the communications channel on the transmitted data symbols." Ex.

[redacted]

F at 8 (citing Ex. B at 1:27-36, 6:1-7); Ex. G ⁋⁋ 95-96 (quoting Ex. B at 1:33-35). But Samsung's cited passages do not demonstrate any intent to redefine "channel matrix." *Cf. Luminara*, 814 F.3d at 1353; Ex. C ¶ 110 ("A POSITA would not understand these passages to constitute a special definition … or a reference to anything other the plain and ordinary meaning of the term."). Instead, those cited passages describe a function of the channel matrix that is not recited in the claims, and where a claim term is well understood in the field of wireless communications, such limitations from the specification are not imported into the claims. Ex. C ⁋⁋ 108-09; *see also Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims.").

Samsung's statements in its IPR papers undermine its proposed construction here. Samsung's IPR Petition uses "channel matrix" consistently with its plain meaning. For example, it uses "channel matrix" and "channel estimate" interchangeably and describes prior-art references as purportedly disclosing a "a channel matrix of the communications channel" without referring to an operation on transmitted data symbols. *See, e.g.*, Ex. E at 10, 18-19. Similarly, Samsung's expert declaration in support of its IPR Petition opines that a "POSITA would have recognized that estimating the channel state corresponds to estimating the channel matrix" and "channel state information is modeled as a matrix (the channel matrix)." Ex. O, Valenti Decl. at ¶¶ 53-57, 95, 166.

**3. "replicated data"**

| Term To Be Construed | Empire's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| **"replicated data"**<br><br>**(Claims 1-5)** | "duplicated data" | "copied non-pilot symbols"<br><br>Alternatively, indefinite under 35 U.S.C. § 112. |

The claims, intrinsic record, and extrinsic evidence demonstrate that the ordinary meaning of "replicated data" is "duplicated data," or multiple instances of the exact same data. Additionally,

[redacted]

Samsung's indefiniteness argument fails because a POSITA would be able to ascertain the meaning of "replicated data" with reasonable certainty. *Nautilus*, 572 U.S. at 910; Ex. C ¶ 126.

Samsung's proposed construction seeks (i) to exclude pilot symbols by replacing data with the negative limitation "non-pilot symbols," and (ii) to capture mathematical representations of data that are not identical but may be considered *copies or representations* of data, such as complex conjugates. For the reasons discussed below, Samsung's construction is incorrect.

**a. The Claims Support Empire's Construction.**

The claims demonstrate that the ordinary meaning of "replicated data" is "duplicated data." Claim 1 is directed to, in relevant part, a "method of decoding a signal transmitted over a communications channel" that comprises receiving a pilot symbol over the communications channel, estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol, receiving replicated data from multiple data streams transmitted over the communications channel, and generating an updated estimate of the channel matrix based, at least in part, on the replicated data. Thus, the claim makes clear that both a pilot symbol and replicated data are used in estimating a channel matrix of the communication channel.

The claims also distinguish between replicated data and copies of encoded data. Dependent claims 2-4 involve decoding replicated data using specific techniques (joint detection, space-time block decoding, and space-frequency block decoding). The techniques recited in claims 2-4 are used to decode multiple, non-exact copies of data that were coded using certain techniques. *See* Ex. C ¶ 117. Thus, it follows that "replicated data" in claim 1 must be different than copies of data encoded using a specific technique. Otherwise, the limitations of claims 2-4 would be superfluous. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."); *Apple, Inc. v.*

[redacted]

*Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant.").

**b. The Specification Supports Empire's Construction.**

The specification further demonstrates that the ordinary meaning of "replicated data" is "duplicated data." The specification explains that replicated data is akin to pilot symbols because both are data known to the receiver. Specifically, the invention of the '331 Patent is directed "to the use of replicated data as a pilot symbol in a communications system." Ex. B at 4:3-5. The '331 Patent also states that the "use of replicated data symbols as pilot symbols may advantageously increase the channel estimation accuracy" and "the number of pilot symbols may be effectively increased through the use of replicated data symbols." *Id.* at 9:5-7, 10:54-56. Further confirming their analogous nature, the specification explains that "the replicated data symbols may be utilized in a manner similar to pilot symbols to estimate the communications channel." *Id.* at 7:14-16.

For example, in Figure 5, the specification describes data symbols (**530** and **531**) as being replicated from one frequency to another in data stream **510**. *Id.* at Fig. 5, 8:15-21. The replicated data are duplicated instances of the exact same data, *e.g.*, S3 at data symbol **530** appears twice in data stream **510**, as shown in green in annotated Figure 5 below.[5] At the same time, Figure 5 depicts data symbols, shown in red below, that are coded by using different mathematical representations of the data symbols across streams **510** and **515**. For example, S1 in data stream **510** is coded as S1* in data stream **515**. Since they are not multiple instances of the exact same data, the specification does not describe these coded data symbols as replicated data.

