**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

EMPIRE TECHNOLOGY DEVELOPMENT LLC,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC.,

Defendants.

Civil Action No. 2:23-cv-00427-JRG

JURY TRIAL DEMANDED

[redacted]

**PUBLIC VERSION**

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF ON <u>THE DISPUTED TERMS OF U.S. PATENT NOS. 8,798,120 AND 8,565,331</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. THE ’120 PATENT DISPUTED TERMS ..... 1

A. Overview of the ’120 Patent ..... 2

B. The “in accordance with” limitation ..... 2

1. Samsung’s construction is supported by the claim language while Empire seeks to improperly rewrite the claims ..... 3

2. Samsung’s construction is also supported by the specification, while Empire argues for a meaning *opposite* of what the specification says. ..... 5

3. If the controller’s selected mode need only be “compatible with” the control signal, then this claim term is indefinite. ..... 6

C. “power consumption of the first and second circuitry” ..... 7

1. The intrinsic evidence, and the prosecution history in particular, strongly supports Samsung’s construction ..... 7

2. Empire’s arguments regarding the prosecution history fail. ..... 10

D. “an idle power consumption of the mobile station” ..... 12

1. The intrinsic evidence, and the patent specification in particular, strongly supports Samsung’s construction ..... 13

2. Empire’s arguments are directly contrary to the specification. ..... 14

III. THE ’331 PATENT DISPUTED TERMS ..... 15

A. Overview of the ’331 Patent ..... 15

B. “pilot symbol” ..... 16

1. Samsung’s construction is the plain meaning of “pilot symbol” in the ’331 Patent, the prosecution history, and in the art. ..... 17

2. Empire seeks to conflate “pilot symbol” with “replicated data.” ..... 18

C. “a channel matrix of the communications channel” ..... 21

1. The applicants’ defined this term in the specification. ..... 21

2. Empire never says what the term means, yet insists it has some unstated “plain and ordinary meaning.” ..... 22

D. “replicated data” ..... 24

1. Only Samsung’s construction is supported by the intrinsic evidence ..... 24

**TABLE OF CONTENTS**
(continued)

**Page**


2. Empire's construction is contrary to the purpose of the invention. ......... 27

3. If "replicated data" is not "copied non-pilot symbols," it is indefinite. ........ 30

IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ..................................................................................... 26

*Baran v. Med. Device Tech., Inc.*,
616 F.3d 1309 (Fed. Cir. 2010) ....................................................................................... 6

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) ..................................................................................... 26

*Berkheimer v. HP Inc.*,
881 F.3d 1360 ................................................................................................................. 7

*D Three Enter., LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018) ....................................................................................... 8

*Eon Corp. IP Holdings LLC v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ....................................................................................... 2

*Every Penny Counts v. Am. Express Co., et al.*,
563 F.3d 1378 (Fed. Cir. 2009)…………………………………………………………17

*Garrity Power Servs. LLC v. Samsung Elecs. Co.*,
No. 2:20-CV-00269-JRG, 2021 WL 3403747 (E.D. Tex. Aug. 4, 2021) ......................... 20, 21

*Kinik Co. v. Int'l Trade Com'n.*,
362 F.3d 1359 (Fed. Cir. 2004) ..................................................................................... 11

*Lemelson v. Gen. Mills, Inc.*,
968 F.2d 1202 (Fed. Cir. 1992) ..................................................................................... 10

*Lenovo Holding Co., Inc. v. DoDots Licensing Sols. LLC*,
2021 WL 5822248 (Fed. Cir. Dec. 8, 2021) ................................................................... 26

*Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*,
927 F.3d 1232 (Fed. Cir. 2019) ..................................................................................... 22

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ..................................................................................... 11

*PODS, Inc. v. Porta Stor, Inc.*,
484 F.3d 1359 (Fed. Cir. 2007) ..................................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016) .......... 6

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......... 1

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) .......... 22

*Seachange Int'l, Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) .......... 11

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004) .......... 23

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008) .......... 6

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
336 F.3d 1322 (Fed. Cir. 2003) .......... 10

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......... 23

*Unwired Planet, LLC v. Apple Inc.*,
829 F.3d 1353 (Fed. Cir. 2016) .......... 4

Samsung respectfully submits this Responsive Claim Construction Brief for the disputed terms of U.S. Patent Nos. 8,798,120 ("the '120 Patent," Ex. A) and 8,565,331 ("the '331 Patent," Ex. B). This brief is supported by the expert declaration of Dr. Danijela Cabric. Ex. G.[1]

## I. INTRODUCTION

Samsung's proposed constructions adopt the plain meaning of the claim terms in light of the intrinsic evidence and provide clarity to complex claim terms. They stay "true to the claim language" and align "with the patent's description of the invention." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Indeed, a number of Samsung's constructions come straight from the specification. There really should be no dispute.

In sharp contrast, Empire seeks to erase all meaning from the claims, recapture that which was distinguished in prosecution, and rewrite the claims such that they are untethered from the patents. This includes implausible arguments such as a selection made contrary to a control signal is somehow "in accordance with" that signal even though the '120 Patent states the opposite, describing this as "***not*** … in accordance with." Likewise, for the '331 Patent, Empire implausibly argues that "replicated data" used to replace a "pilot symbol" could be just another pilot symbol. Empire's positions are contrary to the claims, specifications, and the law, and would undermine the core concepts of the claimed inventions. These extreme positions confirm that construction of the terms is necessary and Samsung's constructions should be adopted.

## II. THE '120 PATENT DISPUTED TERMS

For each of the terms of the '120 Patent, Samsung's proposed construction represents the plain and ordinary meaning of the term, as used throughout the specification and the claims. But,

[1] For ease of reference and the elimination of duplicate exhibits, Samsung cites to Exhibits A through T (Dkt. 54-1 through Dkt. 54-19 and Dkt. 53-2) for evidence already submitted by Empire. Additional evidence cited by Samsung will be cited beginning with Exhibit 1 and will refer to exhibits to the Declaration of Marc J. Pensabene, filed herewith.

because the parties dispute the scope of the "plain and ordinary meaning," the Court should clarify the meaning of the terms. *See Eon Corp. IP Holdings LLC v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (plain and ordinary meaning "may be inadequate … when reliance on the term's ordinary meaning does not resolve the parties' dispute.").

### A. Overview of the '120 Patent

The '120 Patent describes a system that selects a multiple-input-multiple-output (MIMO) communication mode, which communicates data using multiple transmit antennas and multiple receive antennas, or a single-input-multiple-output (SIMO) mode, which communicates data using a single transmit antenna and multiple receive antennas, for transmissions between a mobile station (*e.g.*, a cell phone) and a base station (*e.g.*, a cell tower). Ex. A, Abstract, 1:17-28. The use of, and switching between, MIMO and SIMO modes in a communication system was known prior to the '120 Patent. *Id.*, 1:29-33. The claimed improvement of the '120 Patent is making this selection between MIMO and SIMO based on certain factors, such as the power consumption of the MIMO/SIMO transmission circuitry, the idle power consumption of the mobile station, and/or the number of users of the communications system. *Id.*, Claims 25, 29.

