[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| EMPIRE TECHNOLOGY DEVELOPMENT LLC<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Defendants. | Case No. 2:23-cv-00427-JRG-RSP<br><br>[redacted] |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO**
**<u>FED. R. CIV. P. 12(B)(1) AND 12(C) FOR LACK OF CONSTITUTIONAL STANDING</u>**

[redacted]

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

I. RESPONSE TO STATEMENT OF THE ISSUES TO BE DECIDED ........ 2

II. FACTUAL BACKGROUND ........ 3

A. The University Granted Empire's Predecessor, IDMC, an Exclusive License and "All Substantial Rights" in the '120 and '331 Patents ........ 3

B. IDMC Assigned Its Rights to Empire ........ 4

C. The MLA Permitted IDMC to Select Inventions in Various Ways, One of Which Was by Payment of a Specified Fee ........ 4

D. Amendment No. 2 to the MLA Permitted IDMC to Select Inventions in Additional Ways, One of Which Was by Filing a Non-Provisional Patent Application ........ 5

E. IDMC Obtained an Exclusive License to the '120 Patent ........ 7

F. Empire Did Not [redacted] ........ 9

III. LEGAL STANDARD ........ 11

IV. ARGUMENT ........ 12

A. Empire Has Standing to Sue for Infringement of the '120 Patent ........ 13

i. The Amended MLA Created a Pathway for Licensing Inventions that the University Had Reduced to a Provisional Patent Application, Including the '120 Patent's Inventions ........ 13

ii. IDMC Waived Any ISA Requirement by Making Payments that Serve as "Conclusive Evidence" of Licensing ........ 18

iii. All Relevant Parties Understood that IDMC, and Later Empire, Licensed the '120 Patent ........ 20

B. Empire Has Standing to Sue for Infringement of the '331 Patent ........ 21

C. Samsung's Challenge to the '331 Patent Only Affects Damages, Not Constitutional Standing ........ 26

CONCLUSION ........ 26

[redacted]

## TABLE OF AUTHORITIES

**Cases** **Pages (s)**

*Bornstein v. Marcus*,
275 So. 3d 636 (Fla. Dist. Ct. App. 2019) ....................14

*Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*,
951 F.3d 248 (5th Cir. 2020) ....................14, 23

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
517 F.3d 1284 (Fed. Cir. 2008)....................16

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ....................12

*Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*,
86 F.4th 667 (5th Cir. 2023) ....................23, 24, 25

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) ....................11

*Guidry v. Am. Pub. Life Ins. Co.*,
512 F.3d 177 (5th Cir. 2007) ....................12

*Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*,
31 F.4th 305 (5th Cir. 2022) ....................14

*Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
248 F.3d 1333 (Fed. Cir. 2001)....................11

*Intell. Tech LLC v. Zebra Techs. Corp.*,
101 F.4th 807 (Fed. Cir. 2024) ....................12, 19, 22, 23

*IP Innovation L.L.C. v. Google, Inc.*,
661 F. Supp. 2d 659 (E.D. Tex. 2009)....................11

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019)....................11

*Mars, Inc. v. Coin Acceptors, Inc.*,
527 F.3d 1359 (Fed. Cir. 2008)....................12

*Minco, Inc. v. Combustion Eng'g, Inc.*,
95 F.3d 1109, 1117 (Fed. Cir. 1996)....................12

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
52 F.3d 1026 (Fed. Cir. 1995)....................12

[redacted]

*Parking Co. of Am. v. Wilson*,
No. 05-99-00404-CV, 2002 WL 387180 (Tex. App. Mar. 13, 2002) ....................................22

*Walmart Inc. v. U.S. Dep't of Just.*,
21 F.4th 300 (5th Cir. 2021) ..........................................................................................11

**Statutes & Rules**

35 U.S.C. § 100(d) ..........................................................................................................12

35 U.S.C. § 281 ..............................................................................................................12

Fed. R.Civ. P. 12 .................................................................................................1, 11, 12, 26

[redacted]

Empire Technology Development LLC ("Empire" or "Plaintiff") respectfully opposes Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s (collectively, "Samsung" or "Defendants") Rule 12 motion to dismiss for alleged lack of constitutional standing.

## INTRODUCTION

Samsung is not a party to the subject agreements, or decade-plus relationship, between the University of Texas (the "University"), Empire, and Empire's predecessor. Yet, as an outsider, Samsung purports to know better the parties' agreements, intent, and understanding of their rights. Samsung asks this Court to upset the status quo in ways (i) that the University and Empire never intended; (ii) that would have material consequences beyond this litigation; and (iii) that directly contradict unambiguous contractual text and the contract parties' longstanding course of conduct.