[5] Empire and Samsung agree that Figure 5 contains a typographical error. S4 in first stream 510 should be -S4* and S3 in second stream 515 should be S3*. A correct depiction appears in [redacted] shown herein.

[redacted]




*Id.* at Fig. 5 (annotated).

[redacted]

Extrinsic evidence also confirms that "replicated data" is "duplicated data," or multiple instances of the exact same data, as various dictionaries define "replicate" in this manner. Ex. Q, Bloomsbury ("to make an identical version of something repeatedly and exactly"); Ex. R,

[redacted]

Longman ("make an exact copy"); Ex. S, Merriam-Webster's ("duplicate, repeat"); Ex. T, Random House Webster's ("to repeat, duplicate, or reproduce").

**c. Samsung's Proposed Construction Is Incorrect.**

Samsung's attempt to import the negative limitation "non-pilot symbols" is incorrect. That limitation never appears in the patent. Moreover, the specification repeatedly describes replicated data as being used as, or at least acting as, pilot symbols. Ex. B at 4:3-5, 9:5-7, 10:54-56, 7:14-16. Under such circumstances, there is no basis to add a negative limitation, particularly where it would contradict express teachings of replicated data in the specification. *See Omega Eng'g*, 334 F.3d at 1323; *Linear Tech.*, 566 F.3d at 1060 (declining to add a negative limitation to a claim term where "there is no basis in the patent specification"). Even Samsung's expert confirms the analogous nature of "replicated data" and "pilot symbols" in stating a "POSITA would understand that a receiver would need to be aware in advance of which data symbols are replicated in order to compare them for purposes of channel estimation" since pilot symbols would also need to be known to the receiver in order to compare them for purposes of channel estimation. Ex. G ¶ 107.

Samsung's expert complains that "Empire's interpretation leaves ambiguous whether the 'data' being replicated could consist of pilot symbols, as opposed to payload data symbols." *Id.* at ¶ 108. That's not true, and it pre-supposes (incorrectly) that pilots and data are never the same thing. The patent does not say replicated data must always be payload data. Although the patent recognizes that where replicated data is payload data the overall reduction in data rate "may not be as severe as if more known pilot symbols were inserted," Ex. B at 9:25-27, the patent is not limited to that situation. The specification teaches that "the number of pilot symbols may be effectively increased through the use of replicated data symbols," *id*. at 10:54-56, and simply does

[redacted]

not distinguish between pilot symbols and payload data symbols in a manner that warrants redefining "replicated data" with the negative limitation "non-pilot symbols."

Samsung's positions in its IPR Petition undermine its proposed construction. For example, in the IPR, Samsung has not taken the position that "replicated data" excludes pilot symbols. To the contrary, Samsung asserts that various prior-art disclosures of redundant data or pseudo-pilot data are forms of pilot symbols that disclose "replicated data." Ex. E at 21 ("[R]edundant payload data/pseudo-pilot data … are 'payload data which are intended to be handled as pilot signals….'"), 89 ("Tang explains that … the received replicated data symbols … 'are regarded as extra 'pilot symbols' and can be used to compute the channel frequency response[.]'"); *see also id.* at 53-55.

Samsung's IPR Petition also conflicts with its definiteness arguments here. Samsung demonstrated that it understood the meaning of "replicated data" by arguing that various prior-art references disclose the term. *See Sonix Tech.*, 844 F.3d at 1380 ("Appellees' other actions during litigation also reflect that they understood [the term]."). The inconsistency between Samsung's positions taken in this Court and the IPR further support Empire's proposed constructions.

[redacted]

Respectfully submitted,

Dated: November 27, 2024

*/s/ Nathaniel Browand*
Nathaniel Browand (admitted *pro hac vice*)
New York Bar No. 4349981
Christopher Gaspar (admitted *pro hac vice*)
New York Bar No. 2932762
Leslie Irwin (admitted *pro hac vice*)
New York Bar No. 6060545
Nicholas Fallah (admitted *pro hac vice*)
New York Bar No. 6090542
MILBANK LLP
55 Hudson Yards
New York, New York 10001
(212) 530-5000
nbrowand@milbank.com
lirwin@milbank.com

Marina Markarian (admitted *pro hac vice*)
California Bar No. 340686
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, California, 90067
(424) 386-4000
mmarkarian@milbank.com

Elizabeth L. DeRieux
Texas Bar No. 05770585
CAPSHAW DERIEUX, LLP
114 East Commerce Avenue
Gladewater, Texas 75647
(903) 845-5770
ederieux@capshawlaw.com

*Attorneys for Plaintiff*
*Empire Technology Development LLC*

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2024, all counsel of record are being served with a copy of the foregoing document via electronic mail.

*/s/ Nathaniel Browand*
Nathaniel Browand

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document is being filed under seal pursuant to the Protective Order entered in this matter.

*/s/ Nathaniel Browand*
Nathaniel Browand