### B. The "in accordance with" limitation

| Claim Term | Samsung's Construction | Empire's Construction |
|---|---|---|
| "wherein the controller is configured to receive a control signal and, ***in accordance with the control signal, to select*** between a multiple-input multiple-output (MIMO) mode … and a single-input multiple-output (SIMO) mode …"<br>(Claims 25 and 29) | "wherein the controller is configured to receive a control signal and to select between a MIMO mode and a SIMO mode as indicated by the control signal"<br><br>Alternatively, the term is indefinite. | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) |

All of the intrinsic evidence makes clear that the "in accordance with" limitation of the claims requires "the controller [be] configured to receive a control signal and to select between a

MIMO mode and a SIMO mode ***as indicated by*** the control signal," as Samsung proposes. By contrast, Empire completely rewrites the claim term, injecting language found nowhere in the patent, all in an attempt to disregard the control signal altogether. As a result, Empire interprets "in accordance with" to mean what the patent explicitly describes as the opposite—*i.e.*, "***not*** … in accordance with." Such an absurd interpretation should be rejected. It is not only contrary to the claim language and specification but eviscerates the very essence of the purported invention.

**1. Samsung's construction is supported by the claim language while Empire seeks to improperly rewrite the claims.**

Looking first to the claims, the plain language supports Samsung's construction and flatly contradicts Empire's arguments. Both independent claims recite:

> wherein the controller is configured to receive a control signal and, <u>**in accordance with the control signal, to select between**</u> a multiple-input multiple-output (MIMO) mode … and a single-input multiple-output (SIMO) mode …, wherein <u>**the control signal is based, at least in part, on**</u> a power consumption of the first and second circuitry, wherein <u>**the control signal is based, at least in part, on**</u> [an idle power consumption of the mobile station (claim 25)/a number of users of the communications system (claim 29)]

Thus, while the ***control signal <u>received</u> by the controller*** may be based on factors, such as power consumption and number of users, ***the selection*** between MIMO and SIMO is "in accordance with" (*i.e.*, as indicated by) the control signal. Ex. G ¶¶48-56. This is the plain and ordinary meaning of the claim term. Nothing in the claim suggests that the controller can disregard the control signal and make its own, independent selection based on some other, unidentified factors.

Empire repeatedly argues that the claims require only that "the controller is configured to select between a MIMO mode and SIMO mode ***while operating*** in accordance with the control signal." *See, e.g.*, Dkt. 53, 3-4 (emphasis added), 5, 6, 7. But Empire's "while operating" language completely rewrites the claims. Indeed, the phrase "while operating" does not appear anywhere in the claims or the specification. Instead, the claims require the controller to be

configured to receive the control signal and ***to select*** between a MIMO mode and a SIMO mode as indicated by the control signal, as Samsung proposes.[2] Ex. A, Claim 25 ("wherein the controller is configured to receive a control signal and, ***in accordance with the control signal, to select between*** a … (MIMO) mode … (SIMO) mode").

Attempting to justify its unsupported insertion of the phrase "while operating," Empire explains that, in one embodiment, the mobile station "takes th[e] mode" indicated by the control signal "into account while also considering 'other criteria'" to, in some instances, "override" the mode indicated by the control signal. Dkt. 53, 6-7. But that is not what is recited in Claims 25 and 29. While the claims recite that the ***control signal*** (received by the controller) is based on specific factors, including power consumption of the first and second circuitry, the claims require the controller ***to select MIMO/SIMO as indicated by ("in accordance with") the control signal***. If the patentees had intended the controller to consider "other criteria" in addition to the control signal in making the MIMO/SIMO selection, as Empire argues, they plainly knew how to do so. For example, the claims repeatedly recite that the control signal is based "at least in part" on a variety of factors. In contrast, the MIMO/SIMO selection must be "in accordance with" the control signal. The fact that the patentees did not recite other criteria for the selection is strong evidence that they did not intend such "other criteria" to be considered. *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358-59 (Fed. Cir. 2016) (construing a term to not require a limitation that the patentee had expressly recited in other terms).

Empire's reliance on unasserted Claims 16 and 24 is also misplaced, as those claims do not contain the same disputed claim language. *See* Dkt. 53, 7-8. Further, while asserted Claims 25 and 29 are directed to the "mobile station" (the cell phone), unasserted Claims 16 and 24 are

[2] This is true regardless of whether the "in accordance with the control signal" clause modifies the controller's selection or the configuration of the controller to perform the selection.

directed to the base station (the cell tower). Regardless, if they were to be considered, they support Samsung's construction, not Empire's. Claims 16 and 24 expressly describe the base station deciding whether to select MIMO or SIMO based on a number of factors, including the "energy consumption" of the transmission circuitry. Ex. A, Claim 16. But Claims 25 and 29 do ***not*** describe the mobile station's controller making the MIMO/SIMO selection based on any other factors. Rather, as explained above, the selection is "in accordance with" ("as indicated by") the control signal. Stated differently, both sets of claims contemplate a base station selecting between MIMO/SIMO mode (which may be based on various factors), sending that selection to the mobile station, and the controller in the mobile station receiving that selection (*e.g.*, as indicated by a "control signal") and selecting the MIMO/SIMO mode for use in the mobile station as directed by the base station. If the mobile station were free to ignore the clear direction from the base station, and to not act in accordance with the instructions received from the base station, then communications would break down in the communications system.

**2. Samsung's construction is also supported by the specification, while Empire argues for a meaning *opposite* of what the specification says.**

The specification likewise supports Samsung's construction and directly contradicts Empire's. As Empire acknowledges, the '120 Patent discloses two different embodiments. In the first, the mobile station's controller receives a control signal that indicates whether it is to select MIMO or SIMO, and the controller makes the selection as indicated by that control signal. Ex. A, 11:36-38 ("The controller 475 may be provided with ***a signal indicative of the selected mode***[.] Based on the received signals, the controller may configure the encoder 470 to encode data using the selected mode[.]"). Claims 25 and 29 are directed to this embodiment, reciting a mobile station in which the "controller is configured to receive a control signal and, ***in accordance with*** the control signal, to select between [a MIMO mode and a SIMO mode]." *Id.*,

Claims 25, 29. This embodiment is consistent with and supports Samsung's construction: "wherein the controller is configured to receive a control signal and to select between a MIMO mode and a SIMO mode as indicated by the control signal."[3]

Empire relies on the second embodiment, where the mobile station controller may, as Empire states, "override the base station's MIMO/SIMO selection based on parameters of the mobile station." Dkt. 53, 6-7. But, while Empire quotes the description of this embodiment, it ignores the key language describing it as " ***not*** … ***in accordance with***" the selected mode:

> In some examples, the controller 475 may **not** configure the encoder 470 **in accordance with** the mode selected by the base station 405, but may override that selection based on some other criteria. For example, if a battery power at the mobile station 410 is too low to implement a mode selection made by the base station 405, the controller 475 may implement a different mode.

Ex. A, 11:50-56 (emphasis added). By their plain language, Claims 25 and 29 do not cover this.

Accordingly, Samsung's proposed construction is correct, and should be adopted.

#### 3. If the controller's selected mode need only be "compatible with" the control signal, then this claim term is indefinite.