With regard to U.S. Patent No. 8,798,120 (the "'120 Patent"), Samsung looks back to the 2010 time period and now argues the patent was never licensed to Empire's predecessor. Samsung rests its defense entirely on the hyper-technical (and irrelevant) observation that *the University* did not supply a one-page form to Empire's predecessor in 2010 – a form called an Invention-Specific Agreement ("ISA") that the University was never *required* to supply for the '120 Patent's inventions. The Master License Agreement, as amended ("MLA"), makes clear that no ISA was required for the '120 Patent; and, even without the amendment, the MLA further states that a payment undisputedly made by Empire's predecessor was "conclusive evidence" that all preconditions to the transfer of rights from the University had been "satisfied or waived," the ISA being one of many such preconditions. Empire's predecessor completed all steps required to obtain "all substantial rights" in the '120 Patent's inventions, including *by filing a patent application with its own counsel* and by paying all specified expenses and fees. And for more than fifteen years, the parties to the MLA have conducted themselves in a way that demonstrates their shared

understanding that Empire (and before, its predecessor) has all substantial rights in the '120 Patent. Empire has standing.[1]

With regard to U.S. Patent No. 8,565,331 (the "'331 Patent"), Samsung argues that Empire [redacted] years after Samsung's infringement began. Samsung concedes that such [redacted] does not meet the MLA's unambiguous and specific requirements to effect a notice of abandonment. And here again, the parties to the MLA have never conducted themselves as if the '331 Patent was abandoned. To the contrary, for example, Empire has continued to make maintenance payments for the '331 Patent (as provided under the MLA), and the University refers to Empire as the patent's exclusive licensee.

Finally, even if Empire had [redacted] (it did not), dismissal would not be correct. There is no genuine dispute that the '331 Patent was properly licensed for years before the alleged abandonment, during which time Samsung's infringement of the '331 Patent was ongoing. Thus, at best for Samsung, this motion impacts damages with respect to infringement of the '331 Patent, but it would not require dismissal due to lack of standing.

## I. RESPONSE TO STATEMENT OF THE ISSUES TO BE DECIDED

Empire disagrees with Samsung's statement of issues. The proper statement of the issue is: Whether it is clear that there is no set of facts that Empire can prove by a preponderance of the evidence to show it has standing to sue for infringement of the'120 and '331 Patents.

[1] Empire brought suit and has litigated against Samsung without the University (i) *objecting* to Empire's assertion of the two patents-in-suit; (ii) *seeking to intervene* to clarify or protect the rights Samsung now alleges the University alone holds; or (iii) *defending* Samsung's *inter partes* review of the asserted patents, each of which a patent owner presumably would have done if Empire indeed lacked all substantial rights.

[redacted]

## II. FACTUAL BACKGROUND

### A. The University Granted Empire's Predecessor, IDMC, an Exclusive License and "All Substantial Rights" in the '120 and '331 Patents

On June 26, 2009, the University, as Licensor, and Invention Development Management Company, LLC, as Licensee ("IDMC" or "Licensee"), entered into the MLA. Ex. 1[2] at -330. Section 6.2 states, among other things: "This Agreement *transfers to Licensee all substantial rights* under the Patents[3] and, as a result, *Licensee has the right to bring any future action* or proceeding to enforce claims under the Patents . . . ." *Id.* at -342 (emphasis added). Section 7.1 of the MLA, entitled "All Substantial Rights," reiterates that the University "intends by this Agreement to provide to Licensee all substantial rights under the Patents." *Id.* at -343. The MLA also reiterates the University's grant to IDMC of exclusive rights to enforce the Patents. *Id.* at -341 ("Licensee and its Affiliates will have the exclusive right . . . to, in Licensee's own name and at Licensee's expense (or in the name and expense of an Affiliate of Licensee), institute, prosecute, and control any action or proceeding with respect to infringement of the Patents . . . ."). In addition, the MLA confirms that the University "does not have and/or retain any right to, and will not, institute any case, action or other enforcement proceedings with respect to infringement of the Patents." *Id.* at -341-42. Section 3.1 grants IDMC an exclusive license (*id.* at -336), while Section 3.2 confirms the right to grant sublicenses "in Licensee's sole and absolute discretion" (*id.* at -337).

---

[2] "Ex. __" refers to an exhibit to the Declaration of Nathaniel Browand, submitted herewith.

[3] The MLA defines "Patents" as "all (a) patents or patent applications claiming the Inventions or any portion thereof...." Ex. 1 at -354. The definition of "Inventions" was amended to mean "inventions and discoveries disclosed in an Invention Disclosure and claimed in the provisional patent application filed by Licensor and/or the patent applications filed by Licensee in accordance with Section 1.3 of the Agreement (or that could have been claimed in such patent application based on the written specification actually contained therein). Ex. 3 at -986.

[redacted]

### B. IDMC Assigned Its Rights to Empire

On June 5, 2017, IDMC and Empire entered into an Assignment and Assumption Agreement ("Assignment"), by which IDMC assigned to Empire "all of its rights and obligations under the [MLA] with respect to all of the patents, patent applications and related rights licensed, assigned or otherwise granted to IDMC." Ex. 2. at -368. A list of patents and applications covered by the Assignment was attached as Exhibit B and included the '120 Patent and '331 Patent. *Id.* at -368, -414-15.

Defendants do not appear to dispute the validity of the Assignment, nor could they; the MLA is clear that Licensee had the right to assign any and all rights under the MLA without Licensor's consent. Ex. 1 at -347.

Following the assignment of rights to Empire, [redacted] *See, e.g.*, Ex. 4 at -442 ([redacted]). And Empire made required maintenance payments for the patents-in-suit, documented the '120 Patent as a highlighted asset when contacting counterparties about its wireless portfolio, and managed its patent portfolio in all other manners to include the '120 Patent. Exs. 5-6 (maintenance payments); Ex. 7 (listing the '120 Patent as among Empire's U.S. patent assets).