In the event that the Court does not construe the term as Samsung proposes, then the term is indefinite. Empire concedes that its interpretation of the term requires nothing more than the controller's selected mode to be "compatible with" the control signal. Dkt. 53, 9. But Empire does not explain what it means to be "compatible with" the control signal if it is not "as indicated by" the control signal (as proposed by Samsung). Empire states that the controller need only

[3] Empire argues but does not explain how Samsung's proposed construction excludes both embodiments of the patent. As described, Samsung's construction is supported by the first embodiment and the law does not require all claims to cover all disclosed embodiments. *See, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (rejecting the proposition that "each and every claim ought to be interpreted to cover each and every embodiment"); *Baran v. Med. Device Tech., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment."); *TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed.")

"consider" the control signal to be compatible with it, but this does not answer the question, particularly where Empire also interprets completely disregarding or overriding the control signal to be "compatible with" it. Accordingly, a person of ordinary skill in the art ("POSITA")[4] would not understand the invention's scope "with reasonable certainty" and the term is indefinite (*see, e.g.*, Ex. G ¶¶48-56). *See, e.g.*, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1360-64.

### C. "power consumption of the first and second circuitry"

| Claim Term | Samsung's Construction | Empire's Construction |
|---|---|---|
| "power consumption of the first and second circuitry" (Claims 25 and 29) | "power used by the first and second physical transceiver circuitry, not the signal energy" | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) |

The primary disputes are (i) whether the claimed "first and second circuitry" means the "physical transceiver circuitry," and (ii) whether "power consumption" of such circuitry should be construed to exclude the "signal energy" emitted by the antennas of the mobile station, as Samsung proposes. Despite posing its construction as "plain and ordinary meaning," Empire argues for a reading of the claims that is anything but. Empire argues that "circuitry" need not actually include any physical circuitry, but instead may be met by software. Dkt. 53, 12. Empire also argues that "power consumed" by the circuitry could be satisfied by the "signal energy" that circuitry ***emits***. *Id.*, 10-14. Neither is supported by the claims or the intrinsic evidence. Empire's purported "plain and ordinary meaning" demonstrates why claim construction is needed here.

#### 1. The intrinsic evidence, and the prosecution history in particular, strongly supports Samsung's construction

**<u>Claims</u>**: The claims recite "first and second circuitry" and a control signal that is "based, at least in part, on a power consumption of the first and second circuitry." Samsung's proposed construction is consistent with the plain and ordinary meaning of these terms. Ex. G ¶¶57-76. For

[4] Empire has adopted Samsung's definition of a POSITA for both patents. Dkt. 53, 2.

example, Samsung clarifies that the first and second circuitry are the "physical transceiver circuitry," and that "power consumption" refers to "power used" by this circuitry, not the signal energy ***emitted by*** this circuitry.

**Specification and Prosecution History**: Samsung's proposed construction is also consistent with and fully supported by the specification.

***First***, as Empire acknowledges (Dkt. 53, 10), the specification's description of the "first and second circuitry" identifies the physical components shown in Figure 4 of the patent:

> **The first circuitry** may include a **digital-to-analog converter** 455, **a filter** 456, **a mixer** 457, **a filter** 458, and **a power amplifier** 459. . . . **The second circuitry** 460 may also include a **digital-to-analog converter** 461, **a filter** 462, **a mixer** 463, **a filter** 464, and **a power amplifier** 465.

Ex. A, 7:18-27. And Empire concedes that "the power consumption of the circuitry is, *e.g.*, nothing more than the power consumed ***by these various circuit components***." Dkt. 53, 10 (emphasis added). In other words, Empire wholly agrees that the only examples of the first and second circuitry given in the specification are all physical transceiver circuits, consistent with the plain and ordinary meaning and Samsung's construction.

To contradict this express description of the "first and second circuitry" in the specification, Empire points only to boilerplate, catchall language at the end of the patent:

> it will be understood by those within the art that each ***function and/or operation*** within such ***block diagrams, flowcharts***, or examples can be implemented, individually and/or collectively, by a wide range of hardware, ***software***, firmware, or virtually any combination thereof.

Ex. A, 13:65-14:2. The Federal Circuit has routinely rejected using this type of form language to enlarge claims beyond what is described and enabled in the specification. *E.g., D Three Enter., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018). Regardless, the first and second circuitry are not shown in "block diagrams" or "flowcharts," as referenced in the boilerplate quote. Rather, as Empire admits, the first and second circuitry are shown in the "schematic

illustration" of Figure 4, which the quoted boilerplate does not even mention. Ex. A, 1:55-57.

***Second***, the specification confirms that "power consumption" is not emitted "signal energy." As Empire acknowledges, basing a control signal on "signal energy" is "found ***nowhere*** in the patent." Dkt. 53, 12 (emphasis in original); *see generally* Ex. A. This implicitly concedes that a construction of "power consumption" contrary to its plain meaning to ***include*** the emitted "signal energy" is ***not*** warranted by the specification.

***Third***, the prosecution history confirms this conclusion and provides particularly strong support for the express exclusion of "signal energy." As originally filed, pending claim 27 (which issued as asserted Claim 25) was identical to Claims 25 and 29 of the issued patent but did not include any criteria on which the control signal was based; that is, it did not include, *inter alia*, the "power consumption of the first and second circuitry" language. *See* Ex. 1. The Examiner rejected pending claim 27 as obvious over a prior art patent called "Xu," in view of other prior art (Ex. 2), and the applicants requested an Examiner interview to discuss. The Examiner memorialized this interview, including the agreement reached with the applicants:

> Discussed the application of the Xu reference to the entered claims, and the Examiner's reasoning for the application of the Xu reference with regards to the changing of modes based on energy consumption. A grounds for amendment was discussed, **and agreed on,** to amend the claims to explicitly state that **the power consumption is with regards to the physical transceiver circuitry, not the signal energy**. Both sides also agreed that Xu would not be applicable to such an amendment.

Ex. 3. That is, the Examiner and the applicants agreed that (i) "power consumption … with regard to the physical transceiver circuitry" (as would be reflected in the amended claims) ***is different than the "signal energy"*** emitted by the circuitry, and (ii) Xu would not be a grounds for rejection so long as the claims were amended to include such a limitation. *Id.*

Consistent with the Examiner's summary, after the interview, the applicants amended pending claim 27 (later issued as asserted Claim 25) to include the requirement that the control

signal is based on the "***power consumption of the first and second circuitry***," exactly as recited in the final issued claims. Ex. 4. Thus, the prosecution history makes clear that the applicants and the Examiner understood that the claimed invention was directed to selecting between MIMO and SIMO based on the power consumption of the physical transceiver circuitry, "not the signal energy" emitted by that circuitry. *See, e.g., Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1207 (Fed. Cir. 1992) (holding that a patentee acquiescing in an examiner's rejection of a broad claim by filing narrower claims cannot later regain the broader scope previously abandoned).

**2. Empire's arguments regarding the prosecution history fail.**

Empire does not dispute that Samsung's proposed construction is substantively correct or that Samsung accurately captured the agreement between the Examiner and the applicants. Dkt. 53, 12-14. Instead, Empire argues only that, procedurally, the prosecution history statements do not amount to a "clear and unmistakable" disavowal and are, therefore, insufficient to warrant the proposed construction. *Id.* All five of Empire's arguments fail.