### C. The MLA Permitted IDMC to Select Inventions in Various Ways, One of Which Was by Payment of a Specified Fee

The MLA, governed by Texas law, permitted the University to give IDMC, *e.g.*, an Invention Disclosure (*i.e.*, a document describing inventions) "together with an executed" ISA in order for IDMC to review and determine whether to accept or reject it. *See* Ex. 1 at -332, -339. This process was outlined in Section 1 of the MLA. *Id.* at -332 (MLA §§ 1.1, 1.2). The one-page ISA form is attached as Exhibit A to the MLA. *Id.* at -356.

[redacted]

IDMC was required to make a non-refundable payment of $10,000 notifying the University that it accepted an Invention Disclosure, and another $10,000 payment at each "Closing." *Id*. at -332-33 (MLA § 2.1(a)). These payments were made by debiting from a "prepayment" fund, which IDMC funded at the start of each fiscal year (the "Selected Invention Disclosure Prepayment"). *Id*. at -333 (MLA § 2.1(b)). In the first fiscal year after the MLA was executed, the Selected Invention Disclosure Prepayment was $100,000; and it would remain the same in each renewal term so long as (i) the University submitted at least twenty-five Invention Disclosures to IDMC per year, and (ii) IDMC accepted at least five such Invention Disclosures per year. *Id.*

"Closing" for a particular asset would occur upon the "satisfaction or waiver" of certain conditions and Licensee making the applicable payments by debiting from the fund. *Id.* at -338-39. *Licensee* had the right to determine whether the conditions for Closing had been satisfied and had the right to waive the Closing conditions: "With respect to a Selected Invention Disclosure, the Closing will occur when (i) *Licensee* determines that all the [enumerated] conditions have been *satisfied or waived* and (ii) *Licensee* has made the License Payment contemplated under paragraph 2.1(a)(ii) (such payment to be *conclusive evidence* of *Licensee's* determination that the [enumerated] conditions have been *satisfied or waived*)" *Id*. at -339 (emphasis added). The enumerated conditions included Licensor's transmittal of certain documentation, *including the ISA* (*id*.; *id.* at -338 ("Deliverables" includes ISA)), Licensor's compliance with obligations under the MLA that were to be performed on or prior to Closing (*id*. at -339), and the parties' satisfaction that each other's respective representations and warranties were true and correct (*id*.).

### D. Amendment No. 2 to the MLA Permitted IDMC to Select Inventions in Additional Ways, One of Which Was by Filing a Non-Provisional Patent Application

The MLA was amended three times from 2009 to 2011. As relevant here, Amendment No. 2 to the MLA (the "Amendment") became effective on May 17, 2010. Ex. 3 at -986. The stated

[redacted]

purpose of the Amendment was that "Licensor and Licensee wish to amend the MLA to provide that Licensor may *also* submit *patent applications* to Licensee for possible acceptance and licensing by Licensee under the MLA." *Id.* (emphasis added). In contrast to acquiring exclusive license rights in an invention pre-patent filing, this process was created for the rarer instances where the University had already filed a patent application for a submitted invention disclosure. To that end, the Amendment, *e.g.*, (i) updated the definitions of "Invention" and "Invention Disclosure" to extend to patent applications already filed by Licensor at the time of the amendment; and (ii) broadened Section 1.3. *Id.* at -986-87.

Specifically, the Amendment redefined "Invention"[4] and "Invention Disclosure"[5]:

> "Invention" means the inventions and discoveries disclosed in an Invention Disclosure and ***claimed in the provisional patent application filed by Licensor*** and/or the ***patent applications filed by Licensee in accordance with Section 1.3 of the Agreement*** (or that could have been claimed in such patent application based on the written specification actually contained therein).
>
> "Invention Disclosure" means a document, in substantially the form posted on the website of the University's technology commercialization office from time to time for disclosure of inventions by its inventors, describing the Invention ***either alone or together with a provisional patent application with respect to an Invention that has already been filed prior to submission to Licensee under Section 1.1. For the avoidance of doubt, in the case of provisional patent applications, a copy of the provisional patent application, as filed, will be submitted to Licensee with the Invention Disclosure form.***

*Id.* at -986 (emphasis highlighting new content). Section 1.3 was amended in pertinent part as follows:

---

[4] The original definition of "Invention" was "the inventions and discoveries disclosed in an Invention Disclosure and claimed in the patent applications filed by Licensee in accordance with Section 1.3 of the Agreement (or that could have been claimed in such patent application based on the written specification actually contained therein)." Ex. 1 at -354.

[5] The original definition of "Invention Disclosure" was "a document, in substantially the form posted on the website of the University's technology commercialization office from time to time for disclosure of Inventions by its inventors describing the Invention." *Id.*

[redacted]

> For each Selected Invention Disc1osure, unless otherwise prohibited by applicable law and subject to the cooperation of the applicable Inventors with Licensee and patent prosecution counsel, Licensee will file at least one (1) United States patent application, within six (6) months after Licensee's execution of the Invention-Specific Agreement; ***provided that if Licensor has already filed a provisional patent application with respect to such Selected Invention Disclosure, then Licensee will file a non-provisional patent application on or prior to the deadline for converting such provisional patent application***....

*Id.* at -987 (emphasis highlighting new content). A "Selected Invention Disclosure" means "an Invention Disclosure accepted by Licensee under Section 1 of the Agreement. Ex. 1 at -355.

Through these changes to the defined terms and Section 1.3, the Amendment established an alternative and additional pathway for the University to submit, and the Licensee to adopt, certain inventions, *i.e.*, inventions that had already been memorialized in a University-filed provisional patent application. At the time the parties executed the Amendment, the University had already filed a provisional patent application for the '120 Patent's inventions, and IDMC had filed a non-provisional application that was pending. Ex. 8 at -060-61; Ex. 15 at -657.