Empire first tries to dismiss this agreement because it was embodied in a summary by the Examiner and not the applicants. *Id.*, 13. But the statements expressly memorialize what was "***agreed***" between the Examiner and the applicants. Ex. 3. The applicants had the opportunity to voice any disagreement with the statements in their own summary and remarks, but instead confirmed that agreement. Ex. 5. Furthermore, the applicants amended the claims to recite "power consumption of the first and second circuitry," consistent with the Examiner's summary of the agreement with the applicants and the understanding that this amendment was pursuant to that agreement. Ex. 4; *see, e.g., TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee narrows his or her

claims by amendment … or lets stand an examiner's restrictive interpretation of a claim."); *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction").

Empire's second, third, and fourth arguments hinge on the (incorrect) assumption that the prosecution history statements apply only to the language of claim 1. Dkt. 53, 13-14. These arguments are baseless. Though application claims 27 and 29 (issued Claims 25 and 29) were not explicitly discussed in the Examiner's summary of the agreement, the applicants agreed that "***the power consumption is with regards to the physical transceiver circuitry***," and "***not the signal energy***." Their agreement regarding the scope of "power consumption" is equally applicable to all issued claims of the '120 Patent. Indeed, when discussing the amendment of application claim 27 (issued Claim 25) to include the disputed limitation, the applicants explicitly referenced the discussion of the Xu reference in connection with claim 1, thereby confirming the applicability of those arguments to claim 27. Ex. 5, 11. Thus, any construction of "power consumption" to include signal energy would cover prior art explicitly disavowed by the applicants. *See, e.g., Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005); *Kinik Co. v. Int'l Trade Com'n.*, 362 F.3d 1359, 1363-66 (Fed. Cir. 2004) (noting that "[c]laims cannot be construed as encompassing the prior art that was … disclaimed during prosecution").

Empire's fifth argument is seriously misleading and, in any case, legally wrong. Contrary to Empire's misleading characterization, application claim 27 (which issued as Claim 25) and dependent claim 28 were rejected before the above Examiner interview. Ex. 2. It was only after the above cited arguments, and after claim 27 was amended to include the limitations of claims 28 and 32, that claim 27 was allowed to issue as asserted Claim 25. The fact that dependent

claim 32 would have been allowable before the above-noted interview does not negate the clear agreement between the Examiner and the applicants regarding the scope of the claimed invention and the prior art. *See, e.g.*, *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007) (for "clear assertions made during prosecution in support of patentability," "the relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter," not "whether or not [the statements] were actually required to secure allowance of the claim").

Accordingly, Samsung's proposed construction, which incorporates the express agreement between the applicants and the Examiner with regard to the "physical transceiver circuitry" and excluding "signal energy," should be adopted.

### D. "an idle power consumption of the mobile station"

| Claim Term | Samsung's Construction | Empire's Construction |
|---|---|---|
| "an idle power consumption of the mobile station" (Claim 25) | "power used by the mobile station when it is not sending data over the communications channel" | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) |

The primary dispute centers around what is meant by a mobile station being "idle."[5] Samsung's construction reflects the plain and ordinary meaning of "idle" as referring to times in which the mobile station is not sending data over the communications channel. Empire, on the other hand, says that no construction is necessary, yet argues for a narrow meaning of "idle" requiring that ***all*** the circuitry of the mobile station must be powered on. Dkt. 53, 15-17. Empire's arguments have already been expressly rejected by the PTAB (Ex. 11 at 25-26), and this Court should do the same.

[5] Samsung's construction clarifies that "power consumption" refers to "power used" and is derived from the discussions in the prosecution history. Empire contests this portion of Samsung's construction only cursorily in a footnote, arguing "consumption" and "use" "are not necessarily equivalent" without providing explanation of how they may differ. Dkt. 53, 16, n. 4.

**1. The intrinsic evidence, and the patent specification in particular, strongly supports Samsung's construction.**

**Claims**: Claim 25 recites only "an idle power consumption of the mobile station." It includes no requirement that any specific circuitry of the mobile station remain on. The term should, therefore, be given its plain and ordinary meaning, as reflected in Samsung's construction. Empire sets up a strawman, arguing Samsung's construction would improperly capture situations in which the mobile station is "fully powered off." Dkt. 53, 16. This was not Samsung's intention, nor is it a reasonable reading of the claims. If the mobile station is "fully powered off," the controller cannot possibly "receive a control signal" or "select between" a MIMO mode and SIMO mode, as the claims require.

**Specification**: Samsung's proposed construction comports with ***every*** use of the term "idle" in the specification, all of which specify that an "idle time" is a time in which the mobile station is not sending data over the communications channel:

> The idle time is a time during which the transceiver may be ***waiting to send data over the communications channel***.

Ex. A, 2:58-62.

> However, if the transmission rate is too slow, a greater number of transceivers may become ***idle***, ***waiting to send transmissions over the communications channel***. Even if the idling transceivers turn off their transmission chains, some idle power may be consumed due to leakage current or other effects.

*Id.*, 3:2-10.

> Recall the idle time may include ***times during which the mobile station 410 is waiting to send data over the communications channel***, such as waiting for a scheduled time to begin transmission.

*Id.*, 8:55-58. Samsung's construction, thereby, accurately captures this concept of the mobile station not sending data while "idle," and Empire does not appear to dispute this point.

**2. Empire's arguments are directly contrary to the specification.**

While Empire does not propose its own construction, under the guise of "plain and ordinary meaning," it offers its own special meaning requiring that ***all*** the circuitry of the mobile station be turned on for it to be "idle." Dkt. 53, 15. This is absurd on its face—of course a mobile station (cell phone) could be in an "idle" state, even if the screen, WiFi, Bluetooth, GPS, speakers, microphone and/or some other unused circuitry is turned off.

Moreover, Empire's implicit construction directly contradicts the specification, which defines "idle" according to whether or not the mobile station is sending data over the communications channel. Ex. A, 2:58-62. As the PTAB found in rejecting Empire's arguments, the '120 Patent says nothing about "idle power consumption … requiring the circuitry to be powered on … nor exclude circuitry that is powered off." Ex. 11 at 25-26.. To the contrary, it specifically contemplates that parts of the transmission circuitry may be powered off in an "idle" state: "Even if the ***idling*** transceivers ***turn off*** their transmission chains, some ***idle power*** may be consumed due to leakage current or other effects." *Id.*, 3:2-10.

Empire's only response to the clear specification description is to argue that "***transmission chains*** that are turned off" does not mean the "***power*** is off" for these components. Dkt. 53, 16. In other words, Empire tries to read significance into the use of the phrase "turn off" rather than "turn ***the power*** off." But, as the PTAB recognized, the rest of the sentence makes clear it is referring to power being off because it describes the idle power being "consumed due to ***leakage current or other effects***," not power used by the transmission chains. Ex. A, 3:2-10; Ex. 11 at 25. Thus, consistent with the description in the specification and the ordinary meaning, Samsung's construction captures states where some but not all of the mobile station circuitry may be turned off.

Empire's lengthy discussion of Samsung's IPR, the IPR prior art, and the prosecution

history prior art (Dkt. 53, 15-17) shows Empire's argument for what it is—an effort to avoid the prior art. But its claim that Samsung and its expert agree with Empire is untrue. Empire tellingly omits the beginning of the quoted sentence, which shows that Samsung is discussing the receiver and not the mobile station. Ex. 6. And Empire's discussion of numerous prior art references and their various modes is similarly misleading. For example, IPR prior art reference Cui-2003 discloses a "sleep mode" in which "the power consumption is dominated by the ***leaking current***," which is nearly identical to the '120 Patent's disclosure of its "idle" mode in which "some idle power may be consumed due to ***leakage current***." *See id.*; *see also* Ex. A, 3:2-10.