At no time was Samsung a party to, or beneficiary of, the MLA or Assignment. The parties to the MLA are (i) The University of Texas at Austin Board of Regents; and (ii) Invention Development Management Company, LLC. Ex. 1 at -330. And those parties expressly excluded others, like Samsung, from the contract:

> This Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any party), and no action may be commenced or prosecuted against a party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement. . . .

*Id.* at -350. Samsung had no part in negotiating, documenting, or performing the MLA.

### E. IDMC Obtained an Exclusive License to the '120 Patent

On [redacted], the [redacted]. Ex. 9 at -001. It was assigned the

[redacted]

identifier: [redacted] *Id.* On March 18, 2009, the University's counsel filed a provisional patent application for [redacted] U.S. Patent Application No. 61/161,166. Ex. 8 at -060; Ex. 10 at -109. 5507HEA later became the invention claimed by the '120 Patent.

On June 26, 2009, the University and IDMC entered into the MLA. Ex. 1 at -330. On December 2, 2009, [redacted]. Ex. 11 at -327. The University and IDMC referred to the '120 Patent's inventions (i) as [redacted] and (ii) [redacted] *See, e.g., id.* [redacted]; Ex. 12 at -281. This usage of the inventions' unique identifiers is exactly as the MLA contemplated. Ex. 1 at -352. The parties thus had a shared understanding that the '120 Patent's inventions were under the MLA.

Moreover, the documentary evidence shows that IDMC [redacted] Ex. 13 at -302. [redacted] *Id.* ([redacted]).

On February 19, 2010, the University and IDMC [redacted] Ex. 14 at -017-18. The [redacted] *Id.* at -018. In connection with the [redacted], and [redacted]. *Id.* Accordingly, on March 18, 2010,

[redacted]

IDMC filed a non-provisional patent application that later issued as the '120 Patent. Ex. 15 at -657 (U.S. Patent Application No. 12/727,049).

On April 5, 2010, IDMC personnel sent [redacted] correspondence noting, [redacted] (Ex. 16 at -320-21), [redacted]. *See* Ex. 25 ([redacted]). One month later, the option was exercised by virtue of the Amendment to the MLA, which took effect on May 17, 2010. Ex. 3 at -986.

The parties' course of conduct, from approximately mid-2009 until the date of this filing, demonstrates their mutual understanding that IDMC was the exclusive licensee of the '120 Patent. As mentioned above, IDMC [redacted]. Ex. 11 at -327. Until IDMC assigned its rights to Empire, IDMC [redacted] Ex. 13; Ex. 17. And since IDMC assigned its rights to Empire, [redacted] Ex. 4 at -442 ([redacted]).

**F. Empire Did Not [redacted]**

Under the MLA, Licensee would be entitled to [redacted] Ex. 1 at -341. The MLA provides that "all notices" must be delivered in hard copy to a physical address:

> *All notices* required or permitted to be given hereunder will be in writing, will make

[redacted]

> reference to this Agreement and *will be delivered by hand, or dispatched by prepaid air courier to the addresses* set forth on the cover page of this Agreement.

*Id*. at -349 (emphasis added). [redacted] is not a recognized form of notice under the MLA.

The MLA further provides that, after [redacted] upon Licensor's request, Licensee would be required to send [redacted] *Id.* at -341

On June 30, 2021, [redacted]. Ex. 18. At her deposition, [redacted] Ex. 19 at 76:11-20, 76:21-77:2 [redacted].

[redacted] Rudersdorf Decl. ¶¶ 6-7 [redacted] And the University [redacted]. Rudersdorf Decl. ¶¶ 7, 10.

At all times, Empire continued to pay all maintenance fees on the '331 Patent. For example, on September 23, 2021 – [redacted] – Empire paid the

[redacted]

second maintenance fee due to the Patent Office for the '331 Patent.[6] Ex. 20. Empire also paid the third and final maintenance fee on February 5, 2025. Ex. 22. Empire, of course, also defended Samsung's IPR challenging the '331 Patent in the PTAB – which fully terminated on March 13, 2025 – while keeping the University apprised. Exs. 23-24.

## III. LEGAL STANDARD

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307 (5th Cir. 2021) (citation and internal quotation marks omitted). "Courts only grant motions to dismiss when it is clear the claimant can prove no set of facts in support of its claims that would entitle it to relief." *IP Innovation L.L.C. v. Google, Inc.*, 661 F. Supp. 2d 659, 662 (E.D. Tex. 2009).

In patent cases, those who possess "exclusionary rights" in a patent possess Article III standing to sue infringers and "suffer an injury when their rights are infringed." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019). "A grant of all substantial rights in a patent amounts to an assignment – that is, a transfer of title in the patent – which confers constitutional standing on the assignee to sue another for patent infringement in its own name." *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). A party "that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention." *Id*. at 1346.

Motions made pursuant to Federal Rule of Civil Procedure 12(c) are "designed to dispose

[6] Empire paid the first maintenance fee due to the Patent office for the '331 Patent on March 27, 2017. Ex. 21.

[redacted]

of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation and internal quotation marks omitted). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). In deciding a motion under Rule 12(c), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (citation and internal quotation marks omitted).