## III. THE '331 PATENT DISPUTED TERMS

The '331 Patent purports to address the tradeoff between inserting pilot symbols into transmitted communications signals for greater accuracy in decoding the received signal, on the one hand, and the inherent reduction in the transmitted data rate due to the insertion of pilot symbols, on the other. Ex. B, 2:4-6; 10:60-64. Samsung's proposed constructions afford pilot symbols and data their plain and ordinary meaning in this context, recognizing that replacing one thing with another is meaningless if they are the same.

### A. Overview of the '331 Patent

The '331 Patent describes a technique to improve the reliability of signal transmissions with a reduced negative impact on the data rate of the transmission. The '331 Patent explains that the communications channel, *i.e.*, the air and any obstacles between the transmitter and receiver, can have an impact on the signals that are sent over that communications channel. '331 Patent, 1:27-31; Ex. G ¶40. Transmission systems attempt to measure this impact in order to account for that impact when decoding received signals. Ex. B, 1:62-66. The impact of the channel can be represented by a "channel matrix." *Id.* at 1:33-36. As the '331 Patent acknowledges, one way of measuring the channel matrix known prior to the patent is for the transmitter to insert "pilot

symbols" into the stream of data being transmitted. Because these pilot symbols are also known to the receiver, the receiver can compare the known expected values with the symbols that are actually received to generate an estimate of the communication channel's impact, and thus estimate the "channel matrix." *Id.* at 2:1-4.

The problem in such a system that the '331 Patent purports to address is that "the need to insert pilot symbols into the transmitted data streams may adversely [a]ffect a data rate attainable in the communication system." *Id.* at 2:4-6. In other words, when a transmitter is sending a pilot symbol, it is not sending symbols containing useful data to the receiver, resulting in a "tradeoff between data rate and accuracy of the channel estimation." *Id.* at 9:2-4; Ex. G ¶43.

The '331 Patent's proposed solution is to use fewer pilot symbols, and instead insert "replicated data" symbols. '331 Patent at 9:9-10. Inserting replicated data symbols means that more useful data is transmitted in the same period of time than if pilot symbols are inserted at those locations because the replicated data symbols are still useful data for at least one of the streams. *Id.* at 5:50-57; 9:5-8; Dkt. 54-7 ¶ 45. But the replicated data symbols can also be used to update the estimated channel matrix because the receiver is decoding multiple copies of the same data symbol. *Id.*, 10:31-35.

### B. "pilot symbol"

| Claim Term | Samsung's Construction (revised) | Empire's Construction |
|---|---|---|
| "pilot symbol" (Claims 1 and 5) | "a reference symbol known by the transmitting device and receiving device of a communications system" | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) |

Samsung's construction reflects the plain and ordinary meaning of a "pilot symbol" and is fully supported by the specification. In contrast, while taking the position that no construction is necessary, Empire's arguments for this and the "replicated data" term (see Section III.D below) conflate these two terms and thereby defeat the very object of the claimed invention.

Because the parties dispute what constitutes a "pilot symbol" in the context of the '331 Patent, the Court should clarify the meaning of the term. *Every Penny Counts v. Am. Express Co., et al.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

**1. Samsung's construction is the plain meaning of "pilot symbol" in the '331 Patent, the prosecution history, and in the art.**

**Claims:** Claim 1 recites how pilot symbols are used, *i.e.*, to estimate a channel matrix of a communications channel. But it does not say what a "pilot symbol" is. The claim, therefore, suggests that the term should be given its plain and ordinary meaning of a reference symbol known to both the transmitter and receiver, as reflected by Samsung's construction. Ex. G ¶88.

**Specification:** Consistent with this ordinary meaning, the '331 Patent's specification explicitly describes what a "pilot symbol" is: "Generally, the pilot symbols correspond to symbols known by the transmitting and receiving devices of a communications system." '331 Patent, 8:55-57. The '331 Patent explains that this fundamental nature of a pilot symbol—being known to the receiver and the transmitter—is why pilot symbols can be used to estimate a channel matrix. *See id.* at 2:1-4. And even Empire concedes that this statement from the specification describes "a POSITA's customary understanding of the term." Dkt. 53, 21.

Likewise, consistent with Samsung's construction, the named inventors of the '331 Patent have consistently defined "pilot symbol" in substantially the same way, both in the '331 Patent and in another patent filed shortly before, where they explained the plain and ordinary meaning of pilot symbols: "***Pilot symbols*** correspond to symbols ***known by a transmitter*** (e.g., base station 110, relay station 120) ***and a receiver*** (e.g., receiver 130) that may be used … for establishing communications between the transmitter and receiver." Ex. 7 at 4:21-26.

**The Prosecution History**: The applicants used the terms "pilot" and "reference" interchangeably during prosecution of the '331 Patent, and distinguished them both from data.

Specifically, the applicants sought to distinguish a prior art reference ("Luo") that disclosed sending "a demodulation reference signal (DMRS)." Ex. 8 at [0034]. Luo also disclosed that a "DMRS may also be referred to as a reference signal, pilot, etc." *Id*. The applicants adopted that terminology to distinguish Luo, arguing that "each channel estimate in Luo is based on ***a respective reference signal***," and thus Luo "does not disclose 'generating an updated estimate of the channel matrix based, at least in part, on the replicated data.'" Ex. N at Empire_0000778. A POSITA would understand that both Luo and the applicants used the term "reference" and "pilot" synonymously to distinguish reference/pilot symbols from replicated data. Ex. G ¶ 90.[6]

Empire acknowledges that the applicants adopted "describing the disclosures in Luo using Luo's own terminology." Dkt. 53, 20. But Empire fails to address the applicants use of this terminology to distinguish Luo. Regardless of the applicants' ***reason*** for referring to pilot signals as "reference" signals, the applicants distinguished their claimed "replicated data" from Luo's "reference signals," which Luo referred to synonymously as pilots. Ex. G ¶ 90.

**2. Empire seeks to conflate "pilot symbol" with "replicated data."**

Despite its pretext that no construction is necessary, Empire ***is*** proposing a construction of "pilot symbol": "a ***data*** symbol known to the receiver." *See* Dkt. 53, 18. That is neither the "plain and ordinary meaning" nor the way "pilot symbol" is used in the '331 Patent, which is why Empire can cite only its expert's declaration as support. *Id* (citing Ex. C ¶92).