## IV. ARGUMENT

Under the Patent Act, "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. "Patentee" includes not only the individual(s) to whom the patent was initially issued, but also the successors in title to the patentee. 35 U.S.C. § 100(d). Courts must look to "the substance of an agreement to determine whether it has the effect of an assignment and, thus, satisfies the statutory requirement that the 'patentee' must sue." *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030, 1032 (Fed. Cir. 1995) ("To resolve the issue of standing, we must examine the licensing agreement to determine whether the parties intended to effect a transfer of proprietary rights to the licensee as an incident to protection of its interests.").

"Construction of patent assignment agreements is a matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008) (citing *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996)). Under Texas law, which governs the instant MLA, the interpretation of an unambiguous contract is a question of law for the court. *See, e.g.*, *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 813 (Fed. Cir. 2024) (reversing dismissal of patent claims due to erroneous conclusion that plaintiff lacked standing under applicable license agreement (citing *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004))).

[redacted]

Moreover, "contracts are read as a whole to give meaning to the parties' intent as expressed in the writing, and an agreement is considered ambiguous only where the language of the contract is subject to two or more *reasonable* interpretations or meanings." *Id.* (emphasis added).

**A. Empire Has Standing to Sue for Infringement of the '120 Patent**

Empire is the '120 Patent's exclusive licensee "with all substantial rights." Samsung does not dispute that Empire assumed all rights possessed by IDMC at the time of the Assignment. Instead, Samsung tries to challenge IDMC's acquisition of rights to the '120 Patent under the MLA, pointing to alleged procedural flaws with the process the MLA parties followed when transferring those rights. Not only is Samsung's position based on an incorrect reading of the MLA, it also asks this Court to disregard (i) the parties' mutual understanding that the '120 Patent is among the licensed patents; and (ii) more than fifteen years of conduct consistent therewith, including the University and Empire's collaboration in the instant patent infringement proceedings.

Samsung's argument hinges on the premise that (i) IDMC and the University were required to execute an ISA with respect to the '120 Patent for it to be covered by the MLA; and (ii) the Amendment did not create an avenue for IDMC to obtain rights to the '120 Patent, absent an ISA, despite IDMC's and the University's intent to create such an avenue. Both parts of Samsung's premise are incorrect.

**i. The Amended MLA Created a Pathway for Licensing Inventions that the University Had Reduced to a Provisional Patent Application, Including the '120 Patent's Inventions**

Samsung ignores the plain language and effect of the Amendment. Putting aside that the original version of the MLA contemplated that *the University* would provide IDMC with an ISA

[redacted]

for the inventions IDMC would evaluate,[7] the Amendment expressly created a separate pathway for inventions to be accepted, particularly for inventions like [redacted] that had already been reduced to provisional and non-provisional patent applications at the time the Amendment took effect.

Section 1.3 was amended to provide the parties flexibility in the event that Licensor had already filed a provisional application for a particular invention offered to IDMC. *See supra* § II.D. By its plain terms ("*provided however* . . ."), this amendment not only added a new pathway for the University to offer IDMC inventions, it created an *alternative* pathway that obviated the need for an ISA altogether where, as here, the parties had advanced the invention beyond a disclosure and had already filed a patent application on the invention. *See Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 261 (5th Cir. 2020) (contracts are to be read as a whole and words must be given "their plain meaning unless the provision is ambiguous") (citation and internal quotation marks omitted); *Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 310 (5th Cir. 2022) (under Texas law, the intent of the parties, as manifested in the writing, governs whether an amendment supersedes prior terms of the contract); *Bornstein v. Marcus*, 275 So. 3d 636, 640 (Fla. Dist. Ct. App. 2019) ("When determining the scope of a modification to a contract, the following principles control: (1) '*individual terms of a contract are not to be considered in isolation, but as a whole and in relation to one another*'; (2) 'the proper resolution of any inconsistency . . . is best determined by the manner in which the parties *actually perform under it*'; and (3) 'an amendment to an agreement is designed to serve some useful function, and its existence is strong evidence, therefore, that the

[7] The step of executing an ISA was [redacted], as explained above at Section II.C and below at Section IV.A.ii.

[redacted]

contract was changed from what the parties believed and intended was provided before.'") (citation omitted) (emphases added).

Specifically, amended Section 1.3 requires only that "if Licensor has already filed a provisional patent application with respect to such Selected Invention Disclosure, then Licensee will file a non-provisional patent application on or prior to the deadline for converting such provisional patent application." Ex. 3 at -987. The Effective Date of the Amendment is May 17, 2010. *Id.* at -986. The University had filed the provisional patent application before then, in March 2009. Exs. 8, 10.

With regard to the "Selected Invention Disclosure" mentioned in Section 1.3, it was simply "an Invention Disclosure *accepted by Licensee* under Section 1 of the Agreement." Ex. 1 at -355 (emphasis added). [redacted] was accepted by IDMC (and thus was a Selected Invention Disclosure) [redacted]. Ex. 13. That documentation also shows [redacted]. *Id.* [redacted]

Thus, Samsung's argument that the amendments create requirements *additional to* (rather than replacing) those found in Sections 1.1 and 1.2 – particularly when patent applications had been filed – runs counter to the express language of the amended MLA.