The primary flaw in Empire's construction is that, by inserting the word "data" in its so-called plain meaning, it conflates a "pilot symbol" with a "data symbol," such as in the separately recited "replicated ***data***" limitation. *See also* Section III.D below. Accepting Empire's

[6] Named inventor Heath also equated "pilots" with "reference signals" in other publications in the field. *See* Ex. 9 at 7 ("Defining the time and frequency responses for every antenna pair is critical to accurately model the beam training process with specific resource elements allocated for ***pilots (reference signals)*** and data.").

blending of these two different things would eviscerate the entire purpose of the '331 Patent, which is based on the applicants' proposed solution of ***replacing*** pilot symbols with replicated data symbols, because "the use of replicated ***data symbols*** may not impair the overall data rate of the system as severely as the use of more ***pilot symbols***." Ex. B, 10:60-64 (emphasis added); *see also* Ex. G ¶¶44-46 (explaining the '331 Patent's proposed approach). Indeed, this dichotomy goes to the very core of the claimed invention, which is why the specification so consistently distinguishes between "pilot symbols" and data symbols (as in "replicated data symbols").[7]

Empire's assertion that the specification "describes pilot symbols as data" (Dkt. 53, 19) is just not true. As a preliminary matter, the specification's explicit description of a "pilot symbol" does ***not*** describe it as a "***data*** symbol"; rather it is described as a "symbol": "Generally, the pilot symbols correspond to ***symbols*** known by the transmitting and receiving devices of a communications system." Ex. B, 8:55-57. Moreover, Figure 7 and its description, upon which Empire relies, describe two separate categories: (1) receiving and estimating the channel based on ***"known pilot symbol"*** (steps 705, 710); and (2) receiving and updating the estimate based on "replicated ***data*** from multiple ***data*** streams." (steps 715, 720, 730).

The other quotes that Empire cites as purportedly "describing pilot symbols as data" do no such thing. *See id.* at 9:66-10:3; 10:10-13; 11:29-33. The only one that even mentions "data" at all is at 11:29-33, and that refers to "Program Data 824" that is stored in system memory (i.e., executable code), not data that is received over the communication channel. *Id*. at 11:24-25. Indeed, the full quote makes clear that "pilot symbols" are different than the "replicated data" by separately identifying the two: "Program Data 824 may include known ***pilot symbols*** 825,

[7] Empire's plain and ordinary interpretation also omits a key aspect of pilot symbols described in the '331 Patent—that the pilot symbol must be known to ***both*** the transmitter and receiver. *See, e.g.,* Ex. B, FIG. 6 and 8:52-9:8 (describing process of transmitter inserting known pilot symbols stored in its memory into the signal to be transmitted).

***replicated data symbols*** 826, channel estimate 827, or combinations thereof…" *Id.*

To the extent there is any doubt, the invention disclosure relied on by Empire confirms that pilot symbols ***are not*** data: "[redacted]" Ex. P at Empire_0000948 (emphasis added). Thus, Empire's attempt to improperly insert the word "data" and thereby blur the distinction between "pilot symbols" and "replicated data," contrary to all of the intrinsic evidence and even its own inventor, only provides further support for Samsung's construction.

Empire's other criticisms of Samsung's construction are equally without merit. Empire incorrectly argues that Samsung's original proposed construction "adds a second limitation" that would "require multiple transmitting and receiving devices." Dkt. 53, 20. That is nonsense. Samsung's original construction simply contemplated multiple devices, at least one transmitting and at least one receiving. Nonetheless, Samsung has proposed a modification of its construction (stated above) to avoid any purported confusion: "a reference symbol known by the transmitting ***device*** and receiving ***device*** of a communications system."

Lastly, Samsung's IPR petition in no way supports Empire's position or undermines Samsung's proposed construction. The fact that no construction was necessary to resolve the invalidity questions raised in Samsung's IPR petition has no impact on whether construction is necessary here. *Garrity Power Servs. LLC v. Samsung Elecs. Co.*, No. 2:20-CV-00269-JRG, 2021 WL 3403747, at *11 (E.D. Tex. Aug. 4, 2021). And the IPR petition does not "concede[] that pilot symbols are data." *Id.* at 22. For this purported concession, Empire cites to the petition's discussion of a prior art Haustein reference that uses redundant data to improve upon the channel estimation provided by pilot symbols alone. *See* Ex. E at 11-12 (discussing Haustein reference). The petition repeats a quote from Haustein (not Samsung) saying that data sent with

"strong redundancy" can be used as "***pseudo*** reference signals" because that redundancy "makes out of the firstly unknown data bins known data, which is basically ***the main feature of*** pilots, ***i.e. that they are known transmit signals***." *Id.* at 21 (quoting European Patent App. Pub. No. EP2114029) (emphasis added). In other words, Haustein described the "main feature of pilots" being that they are "***known***," not that they are "data."

### C. "a channel matrix of the communications channel"

| Claim Term | Samsung's Construction | Empire's Construction |
|---|---|---|
| "a channel matrix of the communications channel" (Claims 1 and 5) | "a matrix of data representing the operation of the communications channel on the transmitted data symbols" | No construction required; plain and ordinary meaning; not governed by 35 U.S.C. § 112(f) |

The '331 Patent expressly defines this term: "The channel matrix generally refers to a matrix of data which may represent the operation of the communications channel on the transmitted data symbols, including representations of such effects as reflections." Ex. B, 1:31-36. Tellingly, Empire criticizes Samsung's construction on procedural grounds, but nowhere disputes its technical accuracy.

#### 1. The applicants' defined this term in the specification.

**<u>Claims</u>:** Claim 1 recites that a "channel matrix of the communications channel" is estimated, updated, and used to decode signals. But, as with "pilot symbol," the claim never says what a "channel matrix of the communications channel" is.

**<u>Specification</u>:** The applicants did provide an express definition in the specification: "The channel matrix generally refers to a matrix of data which may represent the operation of the communications channel on the transmitted data symbols, including representations of such effects as reflections." Ex. B 1:31-36. A POSITA would recognize this as a clear definition of the term, notwithstanding the boilerplate wiggle words "generally" and "may" contained therein. *See Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1242 (Fed.

Cir. 2019) (holding that statement in specification that "'in vivo' ***in general*** means in the living body of a plant or animal" was an express lexicography because "patentees specifically define[d] that term in the specification."). And even if the word "generally" were sufficient to water down the applicants' clear definition of "channel matrix," this statement unquestionably provides "guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001).

All of the disclosed embodiments reflect the same meaning of "a channel matrix of the communications channel," consistent with the definition provided in the specification. For example, the '331 Patent discloses that the "communications channel 105 may be characterized by the channel matrix H ***describing the operation of the communications channel 105 on transmitted symbols***," and that the "channel matrix H may provide a representation of effects such as reflections in the communications channel." *Id.* at 6:3-7. And even Empire's expert agrees this is a "reference to" the "plain and ordinary meaning of the term." Ex. C ¶110.

**2. Empire never says what the term means, yet insists it has some unstated "plain and ordinary meaning."**

Empire's attempts to evade this express lexicography is telling. Despite arguing for over two pages that the term "is used in the claims and specification of the '331 Patent consistently with its plain meaning," Empire never identifies ***what*** the plain meaning of "a channel matrix of the communications channel" is. Dkt. 53, 22-24. Its expert's declaration does the same. Ex. C ¶¶104-107. Importantly, Empire's exhaustive collection of quotes from the specification discussing the generation and use of the channel matrix, are all fully consistent with Samsung's proposed construction, and Empire does not anywhere explain otherwise. *Id.*

Empire's other arguments against Samsung's proposed construction are misguided. ***First***,

its insistence that no construction is necessary is premised on one unsupported single-sentence paragraph from its expert, Dr. Akl: "The term 'channel matrix' is well understood in the field of wireless communications." Ex. C ¶108. But Dr. Akl, like Empire, never says what that so-called "well understood" meaning is. The closest he gets is acknowledging that ***Samsung's*** proposed construction is a "reference to" the plain meaning of the term. *Id.* ¶ 110. This is of no assistance to the jury. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (claim constructions should clarify for jury "what the patentee covered by the claims").