Other terms of the Amendment further reinforce that the MLA parties intended to create this pathway as an alternative. The stated purpose of the Amendment was to allow Licensor to submit pending patent applications – rather than Invention Disclosures and ISAs – to Licensee for possible acceptance and licensing. To achieve this purpose, the parties amended Section 1.3 and other provisions. For example, the parties broadened the definition of "Invention" to include not

[redacted]

only the inventions disclosed in patent applications filed by Licensee, but also "claimed in [a] provisional patent application filed by *Licensor*."[8] Ex. 3 at -986 (emphasis added). Similarly, they broadened the definition of "Invention Disclosure" to include a document describing the Invention "either alone *or together with a provisional patent application* with respect to an Invention *that has already been filed prior to submission to Licensee under Section 1.1*." *Id*. (emphases added).

These provisions make clear that there were at least two ways for Licensor to submit an invention to Licensee for potential acceptance and licensing under the MLA: (i) Licensor could submit an Invention Disclosure and ISA pursuant to Section 1.1 (as Samsung suggests); *or* (ii) Licensor could submit to Licensee an already-pending provisional patent application (as the Amendment expressly states). Samsung's suggestion that IDMC was required to walk *both* pathways is belied by the contractual text itself. Either pathway could lead to a Selected Invention Disclosure: (i) where the Invention was described in an Invention Disclosure form with an ISA indicating acceptance; or (ii) where the Invention was already subject to a provisional patent application and IDMC provided acceptance without an ISA.

To the extent the Court finds any ambiguity in the Amendment, extrinsic evidence confirms Empire's explanation. *See, e.g.*, *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1292 (Fed. Cir. 2008) (when a contract is ambiguous, "[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract may . . . be considered in determining the parties' true intent"). For example, [redacted]

---

[8] As noted above (*see supra* §§ II.D-E), Licensor filed provisional U.S. Patent Application No. 61/161,166, which claimed the [redacted] invention, on March 18, 2009, which predated the Amendment. IDMC took over and filed the non-provisional patent application on March 18, 2010, which claimed priority to the provisional application.

[redacted]

[redacted] *See* Ex. 25 at -309 ([redacted]).

Correspondence between the parties also shows that [redacted] Exs. 25-26.[9]

[redacted]

[9] Samsung points to documents [redacted] (Br. at 7), but such documents are irrelevant because they pre-date the Amendment. *See, e.g.*, Exs. 25-26. Samsung also cites an [redacted] Br. at 6-7), [redacted] Ms. Rudersdorf also confirmed that, [redacted] Ex. 19 at 97:21-99:5, 100:12-24.

[redacted]

[redacted]

Ex. 19 at 91:16-93:8 (attorney objections omitted).

Empire's testimony also explains that, contrary to Samsung's claim [redacted] (Br. at 7, 12-13)[redacted]. There was thus no need for a separate licensing agreement:

[redacted]

[redacted]

[redacted]

Ex. 19 at 94:21-95:2, 97:5-12 (attorney objections omitted).

Taken together, the contractual and conduct evidence make it clear that the purpose of the Amendment was to license inventions via a pathway additional to those contemplated by the original MLA, and that the '120 Patent was licensed as a result.

**ii. IDMC Waived Any ISA Requirement by Making Payments that Serve as "Conclusive Evidence" of Licensing**

Additionally, the MLA expressly permitted IDMC to waive the need for an ISA by making a Closing payment, as IDMC in fact did. Pursuant to MLA Section 4.3, Closing would occur when "*Licensee determines* that all the [conditions for Closing] have been *satisfied or waived*," and "Licensee has made the License Payment contemplated under paragraph 2.1(a)(ii) (*such payment to be conclusive evidence* of Licensee's determination that the following conditions have been

---

[10] Paragraph 2 of the Amendment is the amended Section 1.3. Ex. 3 at -987.

[redacted]

*satisfied or waived*).” Ex. 1 at -339 (emphases added). The conditions for Closing included *Licensor's* delivery of the Deliverables required under Section 4.1 and *Licensor's* compliance with all obligations under the MLA. *Id*. In other words, it was *Licensor's* responsibility to satisfy conditions for Closing to occur, but it was *Licensee's express right to waive compliance* with any of these conditions by making the Closing payment. IDMC made the required payments and filed the required patent application. There is no credible argument that the MLA (as amended or not) required IDMC to do more, and the University not delivering an ISA could not prevent a Closing under these circumstances.

The original MLA contemplated that *Licensor* would provide Licensee with an executed ISA for each Invention Disclosure, the absence of which would have been grounds for Licensee to not accept an Invention Disclosure for patenting. Ex. 1 at -338-39. Although Samsung argues that an ISA was still required for the ’120 Patent’s inventions after the Amendment (it was not), it is clear from the structure of the parties’ arrangement that Licensee could and did waive Licensor’s supposed ISA requirement. *See Intell. Tech*, 101 F.4th at 813 (“Under Texas law, contracts are read as a whole to give meaning to the parties’ intent as expressed in the writing. . . .”).

IDMC’s course of conduct also shows unambiguously that it had accepted the Invention Disclosure relating to the ’120 Patent. IDMC took numerous steps that showed its intent to accept the Invention Disclosure, including by (i) [redacted]” (Ex. 11 at -327); (ii) [redacted] (Ex. 14 at -018); (iii) [redacted] (*id.*); (iv) filing the non-provisional patent application using IDMC’s counsel (Ex. 15); (v) [redacted] (Ex. 17); and (vi) [redacted] (Exs. 13, 16, 17). Under the plain

[redacted]

terms of the MLA, IDMC's Closing payments were "conclusive evidence of Licensee's determination" that (i) the University had delivered all Deliverables that IDMC cared to receive; and (ii) the University had "complied in all respects with all of the obligations under this Agreement that are to be performed or complied with" by the University. Ex. 1 at -339. Nothing more was required under the MLA.