***Second***, contrary to Empire's characterization, Samsung's proposed construction does not construe channel matrix to "mean its function" or "limit or redefine the claim term by reciting a function of the channel matrix." Dkt. 53, 24. To the contrary, it simply says what everyone agrees "a channel matrix of the communication channel" ***is***—a matrix of data ***representing*** the operation of the communications channel on the transmitted data symbols.

***Third***, Empire does not and cannot identify any "limitations from the specification" that it accuses Samsung of importing into this plain and ordinary meaning. That is because Samsung affords the term its plain and ordinary meaning; the same one that the '331 Patent does. Moreover, even if the applicants had not chosen to so-explicitly define the term, Federal Circuit case law "does not require explicit redefinition or disavowal" to construe a claim term according to its meaning in the specification. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016).

***Fourth***, Samsung's statements in its IPR papers, once again, do nothing to "undermine its proposed construction here." Dkt. 53, 25. The IPR petition and supporting expert declaration do not use "channel matrix" and "channel estimate" interchangeably. *See* Dkt. 54-5, 10 (describing that in the Haustein prior art reference, "[a]t the receiver, pilot symbols are used ***to estimate*** the

channel matrix …, ***and this channel estimate*** is used to decode the first data transmission."); 19 (describing that when reviewing the Haustein prior art reference, "[a] POSITA would have recognized that estimating ***the channel state*** corresponds to estimating ***the channel matrix***."); Dkt. 54-15 ¶ 95 (same). And even if the terms were used interchangeably, Empire is not asking the Court to construe this term as "channel estimate," and never says why this matters.

### D. "replicated data"

| Claim Term | Samsung's Construction | Empire's Construction |
|---|---|---|
| "replicated data" (Claims 1 and 5) | "copied non-pilot symbols" | "duplicated data" |

Both parties agree that the term "replicated data" requires construction. Samsung's proposed construction is the only reasonable meaning consistent with the core concept of the '331 Patent—*i.e.*, copied symbols (that are not pilot symbols) are used in place of pilot symbols to reduce the use of pilot symbols and their adverse impact on data rate. Ex. B, 9:3-8 (the "use of replicated data symbols as pilot symbols may advantageously increase the channel estimation accuracy while not impacting the overall data rate as severely as using more pilot symbols."). Empire, on the other hand, proposes a construction that does nothing to resolve the key dispute but instead blurs the distinction between "replicated data" and "pilot symbols." *See* Section III.B above. This time, Empire goes so far as to say they may be "the same thing." Dkt. 53, 29.

#### 1. Only Samsung's construction is supported by the intrinsic evidence

**Claims**: Claim 1 differentiates between two separate things used in two different steps, one of those things is "pilot symbols," which are received and used to estimate a channel matrix, and the second thing is "replicated data," which is received and used to update that channel matrix. The claim does not say what "replicated data" is, but logically, a POSITA would understand that it is not the same as the "pilot symbol" or the claim would have said so.

**Specification:** The '331 Patent's specification makes clear that "replicated data," as used

in the claims of the patent, is copied non-pilot symbols, as Samsung proposes. The first part of Samsung's proposed construction, "copied," is the plain English meaning of the word "replicated" that is used throughout the '331 Patent. Ex. 10 (defining "replicate" as "to make or be an exact copy of; reproduce."). Consistent with this plain meaning, the patent describes data being copied from one place to another. For example, as shown by the arrow in the annotated version of Figure 3, "replicated" data is copied from one data stream (S1, 302) to another (S2, 303). Ex. B, 9:9-10 ("[D]ata may be replicated from one data stream and inserted into another data stream.").




Ex. G ¶45 (Ex. B, Figure 3 (annotation added by Dr. Cabric)). The '331 Patent's Figure 5 cited by Empire is similar, also using an arrow to show data from a first pair of frequencies copied to a second pair of frequencies. Dkt. 53, 25.

The second part of Samsung's proposed construction, "non-pilot symbols," does not limit the type of symbol that may be considered data other than to exclude "pilot symbols," consistent with the core invention of replacing "pilot symbols" with "replicated data" to minimize the use and negative impact on data rate caused by pilot symbols. Ex. B, 10:60-64.

The propriety of including a negative limitation here is fully supported by *Lenovo Holding Co., Inc. v. DoDots Licensing Sols. LLC*, 2021 WL 5822248 (Fed. Cir. Dec. 8, 2021). There, the PTAB construed a claimed template as a data structure "which excludes executable applications/compiled code." *Id.* at *2. On appeal, the Federal Circuit affirmed the PTAB's construction, noting that the specification was replete with discussions of the advantages of the template ***not*** including executables or compiled code. *Id.*

Here, as in *Lenovo*, the specification identifies the problem arising from the use of pilot symbols: "The need to insert pilot symbols into the transmitted data streams ***may adversely [a]ffect a data rate*** attainable in the communications system." Ex. B, 2:4-6. It then repeatedly extols the benefit of replicated data ***not*** being pilot symbols, explaining that "[b]y utilizing replicated data to generate or update an estimate of the channel matrix," "***fewer pilot symbols***" need to be inserted into the streams, and "***[r]educing a number of pilot symbols*** inserted into the transmitted signals ***may advantageously improve the data rate***." *Id*. at 5:50-57. This benefit is achieved "[b]ecause the replicated data symbols also transmit data over the communications channel," unlike pilot symbols. *Id.* at 10:60-64. Indeed, this is the core of the invention:

> ***Accordingly, examples have been described above*** of estimating a communications channel based on pilot symbols and replicated data symbols. …. Because the replicated data symbols also transmit data over the communications channel, however, ***the use of replicated data symbols may not impair the overall data rate of the system as severely as the use of more pilot symbols***.

Ex. B, 10:52-64 (emphasis added).

"'When a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1052 (Fed. Cir. 2010) (quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001)). At a minimum, the specification defines "replicated data" as "non-pilot symbols" by implication

through repeatedly extolling the virtues of it being precisely that.

**Knowledge of POSITA:** A POSITA would understand that data symbols are not pilot symbols, even absent the '331 Patent's disclosure. For example, the '331 Patent's inventors made this distinction clear in another patent that they filed just months before the '331 Patent:

> **Pilot symbols** correspond to symbols known by a transmitter (e.g., base station 110, relay station 120) and a receiver (e.g., receiver 130) that may be used, as explained in more detail below, for establishing communications between the transmitter and receiver. **Data symbols** correspond to symbols transmitted to a receiver that represent information."

Ex. 7 at 4:21-27; Ex. G ¶ 103. The inventors' publications are replete with similar evidence that they, like any POSITA, understood data to be non-pilot symbols. Ex. G ¶ 104 (listing examples of publications by Dr. Heath clarifying that data symbols are non-pilot symbols).

**2. Empire's construction is contrary to the purpose of the invention.**

Empire's stated construction ("duplicated data") does little to resolve the key dispute between the parties. And its explanation of that construction ("multiple instances of the exact same data") makes clear that Empire seeks to drastically rewrite the claims. Dkt. 53, 25. In either case, Empire's interpretation is wrong.