**iii. All Relevant Parties Understood that IDMC, and Later Empire, Licensed the '120 Patent**

The record shows that the understanding of all relevant parties at all relevant times – at the time that IDMC [redacted] at the time of the Assignment, and at the time this lawsuit was filed – was that IDMC licensed the '120 Patent. [redacted][11] as of December 2, 2009, notwithstanding the fact that there was no ISA. Ex. 13 at -302. IDMC [redacted], which the [redacted]. Ex. 11 at -327. [redacted]. Ex. 16 at -320-21; *see also* Ex. 1 at -339 ([redacted]). On March 18, 2010, IDMC filed non-provisional U.S. Patent Application No. 12/727,049, [redacted]. Ex. 17 at -297. And [redacted] Ex. 25 at -309. As such, it is clear that the parties intended for the '120 Patent, [redacted] to be licensed under the agreement.

Additionally, the '120 Patent was among the licensed patents identified in the Assignment.

---

[11] [redacted] Ex. 19 at 65:17-66:3.

Ex. 2 at -414. In that agreement, IDMC assigned to its affiliate Empire all rights and obligations with respect to (without limitation) the patents and applications identified in Exhibit B to the agreement. *Id*. at -368. Because the '120 Patent was among the patents identified, it was clearly one of the patents that IDMC intended to be covered by the assignment to Empire and for which IDMC knew it possessed the rights to assign.

The University has never challenged IDMC's right to assign the '120 Patent rights to Empire. In fact, [redacted] Ex. 4 at -442 [redacted] The '120 Patent has also [redacted]. Exs. 23-24.

### B. Empire Has Standing to Sue for Infringement of the '331 Patent

Empire has satisfied its burden of demonstrating that, as the licensee of the '331 Patent with "all substantial rights," it has standing to sue for Samsung's infringement. Samsung does not genuinely contest the proper assignment of rights to the '331 Patent.[12] Instead, Samsung claims that Empire [redacted] Br. at 15. Samsung suggests that the [redacted] (*see* Ex. 19 at 76:11-77:2), demonstrates that Empire [redacted]

[12] Samsung claims that Empire cannot prove that the ISA for the '331 Patent was "delivered by hand[] or dispatched by prepaid air courier" and, thus, Empire never had rights to the '331 Patent. Br. at 17. [redacted]. Ex. 28 at -003. [redacted] *See supra* at Section II.C; *see also* Ex. 27 at -293 [redacted]

[redacted]

*e.g.*, (i) Empire never delivered [redacted] as is *required* under the MLA; (ii) [redacted] (iii) neither the University nor Empire has ever treated the [redacted]; and (iv) Empire has paid all fees and expenses to generate and maintain the patent, both before *and after* the 2021 [redacted].

As a matter of simple contract law, Empire could not have [redacted], as the unambiguous language of the MLA provides that such notices must be delivered in hard copy to a physical address. Ex. 1 at -349. To effectuate notice under the MLA, the notice provision specifies the form and manner of notice – "in writing" and "delivered by hand, or dispatched by prepaid air courier to the addresses set forth on the cover page of this Agreement." *Id*. Under Texas law, this provision is to be read in light of the entire contract to determine the parties' intent. *See*, *e.g.*, *Parking Co. of Am. v. Wilson*, No. 05-99-00404-CV, 2002 WL 387180, at *2 (Tex. App. Mar. 13, 2002). The parties clearly intended that any formal notice – particularly of [redacted] for which Empire had consistently paid over decades – must be delivered via specific means. Had the parties intended for [redacted] they could have said so; but they did not. *Intell. Tech*, 101 F.4th at 813 (contracts must be read "to give meaning to the parties' intent as expressed in the writing").

Underscoring this point is the fact that the MLA expressly permits the parties to use electronic communications for *other* purposes, such as exchanging signature pages. *See* Ex. 1 at -350-51 ("'Transmitted copy' means a copy bearing a signature of a party that is reproduced or transmitted *via email* of a .pdf file, photocopy, facsimile, or other process of complete and accurate reproduction and transmission.") (emphasis added). This makes clear that, when the contract is "read as a whole," the parties *intended* for certain communications to be exchanged via [redacted] while

[redacted]

others – including [redacted] – were required to be delivered physically. *Intell. Tech*, 101 F.4th at 813.

Here, Empire never [redacted]. *See* Rudersdorf Decl. ¶ 7 [redacted] As noted above, the [redacted] was clearly insufficient to constitute notice of abandonment under the plain terms of the MLA. This is enough to end the inquiry. *Intell. Tech*, 101 F.4th at 813; *see also Certain Underwriters at Lloyd's*, 951 F.3d at 261 (contracts are to be read as a whole and words must be given "their plain meaning unless the provision is ambiguous").

Samsung, in apparent recognition of the fact that [redacted] under the plain language of Section 10.8 of the MLA, instead argues that the [redacted] "substantially complied" with the MLA. Br. at 16. But the cases identified by Samsung do not create the doctrine or rule Samsung's brief suggests and do not support Samsung's position. While the doctrine of substantial compliance may excuse "a party's deviations from a contractual requirement . . . if those deviations do not severely impair the purpose of the requirement," *Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 678 (5th Cir. 2023) (citation and internal quotation marks omitted), Samsung has not identified any case that suggests notice of [redacted]

[redacted]

[redacted] requires anything less than strict compliance with the terms of the unambiguous agreement. Indeed, the "deviation from a contractual requirement" that Samsung proposes would most certainly "severely impair the purpose of" the notice requirement – it would nullify it entirely.