Empire's "duplicated data" construction merely replaces "replicated" with "duplicated" without any explanation for doing so. In fact, Empire's dictionary definitions of the term "replicate" support that the plain and ordinary meaning of "replicate" is "copied" (as Samsung proposes), not "duplicate." *See* Dkt. 54-17 ("to do or make something again, so that you get the same result or ***make an exact copy***"). And Empire's arguments that "copies of data encoded using a specific technique" or "coded by using different mathematical representations of the data symbols" (Dkt. 53 at 26, 27) are not "replicated" are inapposite.[8] Empire does not explain how

[8] Nobody is arguing to limit "replicated data" to the decoding techniques in dependent claims 2 through 4 (Dkt. 53, 26), and nothing in Samsung's construction renders those claims superfluous.

either supports "duplicated" over "copied," or the difference between the two.

Empire's explanation of its construction reveals its true intention—Empire ***actually*** seeks to construe "replicated data" to mean "multiple instances of the exact same data." Dkt. 53, 25. In other words, Empire asks the Court to construe "replicated" to mean simply that two things are the same, even if by happenstance. Of course, there can be "multiple instances of the exact same data" without the data ever having been "replicated." For example, the Court's phone number has three instances of the exact same number "9": (9̲03) 9̲35-29̲12. These are multiple instance of the exact same thing (the number "9") but they were not "replicated," they just happen to be the same. Similarly, a wireless communication might be replete with "multiple instances of the exact same data," for reasons having nothing to do with being replicated. That is not "replicated data" under any reasonable interpretation, and certainly not as used in the '331 Patent.

The embodiments in both Figures 3 and 5 show data symbols being "***replicated from*** one data stream ***and inserted into*** another data stream" and "***replicated from*** one frequency ***to another*** frequency in the data streams," respectively. Ex. B, 9:9-10, 8:15-16 (emphasis added). In other words, it is not happenstance that they are the same. It is because they are copied. Moreover, the receiver must ***know*** that a particular data symbol is replicated from another particular data symbol in order to use it to improve the channel estimate. *See, e.g., id.* at 10:19-22 ("Generally, signals are received that may encode the replicated data and the signals may also encode ***an indication that the data includes one or more replicated data symbols***."); 10:36-42 (updating channel estimate by comparing the decoded symbol with the replicated data). Otherwise, the receiver would not know which data symbols to compare to determine whether any adjustment of the channel estimate were needed.

More fundamentally, Empire's proposed construction and its intended meaning of that

construction discard the ’331 Patent’s entire solution of ***replacing*** “pilot symbols” with “replicated data.” Empire attempts to justify doing so based on an incorrect premise: that “replicated data is akin to pilot symbols because both are data known to the receiver.” Dkt. 53 at 27. Empire is wrong. Unlike pilot symbols, which are known to the receiver before being received, the receiver does not know the value for the replicated data symbols. Ex. B, 10:40-42.

But Empire goes even further, revealing that its position really boils down to arguing that pilot symbols and data can be “the same thing.” Dkt. 53, 29. Such a construction requires discarding ***all*** of the intrinsic evidence, and the patent’s entire purpose: addressing the “tradeoff between data rate and accuracy of the channel estimation” by using “replicated data symbols” to “***not*** impair the overall data rate of the system as severely as the use of more ***pilot symbols***.” Ex. B, 10:60-64. In that context, “replicated data” and pilot symbols cannot be “the same thing.”

Empire’s criticisms of Samsung’s proposed construction are once again meritless. First, Empire bases its opposition on the premise that “the specification repeatedly describes replicated data as being used as, ***or at least acting as***, pilot symbols.” Dkt. 53, 29 (emphasis added). But this just supports Samsung’s construction. If “replicated data” could be construed as including pilot symbol, as Empire argues, then the replicated data would not merely be “used as, or at least acting as, pilot symbols”; the replicated data would ***be*** pilot symbols. The fact that the ’331 Patent describes the “replicated data” as performing a function similar to the pilot symbols, but never states replicated data could be pilot symbols, thus supports Samsung’s construction.

And while they are used for a similar (but different) purpose, the point of the invention is that the replicated data ***replaces*** the pilot symbols. “[A]s ***more replicated data*** is inserted, the overall data rate of the communications system may be reduced, although the reduction may not be as severe ***as if more known pilot symbols*** were inserted.” *Id.*, 9:24-27 (emphasis added).

Empire's reliance on a statement that the number of pilot symbols "may be effectively increased" through this process is misplaced. Dkt. 53, 29 (citing Ex. B, 10:54-56). That does not mean that the number of pilot symbols are ***actually*** increased, they are only ***effectively*** increased. This means that the pilot symbols are ***replaced*** by replicated data, which performs a similar function to the pilot symbols in channel estimation, but without "impair[ing] the overall data rate of the system as severely as the use of more pilot symbols." *Id.*, 10:53-64.

Third, nothing in Samsung's IPR petition conflicts with its positions here. The Haustein and Tang prior art references that Empire cites describe using replicated data ("redundant payload data" or "data symbols" inserted between "two adjacent pilot sub-carriers," respectively) as "***pseudo*** reference signals" or can be "***regarded as*** extra 'pilot symbols.'" Dkt. 54-5, 21, 83, 89 (emphasis added, quotation marks around "pilot symbols" in original). In other words, they are doing what the '331 Patent describes: using data symbols ***in place of*** pilot symbols.

#### 3. If "replicated data" is not "copied non-pilot symbols," it is indefinite.

If "replicated data" means something other than "copied non-pilot symbols," then the term is indefinite. If "replicated data" can be pilot symbols, a POSITA would not understand whether simply using pilot symbols (the prior art solution that the '331 Patent purported to improve upon) met the limitations in the claim. Dr. Cabric gives the example of the 2000's-era CDMA2000 ED-VO Standard, which used a "repeated stream of all-'0' symbols" for pilots. Ex. G ¶ 109. A POSITA would not understand which '0' symbols should be considered pilots and which would be replicated data. *Id.* Thus, a POSITA would not understand the invention's scope "with reasonable certainty," and the term is indefinite. *Berkheimer*, 881 F.3d at 1360-64.

## IV. CONCLUSION

For the above reasons, Defendants request that their proposed constructions be adopted.

Dated: December 13, 2024

Respectfully submitted,

*/s/ Ryan K. Yagura*

Ryan K. Yagura (Tex. Bar No. 24075933)
ryagura@omm.com
Nicholas J. Whilt (*Pro Hac Vice*)
California State Bar No. 247738
nwhilt@omm.com
**O'MELVENY & MYERS LLP**
400 S. Hope Street
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

Marc J. Pensabene (*Pro Hac Vice*)
New York State Bar No. 2656361
mpensabene@omm.com
Laura Gore (*Pro Hac Vice*)
New York State Bar No. 5172879
lgore@omm.com
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile: 212-326-2061

Cameron Westin (*Pro Hac Vice*)
California State Bar No. 290999
cwestin@omm.com
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: 949-823-6900
Facsimile: 949-823-6994

Melissa R. Smith (Tex. Bar. No. 24001351)
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
Marshall, Texas 75670
Telephone: 903-934-8450
Facsimile: 903-934-9257

***Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on December 13, 2024.

*/s/ Ryan K. Yagura*
Ryan K. Yagura

[redacted]

[redacted]