As Samsung suggests, *Elmen Holdings* involved a lease where notice was required to be delivered in person or by registered mail. *Id*. at 679. There, when the defendant *breached* the lease by failing to make the required royalty payments, and was thereafter notified of that non-payment by email, the defendant argued the email could not serve as notice under the lease provision. *Id*. The court disagreed, unsurprisingly, and held that for this simple notice of breach after the defendant had failed to perform its obligations, the email "substantially complied" with the contract, permitting the plaintiff to pursue remedies for the breach. *Id*. But unlike the facts of *Elmen Holdings*, Samsung asks this Court to ignore the clear intent and plain language of the contract and apply a test of substantial compliance to [redacted] That is markedly different than a notice sent to a breaching party. Samsung identifies no caselaw or doctrine suggesting anything like the aggressive result it urges here. And *Samsung's* invocation of this "doctrine" of substantial compliance – rather than one of the parties invoking it – further casts doubt on Samsung's argument. In effect, Samsung (a stranger to the contract) argues that, despite the *parties'* views and conduct, and despite the unambiguous *contractual* text, *Samsung* is entitled to wipe away its infringement liability by insisting that [redacted] under an agreement that even Samsung recognizes as a valuable IP asset. Samsung offers no precedent for such an outcome.

The undisputed facts demonstrate that [redacted]

[redacted]

treated by the University, as a [redacted]. After the [redacted] was sent, Empire reaffirmed its rights to the '331 Patent in several ways. First, on September 23, 2021, Empire paid the second maintenance fee due to the Patent Office for the '331 Patent.[13] Ex. 20. Empire thereafter paid the third and final maintenance fee on February 5, 2025. Ex. 22. The 2021 and 2025 payments would have been unnecessary had Empire [redacted]. There also is no evidence that the University understood Empire to have [redacted]. Before this suit was filed, [redacted] Ex. 23. Had Empire actually [redacted], the University could have intervened before Empire brought suit or made any submissions to the Patent Office, but it did not do that, as both Empire and the University understood that Empire [redacted] All the uncontroverted facts demonstrate that Empire intended to [redacted] and that [redacted]

Here, unlike in *Elmen Holdings*, where *both* contract parties recognized the breach, neither party "understood" Empire to have abandoned its rights to the '331 Patent. *Elmen Holdings,* 86 F.4th at 680. With respect to Empire's intent, [redacted]. Ex. 19 at 77:3-10;

---

[13] Under Section 5.4 of the MLA, [redacted] Ex. 1 at -341. [redacted] Empire paid the maintenance fee for the '331 Patent on September 23, 2021, which is within 90 days of the date of the [redacted]. Ex. 20.

[redacted]

*see also id.* at 79:4-13 [redacted]. *Id.* at 76:11-20.[14]

Empire did not [redacted] and thus, possesses exclusionary rights and the requisite Article III standing to pursue these claims. Accordingly, Samsung's motion must be denied.

### C. Samsung's Challenge to the '331 Patent Only Affects Damages, Not Constitutional Standing

Even if Empire had in fact [redacted] (which it did not, for the reasons discussed above), such [redacted] would have only been effective in late 2021. There is no genuine dispute that Empire and its predecessor-in-interest had an exclusive license for the '331 Patent from at least 2010 to 2021, which covers a substantial portion of the damages period in this case. *See supra* § VI.B at 20 n.12. At best for Samsung, this motion could only impact the damages period by ending it in 2021, but it does not support full dismissal for lack of standing.

## CONCLUSION

Empire possesses "all substantial rights" in the patents. Samsung's Rule 12 motion should be denied.

---

[14] Samsung argues that [redacted] Br. at 15. [redacted] . [redacted] which was not a legally sufficient means to effectuate [redacted].

[redacted]

Dated: March 31, 2025

Respectfully submitted,

*/s/ Nathaniel Browand*
Nathaniel Browand (admitted pro hac vice)
New York Bar No. 4349981
Christopher Gaspar (admitted pro hac vice)
New York Bar No. 2932762
Rachel Wolf (admitted pro hac vice)
New York Bar No. 5857438
Leslie Irwin (admitted pro hac vice)
New York Bar No. 6060545
Nicholas Fallah (admitted pro hac vice)
New York Bar No. 6090542
MILBANK LLP
55 Hudson Yards
New York, New York 10001
(212) 530-5000
nbrowand@milbank.com
cgaspar@milbank.com
rwolf@milbank.com
lirwin@milbank.com
nfallah@milbank.com

Marina Markarian (admitted pro hac vice)
California State Bar No. 340686
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
(424) 386-4000
mmarkarian@milbank.com

Elizabeth L. DeRieux
Texas Bar No. 05770585
CAPSHAW DERIEUX, LLP
114 East Commerce Avenue
Gladewater, Texas 75647
(903) 845-5770
ederieux@capshawlaw.com

*Attorneys for Plaintiff*
*Empire Technology Development LLC*

[redacted]

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, all counsel of record are being served with a copy of the foregoing document via electronic mail.

/s/ *Nathaniel Browand*
Nathaniel Browand

[redacted]

[redacted]