# EXHIBIT 1

# MASTER LICENSE AGREEMENT

| | |
|---|---|
| ***Licensor Agreement ID:*** | PM0905501 |
| ***Licensee Agreement ID:*** | |
| | |
| ***Licensor Name:*** | c/o Office of Technology Commercialization<br>The University of Texas at Austin<br>Board of Regents, The University of Texas System |
| ***Licensor Address:*** | Attn: Accounting Department<br>3925 West Braker Lane, Suite 1.9A<br>Austin, Texas 78759<br><br>Email: accounting@otc.utexas.edu |
| ***Licensee Name:*** | Invention Development Management Company, LLC |
| ***Licensee Address:*** | Invention Development Management Company, LLC<br><br>[c/o Intellectual Ventures]<br><br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| ***License Payment:*** | $20,000 |
| ***Profit Participation percentage:*** | 15% |
| ***Effective Date:*** | June 26, 2009 |

In witness whereof, intending to be legally bound, the parties have signed below to enter the attached Master License Agreement and Exhibits (this "***Agreement***") as of the Effective Date with the terms and conditions that follow. Capitalized terms not otherwise defined are set forth in Appendix 1 attached to this Agreement.

LICENSOR:

**BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM**

By: ____________________

Name: Juan M. Sanchez, Ph.D.

Title: Vice President for Research
The University of Texas at Austin

LICENSEE:

**INVENTION DEVELOPMENT MANAGEMENT COMPANY, LLC**

By: ____________________

Name: Chris Alliegro

Title: SR. DIRECTOR

Agreed to Section 7 hereof:

**THE UNIVERSITY OF TEXAS AT AUSTIN**

By: ____________________

Name: Juan M. Sanchez, Ph.D.

Title: Vice President for Research



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

# MASTER LICENSE AGREEMENT

The parties to this Master License Agreement listed on the previous page hereby agree as follows:

## 1. SUBMISSION AND ACCEPTANCE OF INVENTION DISCLOSURES

### *1.1 Submission*

From time to time, under the Open Submission Program or in response to an RFI, Licensor may submit to Licensee one or more Invention Disclosures, together with an executed Invention-Specific Agreement for each Invention Disclosure. The parties acknowledge and agree that an Invention-Specific Agreement may cover multiple Invention Disclosures. Each Invention-Specific Agreement will be irrevocable by Licensor for a period of sixty (60) days after submission to Licensee.

### *1.2 Acceptance*

(a) Acceptance Process. Within sixty (60) days after Licensee's receipt of an Invention Disclosure, or such longer period agreed to by Licensee and Licensor in writing ("Review Period"), Licensee will (i) review each Invention Disclosure submitted by Licensor and (ii) notify Licensor in accordance with paragraph 1.2(b) whether or not Licensee has selected such Invention Disclosure to be a Selected Invention Disclosure.

(b) Notification. If Licensee selects an Invention Disclosure to be a Selected Invention Disclosure, Licensee must notify in writing Licensor before the end of the Review Period of Licensee's acceptance and send to Licensor a Transmitted Copy of the Invention-Specific Agreement executed by Licensee indicating acceptance of the particular Invention Disclosure(s) (the "***Notification***"). If Licensee indicates "not accepted" on the Invention-Specific Agreement with respect to a particular Invention Disclosure or if Licensee does not provide such Notification to Licensor during the applicable Review Period, then such Invention Disclosure and the Invention disclosed therein (and any resulting Patents) shall not be subject to this Agreement, and Licensee shall not have any rights therein.

### *1.3 Patent Applications*

For each Selected Invention Disclosure, unless otherwise prohibited by applicable law and subject to the cooperation of the applicable Inventors with Licensee and patent prosecution counsel, Licensee will file at least one (1) United States patent application within six (6) months after Licensee's execution of the Invention-Specific Agreement. If such filing is prohibited by applicable law, Licensee shall notify Licensor within such six (6) month period and the applicable Selected Invention Disclosure and the Invention disclosed therein (and any resulting Patents) shall no longer be covered by this Agreement or by the applicable Invention-Specific Agreement.

## 2. PAYMENT

### *2.1 Payment*

(a) License Payment. Subject to paragraphs (b) and (c) below, for each Selected Invention Disclosure, Licensee shall pay to Licensor non-refundable payments of (i) Ten

Thousand United States Dollars (US $10,000) upon Notification, and (ii) Ten Thousand United States Dollars (US$10,000) at each applicable Closing (collectively, "***License Payment***"). Licensor will furnish Licensee with all necessary information to make an electronic transfer to a designated bank account of Licensor.

(b) Selected Invention Disclosure Prepayment; Credit. In anticipation of accepting submitted Invention Disclosures, Licensee will pay to Licensor a non-refundable prepayment for each fiscal year of Licensor (September 1 – August 31) during the Term ("***Selected Invention Disclosure Prepayment***"). Licensor shall hold Selected Invention Disclosure Prepayment as credit for Licensee and, at each applicable Notification or Closing, at the direction of Licensee, debit the License Payment for each Selected Invention Disclosure. From time to time upon Licensee's request, Licensor will provide to Licensee a statement of account with respect to the Selected Invention Disclosure Prepayment. Said Selected Invention Disclosure Prepayment shall be non-refundable, other than as credits for the License Payments arising during the applicable fiscal year. The Selected Invention Disclosure Prepayment for the 2008-09 Licensee fiscal year will be One Hundred Thousand Dollars ($100,000). For each Renewal Term, the Selected Invention Disclosure Prepayment shall be the same as the previous fiscal year as long as Licensor submitted at least twenty five (25) Invention Disclosures in such previous fiscal year and Licensee accepted at least five (5) Invention Disclosures in such fiscal year. If Licensor did not submit at least twenty five (25) Invention Disclosures in such previous fiscal year or Licensee did not accept at least five (5) Invention Disclosures in such fiscal year, then the Selected Invention Disclosure Prepayment for the then current Renewal Term shall be 50% of the Selected Invention Disclosure Prepayment of the prior fiscal year. The Selected Invention Disclosure Prepayment for the 2008-2009 Licensor fiscal year shall be paid by Licensee within ten (10) days of execution of this Agreement and thereafter shall be paid on October 1 of succeeding Licensor fiscal years during the Term.

(c) Additional License Payments in Excess of Selected Invention Disclosure Prepayment. During the Term, if the aggregate License Payments payable for Selected Invention Disclosures exceeds the amount of the Selected Invention Disclosure Prepayment for the applicable fiscal year of Licensor, then for each Selected Invention Disclosure not covered by the Selected Invention Disclosure Prepayment, Licensee shall pay such additional License Payments at the applicable Notification or Closing.

### *2.2 Profit Participation*

Licensor will receive the percentage of the Profit (the "***Profit Participation***") set forth on the cover page of this Agreement. The Profit Participation will be payable on the due dates for the reports required by paragraph 2.6 for Revenue received during the respective Reporting Period.

### *2.3 Portfolio Monetization; Allocation of Portfolio Profit to IP Groups*

Licensor acknowledges and agrees that Licensee and/or its Affiliates may from time to time sublicense, assert, litigate or otherwise exploit the Patents (and not the Inventions separate and apart from the Patents in which they are claimed) with other patents or patent applications held or controlled by Licensee and/or its Affiliates (a "***Portfolio Monetization***"). The parties acknowledge and agree that, unless a Portfolio Monetization specifies a particular royalty for one or more of the patents or patent applications (including the Patents), the Portfolio Profit will be determined according to the following methodology.

Licensee and/or its Affiliates will rank each of the patents and patent applications included in

the Portfolio Monetization as of the date of the applicable Portfolio Monetization in one of the following four categories:

> Category R1: patents and patent applications actually asserted against the licensee and discussed in detail during the discussions leading to the Revenue (i.e., named, analyzed and discussed in the assertion materials and negotiations);
>
> Category R2: patents and patent applications specifically mentioned but not discussed in detail in the discussions leading to the Revenue (i.e., listed as one of the patents that the licensee might infringe or need to license);
>
> Category R3: patents and patent applications in the same patent class code as one or more R1 or R2 patents and patent applications (i.e., not asserted or specifically mentioned, but, as evidenced by its class code, may have been infringed or needed to be licensed by the licensee); and
>
> Category R4: all other patents and patent applications included in the Portfolio Monetization.

Portfolio Profit will be allocated among the patents and patent applications included in the Portfolio Monetization according to the following formula (except, and to the extent, a Portfolio Monetization specifically assigns allocations otherwise):

$$P = R * (VA/P_N)$$

Where:

> P = Portfolio Profit allocated to each patent and/or patent application included in a Portfolio Monetization in one of the four categories
>
> R = Portfolio Profit
>
> VA = Value Allocation for that patent category (see below)
>
> $P_N$ = Aggregate number of patents or patent applications from that category included in the Portfolio Monetization

The Value Allocations for the four categories are:

R1 = 55%

R2 = 27.5%

R3 = 13.75%

R4 = 3.75%

### *2.4 Adjustments to Value Allocations*

Notwithstanding the foregoing Value Allocations, for any given Portfolio Monetization, in the event that the formula set forth above results in allocated per item Portfolio Profit in category R1 being less than the allocated per item Portfolio Profit in category R2, R3 or R4,

or the allocated per item Portfolio Profit in category R2 being less than the allocated per item Portfolio Profit in category R3 or R4, or the allocated per item Portfolio Profit in category R3 being less than the allocated per item Portfolio Profit in category R4, then, in each such event, Licensee and/or its Affiliates will appropriately adjust the formula such that the allocated per item Portfolio Profit for each category is equal to or higher than the allocated per item Portfolio Profit for each higher numbered category (for example, the allocated per item Portfolio Profit in category R1 should be equal to or higher than allocated per item Portfolio Profit in categories R2, R3 and R4, after the adjustment). Furthermore, in the event that any patent category has no patents or patent applications, then Licensee and/or its Affiliates will adjust the Value Allocations to allocate the null category's Value Allocation pro rata (based on relative Value Allocations) among the other categories. For purposes of this paragraph, an "item" will be a patent or a patent application included in the given Portfolio Monetization.

### *2.5 Good-Faith Allocations Final*

In allocating patents or patent applications among categories for purposes of allocating Portfolio Profits, adjusting Value Allocations, and determining Portfolio Profits, Licensee and its Affiliates will exercise their reasonable business judgment, in good faith, without inequitable discrimination for or against patents or patent applications held or controlled by Licensee or any of its Affiliates. Any allocation or adjustment that is not clearly and materially inconsistent with the foregoing will be final, binding, and conclusive.

### *2.6 Reports and Records*

As of each March 15 through the end of the last to expire of any ISA Terms, Licensee will provide to Licensor a report reasonably detailing its sublicensing activities with respect to the Patents for the preceding twelve (12) month period ending as of December 31 (each, a "***Reporting Period***") when there has been Revenue with respect to the Patents in such Reporting Period, or stating that there has been no Revenue when there has been no Revenue with respect to the Patents in such Reporting Period. The period from the Effective Date until December 31, 2009 shall constitute the first Reporting Period.

No later than the 15th day after the end of each calendar quarter (i.e., April 15th, July 15th, etc.), Licensee will also provide to Licensor a quarterly report with respect to each Selected Invention Disclosure (identified by title and Unique UT Identifier) with the following information current as of the last day of such calendar quarter: (a) the date of submission, (b) the date of acceptance, (c) the date of patent application filing (or if the patent application has not yet been filed, the status of the patent prosecution activity), (d) the date of receipt by Licensee of the last necessary Assignment Agreement with respect to each Selected Invention Disclosure (or the status of receipt of the necessary Assignment Agreements) and (e) date of Closing (if it has occurred).

### *2.7 Books of Account*

Licensee will keep accurate books of account containing all particulars that may reasonably be deemed necessary for the purpose of showing the Amounts payable to Licensor hereunder. Any Monetization Expenses or IP Group Expenses for Reporting Periods that exceed Revenue for that Reporting Period will be carried forward to the next Reporting Period such that Profit will not be deemed to have occurred for any Reporting Period until

cumulative Revenues exceed cumulative Monetization Expenses (whether of a Portfolio Monetization or a monetization event involving solely the Patents) and cumulative IP Group Expenses in the current Reporting Period and all prior Reporting Periods. Said books of account will be kept at Licensee's or its Affiliates' principal place of business or, if written notice thereof is given to Licensor, the principal place of business of the appropriate division of Licensee to which this Agreement relates. Not more than once during every twenty-four (24) month period and upon Licensor's advance request of at least thirty (30) days, Licensee will make said books and the supporting data available for inspection by Licensor or its agents during normal business hours for the two (2) most recent Reporting Periods for the sole purpose of verifying Licensee's calculations of the Profit Participation under this Agreement. Should such inspection lead to the discovery of a greater than ten percent (10%) discrepancy in reporting to Licensor's detriment, Licensee agrees to pay the reasonable fees and expenses of Licensor's agents who conducted the inspection. Licensee will promptly pay to Licensor all amounts appropriately determined by any audit to be due to Licensor. Any and all disputes with respect to the Profit Participation due under this Agreement or the calculation of Profit must be (a) raised within ninety (90) days after completion of the associated audit, and (b) resolved solely and exclusively pursuant to the provisions of paragraph 10.7.

### *2.8 Nondivison*

No Person will anticipate, alienate, hypothecate, divide, pledge, exchange, encumber, or charge any right to payment of Profit Participation (if any) under this Agreement, and any attempt to anticipate, alienate, hypothecate, divide, pledge, exchanges, encumber, or charge any right to payment of Profit Participation under this Agreement will be void. No right or benefit hereunder shall in any manner be liable for or subject to the debts, contracts, liabilities or torts of the Person entitled to such benefit (if any such benefit arises).

### *2.9 Inventor Payments*

Licensor will be obligated to pay to Inventor any amounts due to such Inventor in respect of Inventions and Patents in accordance with Licensor's rules as applicable from time to time, and Licensee will have no obligation to pay any amounts to Inventor. Licensor will be responsible for all costs, losses, damages, liabilities and expenses arising out of or related to any failure to pay to Inventor any consideration due to Inventor by Licensor based on payments made by Licensee to Licensor hereunder.

## 3. GRANT OF EXCLUSIVE LICENSE

### *3.1 Exclusive License*

For all Selected Invention Disclosures, effective upon the Closing, Licensor hereby grants to Licensee, the exclusive (subject to paragraph 3.4), worldwide, transferable, sublicensable license of all rights of any kind conferred by the Inventions and the Patents, including, without limitation, the rights of any kind to, or conferred by, the Inventions and the Patents to (a) use or otherwise practice any art, methods, processes, and/or procedures covered by the Patents, (b) make, have made, use, offer to sell, sell, import, and otherwise distribute or dispose of any inventions, discoveries, products, services, or technologies covered by the Patents, (c) work, make profits from, or otherwise exploit any rights granted in the Patents and the Inventions, and (d) exclude other Persons from exercising any of such rights. For

the avoidance of doubt, the parties acknowledge that Licensee has no right to dispose of or otherwise assign the Licensor's ownership interest in the Inventions and the Patents.

### *3.2 Sublicenses*

The exclusive license rights granted to Licensee under paragraph 3.1 include the right to grant and authorize, from time to time and in Licensee's sole and absolute discretion, one or more sublicenses but only if the Closing with respect to the relevant Selected Invention Disclosure has occurred. No sublicense granted to any Person pursuant to the terms of this Agreement will be terminable as a result of the termination of the Term.

### *3.3 Assignment of Causes of Action and Other Rights*

For all Selected Invention Disclosures, Licensor hereby assigns, transfers and conveys to Licensee, effective upon the applicable Closing, all right, title and interest in and to all:

(a) Rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any of the Patents and the Inventions;

(b) Causes of action and enforcement rights of any kind (whether such claims, causes of action or enforcement rights are known or unknown; currently pending, filed, to be filed; or otherwise) under the Patents and/or under or on account of any of the Patents for past, current and future infringement of the Patents, including without limitation, all rights to (i) pursue and collect damages, profits and awards of whatever nature recoverable, (ii) injunctive relief, (iii) other remedies, and (iv) subject to paragraph 10.15, compromise and/or settle all such claims, causes of action and enforcement rights for such infringement by granting an infringing party a sublicense or otherwise; and

(c) Rights to collect royalties or other payments under or on account of any of the Patents or any of the foregoing.

### *3.4 Rights of Licensor*

(a) It is understood and agreed that the granting of any license hereunder is subject to the institutional rights of Licensor, and its respective employees, to make and to use the Inventions for research, clinical and educational purposes on behalf of Licensor, including, but not limited to, subject to paragraph 3.4(b), publishing educational and scholarly works, but for no other purpose, and that if federal funding supported the Patents, Licensee's license will also be subject to the rights, conditions, obligations and limitations imposed by United States law including, without limitation, USA manufacturing, the royalty-free, non-exclusive license granted to the United States government (see 35 U.S.C. § 202 et seq. and regulations pertaining thereto). It is further understood and agreed that nothing herein will be construed to grant Licensee a license, express or implied, under any patent owned solely or jointly by Licensor other than the Patents expressly licensed hereunder. As reasonably requested by Licensor, Licensee will use commercially reasonable efforts to cooperate with Licensor to comply with Licensor's reporting and other obligations under United States law.

(b) With respect to RFI submissions only, in the event that Licensor and/or Inventor desires to publish or publicly present materials with respect to a Selected Invention Disclosure, Licensor will submit a copy of the proposed written materials to Licensee for Licensee's review and comment at least thirty (30) days prior to submission for publication

or presentation. Licensor and/or Inventor will cooperate with Licensee in making such revisions as Licensee deems reasonably necessary or appropriate to preserve Licensee's rights in any Inventions that might be disclosed in the publication or presentation. If Licensee requests that Licensor and/or Inventor prevent or delay publication/presentation of all or any portion of his or her materials for up to sixty (60) days to enable Licensee to adequately protect and exploit any Inventions that might be disclosed in the publication or presentation, Licensor and/or Inventor will honor Licensee's request. With respect to disclosures made by Licensor to Licensee that are not pursuant to an RFI, Licensor will inform Licensee upon disclosure of any prior publication or presentation of each such disclosure.

### *3.5 Diligence*

Licensor acknowledges and agrees that Licensee and its Affiliates intend from time to time to sublicense the Patents with other patent rights held or controlled by Licensee and its Affiliates, and will in good faith seek to generate Profit consistent with the business plan of Licensee and its Affiliates. Licensee and its Affiliates may seek such Profit by making decisions in Licensee and its Affiliates' sole discretion.

### *3.6 Reasonable and Non-Discriminatory Licensing*

If Licensee chooses to pursue non-exclusive licensing of the Patents, Licensee will do so on reasonable and nondiscriminatory terms.

## 4. CLOSING AND ADDITIONAL OBLIGATIONS

### *4.1 Delivery*

Within twenty (20) calendar days following the date Licensee receives a Transmitted Copy of the applicable Invention-Specific Agreement executed by Licensor, Licensor shall send to Licensee, or its legal counsel, copies of all Reported Publications (defined in paragraph 7.5) and any non-public prior art references cited in the Invention Disclosure. Licensor will provide any other relevant documents relating to the Invention Disclosures reasonably requested by Licensee and reasonably available to Licensor within twenty (20) calendar days after such request. Within twenty (20) days of Licensee notifying Licensor of the filing of a patent application with respect to any Invention, Licensee's counsel will send the Form of Assignment Agreement (Attachment 1) to applicable Inventors for signatures. As may be necessary from time to time, Licensor will use reasonable efforts to (i) obtain fully executed Assignment Agreements from the Inventors with respect thereto; and (ii) cause such fully executed Assignment Agreements to be delivered to Licensee's representatives. The items required to be delivered by Licensor under this paragraph 4.1 are collectively referred to as the "**Deliverables**".

### *4.2 Closing*

Licensor and Licensee will use reasonable efforts to satisfy the conditions to Closing described in paragraph 4.3 for each Selected Invention Disclosure under the related Invention-Specific Agreement entered into between Licensor and Licensee. Upon satisfaction or waiver of all conditions to Closing described in paragraph 4.3, Licensee will thereafter pay Licensor the applicable balance of the License Payment (or direct Licensor to debit the applicable License Payment from the Selected Invention Disclosure Prepayment) on the closing (each, a ***"Closing"***) in accordance with Section 2. After Closing, Licensee may record the Assignment Agreements with any patent office and any recording expenses,

including costs, attorneys' fees, and translation expenses, shall be borne by Licensee. With respect to each Selected Invention Disclosure, in the event all conditions to Closing set forth in paragraph 4.3 are not met or waived by Licensee within the earlier of (a) eight (8) months after the initial delivery by Licensor to Licensee of the Invention-Specific Agreement signed by Licensor with respect thereto or (b) thirty (30) days after the filing of the patent application, each of Licensor and Licensee will have the right to terminate the applicable Invention-Specific Agreement with respect to such Selected Invention Disclosure by written notice to the other party; provided that Licensor may only terminate the applicable Invention-Specific Agreement with respect to such Selected Invention Disclosure pursuant to this paragraph 4.2 if Licensor has made commercially reasonable efforts to comply in all material respects with its obligations under paragraph 4.1; provided further, that if Closing has not occurred because of Licensee's failure to pay the applicable License Payment, Licensor shall not have the right to terminate the applicable Invention-Specific Agreement with respect to such Selected Invention Disclosure unless and until Licensor has delivered written notice of such failure to pay to Licensee and Licensee has failed to make the License Payment within fifteen (15) days of receiving such notice.

### *4.3 Closing Conditions*

With respect to a Selected Invention Disclosure, the Closing will occur when (i) Licensee determines that all the following conditions have been satisfied or waived and (ii) Licensee has made the License Payment contemplated under paragraph 2.1(a)(ii) (such payment to be conclusive evidence of Licensee's determination that the following conditions have been satisfied or waived):

(a) Transmittal of Documents. Licensor will have delivered to Licensee all the Deliverables (defined in paragraph 4.1).

(b) Compliance With Agreement. Licensor performed and complied in all respects with all of the obligations under this Agreement that are to be performed or complied with by it on or prior to the applicable Closing.

(c) Representations and Warranties True. Licensee is satisfied that, as of the Effective Date and as of the applicable Closing, the representations and warranties of Licensor contained in Section 7 are true and correct, and Licensor is satisfied that, as of the Effective Date and as of the applicable Closing, the representations and warranties of Licensee contained in Section 8 are true and correct.

The preceding conditions are conditions precedent to the applicable Closing and to Licensee's obligation to make the payments contemplated pursuant to this Agreement.

### *4.4 Further Cooperation*

(a) For each Selected Invention Disclosure, Licensor will, and will take commercially reasonable steps to cause Inventor to, fully and diligently cooperate with Licensee and Licensee's designated patent counsel or patent agent to prepare patent applications and promptly to respond to requests and be available in connection therewith. Licensor will, and will take commercially reasonable steps to cause Inventor to, do all lawful and just acts that may be or become necessary for evidencing, maintaining, recording and perfecting Licensee's rights to file such patent applications, including, without limitation, execution, acknowledgment and recordation of specific assignments to Licensor, oaths, declarations and other documents on a country-by-country basis in a form required by Licensee.

(b) At the reasonable request of Licensee Licensor will, and will take commercially reasonable steps to cause Inventor to, execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including, without limitation, execution, acknowledgment and recordation of other such papers, and using reasonable efforts to obtain the same from the respective inventors, as necessary or desirable for fully perfecting and conveying unto Licensee the benefit of the transactions contemplated hereby, including, without limitation, providing and assisting in obtaining execution of any assignments to Licensor, confirmations, powers of attorney, inventor declarations, and other documents that Licensee may request for prosecuting, maintaining, filing, obtaining issuance of, registering, enforcing, defending, or bringing any proceeding relating to the Patents. Licensee shall compensate Licensor for any reasonable, documented disbursements and time incurred after Closing in connection with providing assistance under this subparagraph 4.4(b) in connection with any enforcement or other infringement action regarding the Patents, under a standard billable hour rate of Licensor; provided that Licensor shall have furnished Licensee in advance, written estimate of the fees and costs for such assistance and Licensee shall have agreed in writing to pay such fees and costs.

## 5. Filing, Prosecution and Maintenance of Patent Rights

### *5.1 Costs*

After the Closing, Licensee will, at its sole cost and expense, be solely entitled and responsible for the prosecution, maintenance and defense of all Patents (except to the extent of any portion of the Patents are abandoned pursuant to the terms of this Agreement). Licensee may, but is not obliged to consult with Licensor regarding execution of its responsibility. It is understood that the prosecution of the Patents will be conducted by counsel who have an outside counsel contract with the University of Texas System and the Texas Attorney General provided that Licensee's failure to use such approved outside counsel will not constitute a material breach of this Agreement. If Licensee requests that Licensor enter into outside counsel contract(s) with particular outside counsel, Licensor will reasonably cooperate with such request.

### *5.2 Copies of Prosecution Documents*

Licensee will provide Licensor with a copy of documents received or filed by Licensee pertaining to the filing, prosecution, maintenance or defense of the Patents, including, without limitation, each patent application, office action, response to office action, request for terminal disclaimer, and request for reissue or reexamination of any patent issuing from such patent application.

### *5.3 Conduct of Prosecution*

The conduct of the preparation, filing, prosecution, maintenance, and defense of the Patents will be under Licensee's exclusive control and discretion. Licensee is authorized to execute and record, on Licensor's behalf, any document submitted to the USPTO or other governmental patent office that pertains to filing, prosecution, maintenance, or defense of the Patents, including, without limitation, consents to reissue applications, and declarations. Licensee will consult with Licensor on such matters from time to time on Licensor's reasonable request. At the reasonable request of Licensee, Licensor will, and will take commercially reasonable steps to cause Inventor to, execute and deliver to Licensee such other documents, and do and perform such other acts and things, as may be reasonably

necessary or desirable for confirming in Licensee exclusive right to prosecute, maintain, defend, file, obtain issuance, register, enforce, defend, or bring any proceeding relating to the Patents including, without limitation, execution, acknowledgment and recordation of such documents necessary to convey to Licensee any right or power of attorney in the USPTO or other governmental patent office, in respect to prosecution, maintenance, defense, filing, issuance, or registration of the Patents.

### *5.4 Abandonment of License to Patents*

Licensee will at any time be entitled to abandon its license and other rights to all or any part of the Patents by providing at least ninety (90) days' advance written notice of such intention to Licensor (the "Notice of Abandonment"). Upon such Notice of Abandonment, at the request of Licensor, Licensee will, or cause Licensee's patent counsel, to send Patent files for abandoned Patents to Licensor. From and after providing such Notice of Abandonment, Licensee will have no further rights or obligations with respect to such abandoned portion of the Patents (including the Inventions). Any sublicense granted with respect to any Patents abandoned hereunder will not be terminated or altered as a result of such abandonment, provided that (a) such sublicense was granted prior to the effectiveness of such abandonment, (b) Licensee shall continue to pay the applicable Profit Participation with respect to any sublicense that remains in effect and (c) Licensee has disclosed to Licensor in the Notice of Abandonment, the aggregate number of related sublicenses that are outstanding, the name of any related sublicensee (subject to any applicable confidentiality restrictions), and whether any of these sublicenses permit further sublicensing.

### *5.5 Licensor's Assistance*

Licensor will, and will take commercially reasonable steps to cause Inventor to, provide Licensee with such assistance as Licensee will reasonably request in connection with the filing, prosecution, maintenance, or defense of the Patents. Licensee will not be responsible for any costs incurred by Licensor without Licensee's prior written agreement to bear such costs.

### *5.6 Recordation of Licenses*

Licensor, without demanding any further consideration, will execute all documents reasonably requested by Licensee to effect recordation of the license relationship between the parties created by this Agreement.

## 6. ENFORCEMENT OF PATENTS

### *6.1 Enforcement*

Licensee and its Affiliates will have the exclusive right, but not the obligation, to, in Licensee's own name and at Licensee's expense (or in the name and expense of an Affiliate of Licensee), institute, prosecute, and control any action or proceeding with respect to infringement of the Patents, using counsel of its choice, including any declaratory judgment action arising from such infringement (subject to paragraph 10.15). In the event Licensee exercises its right to commence such action or proceeding, Licensee will notify Licensor prior to such commencement. Thereafter, on Licensor's written request no more frequently than every two (2) months, Licensee will report to Licensor reasonable, nonprivileged information on the status of the action or proceeding commenced by Licensee. Licensor does not have and/or retain any right to, and will not, institute any case, action or other enforcement



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY 

proceeding with respect to infringement of the Patents.

### *6.2 Joinder; Cooperation in Litigation*

This Agreement transfers to Licensee all substantial rights under the Patents and, as a result, Licensee has the right to bring any future action or proceeding to enforce claims under the Patents in its own name, without naming Licensor as a party thereto. However, if necessary or desirable in Licensee's sole discretion, Licensee may provide written notice to Licensor that it seeks Licensor's permission to name Licensor as a party in any action or proceeding to enforce the Patents, provided that Licensor will not be named voluntarily as a co-party in any action or proceeding to enforce the Patents unless Licensee first obtains the written permission of Licensor, which permission shall not be unreasonably withheld, provided however, Licensor shall have reasonable prior input on choice of counsel on any matter where such counsel represents Licensor and Licensee and such counsel agrees to follow all required procedures of the Texas Attorney General regarding retention of outside counsel for state entities. If Licensee finds it necessary or desirable, Licensor will execute all papers or perform any other acts or provide any assistance, at Licensee's expense, toward pursuing such action or proceeding, as reasonably required by Licensee. Licensor will use its reasonable efforts to ensure that any Licensor personnel will be available to cooperate, at Licensee's expense, toward pursuing such action. If Licensee names Licensor voluntarily as a co-party in any action or proceeding to enforce the Patents after obtaining permission from Licensor as stated above, Licensee agrees that it will directly pay, or immediately reimburse Licensor for, all reasonable legal costs and expenses incurred by Licensor, including witness fees, for legal representation of Licensor (including independent representation of Licensor if Licensor believes that its interests may diverge from Licensee's) in connection with any such action or proceeding to enforce the Patents, all subject to the following: (a) Licensor shall reasonably cooperate and provide such assistance (including, without limitation, testimony and access to documentation) as Licensee may reasonably request in writing in connection with any such action or proceeding to enforce the Patents, provided, that Licensor shall not be required to take any actions that require out-of-pocket expenditures or a material use of internal Licensor resources unless Licensee agrees to bear the costs thereof in accordance with paragraph 10.14, and (b) Licensee will not be obligated to pay or reimburse any reasonable costs and expenses of Licensor under this paragraph 6.2 if and to the extent any such action or proceeding to enforce the Patents arises out of any breach of this Agreement by Licensor (including, without limitation, any breach of Licensor's representations and warranties set forth in Section 7). Except as specifically provided in this paragraph 6.2, paragraph 5.5, paragraph 10.14, Licensee will not have any obligation to pay or reimburse any reasonable costs or expenses (including, without limitation, any fees or expenses of any legal counsel retained by Licensor), unless otherwise agreed in writing by Licensee.

### *6.3 Damages for Breach*

In the event of any claim, dispute, controversy, or material breach of this Agreement by Licensee, subject to the terms and conditions of this Agreement, Licensor may seek exclusively money damages (except as otherwise provided in paragraph 9.5), pursuant to the terms and conditions of this Agreement, including, without limitation, paragraphs 9.1 through 9.3. In no event, however, will Licensor be entitled to take any action or direct any proceeding with respect to the Patents and/or the Inventions without Licensee's express consent and direction unless and until there has been a termination of the Invention-Specific Agreement with respect to the particular Selected Invention Disclosure because of Licensee's uncured breach in accordance with Section 10.3(b).

7. REPRESENTATIONS AND WARRANTIES OF LICENSOR

Except as otherwise noted below, Licensor (or The University of Texas at Austin ("***UT***") where specifically indicated) represents and warrants to Licensee as of the Effective Date hereof and the ISA Effective Date of the applicable Invention-Specific Agreement.

***7.1 All Substantial Rights***

Licensor intends by this Agreement to provide to Licensee all substantial rights under the Patents.

***7.2 Authority***

Licensor is a state agency duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation. Licensor has the full power and authority and has obtained all third party consents, approvals, and/or authorizations required to enter into this Agreement and to carry out its obligations hereunder.

***7.3 Independent Work***

To UT's knowledge, formed after reasonable due diligence and investigation, for each Selected Invention Disclosure, the Invention has been independently created solely by Inventor.

***7.4 Ownership***

For each Selected Invention Disclosure, Inventor has assigned (or is under obligation to assign) to Licensor all right, title and interest in and to the Invention, including, without limitation, to all Patents, and UT has received no notice from and is not aware of any third party having or claiming any rights in or to the Invention. Licensor owns, and as of the Closing, Licensor will hold, all right, title and interest to each right conferred under this Agreement with respect to the Patents and the Inventions, as specified in the Selected Invention Disclosure, including, without limitation, all rights, title, and interest in and to the causes of action assigned by this Agreement, subject to the rights granted to Licensee hereunder and to the other interests described in paragraph 3.4. UT represents and warrants to Licensee as of the Effective Date and as of the applicable Closing that (a) each right conferred under this Agreement with respect to the Patents and the Inventions is free and clear of all liens, mortgages, security interests, and restrictions on transfer, except as noted, (b) to the knowledge of UT, there are no actions, suits, investigations, claims, or proceedings threatened, pending or in progress relating in any way to any right conferred under this Agreement with respect to the Patents and the Inventions, and (c) there are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to or in any Person to acquire any Patents and the Inventions.

***7.5 No Prior Disclosure***

For each Invention Disclosure, Licensor has not, and to UT's knowledge formed after reasonable due diligence and investigation, Inventor has not disclosed the Invention, or any related information or ideas, in whole or in part, to any third party or in any public way or in a way that could become public, and no third party has had access to the Invention (in whole or in part) except (a) any prior and pending disclosures and/or the publications identified in the Invention Disclosure or in the Invention-Specific Agreement ("***Reported Publications***") (b) any non-enabling invention profiles thereof published on the University

website ("Non-enabling Profiles"), (c) under a non-disclosure agreement ("NDA Disclosures") or (d) as required by law or regulation ("Legal Disclosures"). Without limiting the foregoing, neither Licensor nor any Inventor has applied for patent protection with respect to any Invention. Licensor shall also disclose to Licensee in the Invention Disclosure or in the Invention-Specific Agreement (i) the number of NDA Disclosures, (ii) any Legal Disclosures (other than to sponsoring agencies identified in the Invention Disclosure) that have been made with respect to any such Invention prior to the date of the related Invention Disclosure and (iii) any Non-enabling Profiles (by delivering copies to Licensee of such Non-enabling Profiles).

### *7.6 Confidentiality*

For each Selected Invention Disclosure, Licensor and, to UT's knowledge, formed after reasonable due diligence and investigation, each Inventor, has kept the Invention confidential using reasonable commercial efforts, except for the Reported Publications, the Non-enabling Profiles, the NDA Disclosures and the Legal Disclosures.

### *7.7 No Commercial Sale*

For each Selected Invention Disclosure, neither Licensor, nor UT, nor Inventor, nor any third party has sold or licensed, or offered for sale or to license (excluding any non-enabling invention profiles published on the University website, in accordance with Section 7.5 above), the Invention or offered for sale any product based on the Invention, or otherwise taken any commercial advantage of the Invention (e.g., including commercialization of a product based on the Invention), and Licensor is not aware of any plans related thereto. For each Selected Invention Disclosure, UT shall disclose to Licensee any offers for sale or offers to license pursuant to a non-enabling invention profile published on Licensor's website in accordance with Section 7.5.

### *7.8 No Public Use*

For each Selected Invention Disclosure, there has been no public use or demonstration of the Invention (e.g., a device implementing the Invention), regardless of whether details of the Invention itself were evident from such public use or demonstration, and Licensor is not aware of any plans related thereto.

### *7.9 Existing Licenses and Restrictions on Rights*

UT represents and warrants to Licensee as of the ISA Effective Date of each Invention-Specific Agreement that with respect to each right conferred under this Agreement with respect to the Patents and the Inventions for each Selected Invention Disclosure, (a) no licenses to and/or under the Patents and/or the Inventions have been granted or retained by Licensor or any Inventor, except for the rights specifically retained in this Agreement or disclosed in the Invention Disclosure; and (b) Licensee will not be subject to any covenant not to sue or similar restrictions on its enforcement or enjoyment of any of the Patents and/or the Inventions as a result of the transactions contemplated in this Agreement or any prior transaction related to the Patents and/or the Inventions.

## 8. REPRESENTATIONS AND WARRANTIES OF LICENSEE

Licensee represents and warrants to Licensor as of the Effective Date hereof and the ISA Effective Date of the applicable Invention-Specific Agreement:

### *8.1 LLC Power*

Licensee is duly organized and validly existing under the laws of the jurisdiction of its formation and has full power and authority to enter into this Agreement and to carry out the provisions hereof.

### *8.2 Due Authorization*

Licensee is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder. The individual executing this Agreement on Licensee's behalf has been duly authorized to do so by all requisite corporate action.

## 9. DISCLAIMER OF REPRESENTATIONS AND WARRANTIES; LIMITATION OF LIABILITY; EXCLUSIONS FROM DAMAGES

### *9.1 Disclaimer of Representations and Warranties*

NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY EXCEPT FOR THEIR RESPECTIVE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTIONS 7 AND 8, AND EACH PARTY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. LICENSEE GIVES LICENSOR NO ASSURANCE THAT ANY PROFIT (EITHER FROM A MONETIZATION EVENT INVOLVING SOLELY THE PATENTS OR AS PART OF A PORTFOLIO MONETIZATION) WILL BE GENERATED FOR LICENSOR OR THAT ANY PROFIT PARTICIPATION WILL BE PAYABLE TO LICENSOR. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 7, NEITHER PARTY GIVES THE OTHER PARTY ANY ASSURANCE (A) REGARDING THE PATENTABILITY OF ANY CLAIMED INVENTION IN, OR THE VALIDITY, OF ANY PATENT; OR (B) THAT MANUFACTURE, USE, SALE, OFFERING FOR SALE, IMPORTATION, EXPORTATION OR OTHER DISTRIBUTION OF ANY PRODUCT OR METHOD DISCLOSED AND CLAIMED IN ANY PATENT BY LICENSEE, ANY SUBLICENSEE OR ANYONE ELSE WILL NOT CONSTITUTE AN INFRINGEMENT OF THE INTELLECTUAL PROPERTY RIGHTS OF OTHERS.

### *9.2 Limitation of Liability*

EXCEPT IN THE EVENT OF BREACH OF ANY OF THE PRIMARY WARRANTIES BY LICENSOR, EITHER PARTY'S BREACH OF ITS OBLIGATIONS UNDER PARAGRAPH 9.5, OR LICENSOR'S INTENTIONAL MISREPRESENTATION, OR BREACH OF ANY OF THE REPRESENTATIONS AND WARRANTIES OF LICENSEE UNDER SECTION 7, NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED THE PAYMENT AMOUNT SET FORTH IN PARAGRAPH 2.1 AND 2.2. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATION ON POTENTIAL LIABILITY WAS AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

### *9.3 Exclusion of Certain Damages*

EXCEPT IN THE EVENT OF EITHER PARTY'S BREACH OF ITS OBLIGATIONS UNDER PARAGRAPH 9.5, AND/OR LICENSOR'S INTENTIONAL MISREPRESENTATION, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR COVER OR FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY 

REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. LICENSOR UNDERSTANDS AND CONFIRMS THAT THERE MAY NOT BE ANY PROFIT PARTICIPATION DISTRIBUTED UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

### *9.4. Compliance With Laws*

Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

### *9.5 Confidentiality*

(a) Confidential Information. Neither party will now or hereafter divulge any of the Confidential Information of the other party to any third party during the Confidentiality Term except: (i) with the prior written consent of the other party ; (ii) as otherwise may be required by law or legal process (including the Texas Open Records Act), including in confidence to legal and financial advisors in their capacity of advising a party in such matters; (iii) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (iv) in confidence to its legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; provided that, in (ii) through (iv) above, (x) the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including without limitation seeking a confidential treatment request or protective order whenever appropriate or available; and (y) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure; (v) the parties may disclose the terms hereof to its respective Affiliates, provided such parties agree to keep the information confidential; and (iv) Licensee may record a memorandum of the rights granted in this Agreement with patent offices and may reveal to potential sub-licensees the exclusive nature of its rights. With respect to an RFI, Licensor's sole obligation shall be to distribute any such RFI only to the employees and students of UT who have agreed in advance to terms of non-disclosure that are reasonably acceptable to Licensor and Licensee.

(b) Remedies. In the event of any breach or default, threatened or otherwise, under this paragraph 9.5, the parties acknowledge and agree that damages alone would be insufficient to compensate for any such breach or default and that irreparable harm would result from such breach or default. Consequently, in the event of any such breach or default, or any threat of such breach or default by either party, the other party will be entitled to temporary or permanent injunctive relief, specific performance and such other equitable relief as may be appropriate in the circumstances in order to restrain or enjoin such breach or default. These remedies will not be the exclusive remedies for violation of the terms of the confidentiality obligations contained in this paragraph 9.5 but will be in addition to all other remedies available to the parties at law or in equity.

## 10. MISCELLANEOUS

### *10.1 Relationship of Parties*



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY 

The parties hereto are independent contractors. Nothing in this Agreement will be construed to create a partnership, joint venture, franchise, fiduciary, employment or agency relationship between the parties. Neither party has any express or implied authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.

***10.2 Assignment; Successors***

The terms and conditions of this Agreement will inure to the benefit of Licensee, its successors, assigns and other legal representatives, and will be binding upon Licensor, its successors, assigns, and other legal representatives. Without Licensor's consent, Licensee may assign, in whole or in part, this Agreement, and/or any license or other rights Licensee acquires hereunder, to its Affiliates. Licensor will not unreasonably withhold or delay its consent to any other assignment requested by Licensee of this Agreement, in whole or in part, or of any license or other rights Licensee acquires hereunder.

***10.3 Term and Termination***

(a) Term of Agreement. The term of this Agreement (the "***Term***") will commence on the Effective Date and will continue until August 31, 2009 (the "***Initial Term***")and shall thereafter automatically renew for successive additional one (1) year terms (each, a "***Renewal Term***") unless the Agreement is terminated by either party on thirty (30) days written notice prior to the end of the Initial Term or any Renewal Term. Either party may terminate this Agreement upon thirty (30) days written notice to the other party. No Invention-Specific Agreement and/or rights and obligations with respect to the Patents licensed thereunder will be terminable as a result of the termination or expiration of the Term and the terms and conditions under this Agreement shall continue to apply to each Invention-Specific Agreement in effect.

(b) Term of Invention-Specific Agreement. The term of each particular Invention-Specific Agreement will commence on the ISA Effective Date and will continue in effect until the last to expire of the Patents licensed under said Invention-Specific Agreement, or such longer time as may be necessary, as determined at Licensee's sole and absolute discretion, to permit Licensee to fully enforce and protect its rights under the Patents for any action or proceeding for infringement arising before such expiration, unless terminated earlier pursuant to paragraph 4.2 (the "ISA Term"). In the event of a material breach of this Agreement with respect to a particular Selected Invention Disclosure, the non-breaching party will be entitled to terminate the Invention-Specific Agreement with respect to such Selected Invention Disclosure by written notice to the breaching party, if such breach is not cured within ten (10) business days (for monetary defaults) and sixty (60) days (for non-monetary defaults) after written notice specifying the breach is given to the breaching party. No sublicense granted to any Person pursuant to the terms of this Agreement will be terminable as a result of such a termination; provided that (a) Licensee shall continue to pay the applicable Profit Participation with respect to any such sublicense that remains in effect and (b) Licensee has disclosed to Licensor the aggregate number of sublicenses that are outstanding, the name of any related sublicensee (subject to any applicable confidentiality restrictions), and whether any such sublicense permits further sublicensing.

***10.4 Survival/Effect of Termination***

No termination of the Term will relieve a breaching party of its obligations arising prior to



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY 

such termination.

### *10.5 Export Controls*

It is understood and agreed that to the extent Licensor is subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes, and other commodities (including the Arms Export Control Act, as amended, and the Export Administration Act of 1979), its obligations hereunder are contingent on compliance with applicable United States export laws and regulations. The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by Licensee that Licensee will not export data or commodities to certain foreign countries without prior approval of such agency. Licensor neither represents that a license will not be required nor that, if required, it will be issued. Licensee will not export (including any deemed export) or re-export (including any deemed re-export) any products, items, articles, computer software, media, services, technical data, and other information relating to the Inventions in violation of applicable U.S. export laws and regulations or other applicable U.S. laws and regulations.

### *10.6 Governing Law*

Any claim arising under or relating to this Agreement will be governed by the laws of the State of Texas, without regard to choice of law principles to the contrary.

### *10.7 Dispute Resolution*

Except as provided under paragraph 9.5, the parties hereby waive their respective rights to seek remedies in court, and will resolve any and all claims, disputes, or controversies relating in any way to, or arising out of, this Agreement, including, without limitation, any breach or threatened breach of this Agreement, the amount of the Profit Participation due under this Agreement, or the calculation of Profit ("***Disputes***"), as follows:

(a) The party raising the Dispute shall promptly provide the other party with a written notice describing the nature of the Dispute in reasonable detail (a "***Dispute Notice***"). During the thirty (30) day period after a party's receipt of a Dispute Notice, the parties will commence discussions to attempt to resolve the Dispute.

(b) If the parties cannot timely resolve the Dispute through negotiation, before resorting to arbitration the parties will try in good faith to settle the Dispute by mediation before a mutually agreed mediator in Austin, Texas. The mediation will be conducted in English and administered by the American Arbitration Association ("***AAA***") under its Commercial Mediation Procedures. If the parties are unable to agree upon a mutually acceptable mediator, the AAA will appoint a qualified mediator. The mediation proceeding shall take place on the earliest practicable date following the submission of a request for mediation by either party, which request shall be submitted within sixty (60) days after a party's receipt of a Dispute Notice.

(c) If the Dispute is not resolved through mediation within thirty (30) days after the mediation hearing, the parties will submit the Dispute to final and binding arbitration administered by the AAA under its Commercial Arbitration Rules. The arbitrator may enter a default decision against any party who fails to participate in the arbitration proceedings.

(i) The arbitration will be conducted before a mutually agreed arbitrator in Austin, Texas. If the parties are unable to agree upon a mutually acceptable arbitrator, the

arbitrator will be selected by the AAA.

(ii) The arbitration hearing will be conducted in English, and under no circumstances will the arbitration hearing extend for more than one (1) business day. The award shall be rendered within one hundred twenty (120) days of the demand and the arbitrators shall agree to comply with this schedule before accepting appointment. The parties have included these time limits to expedite the proceeding, but they are not jurisdictional, and the arbitrator may for good cause permit reasonable extensions which shall not affect the validity of the award.

(iii) All documents and information relevant to the Dispute in the possession of any party shall be made available to the other party not later than sixty (60) days after the demand for arbitration is served, and the arbitrator may permit such depositions or other discovery deemed necessary for a fair hearing.

(iv) The parties agree that the arbitration method to be employed by the parties will be "baseball arbitration," in which case each party will submit to the arbitrators and exchange with each other in advance of the hearing their last, best offers and the arbitrators will be limited to awarding only one or the other of the two figures submitted.

(v) The arbitrators' award may be entered and enforced in any court with competent jurisdiction and will be nonappealable. Such decision may be used in a court of law only for the purpose of seeking enforcement of the arbitrator's decision permitted under this Agreement.

(vi) The costs of the arbitration proceeding, including reasonable attorneys' fees and costs, will be determined by the arbitrators, who may apportion costs equally, or in accordance with any finding of fault or lack of good faith of either party.

(vii) To the fullest extent permitted by law, no arbitration under this Agreement shall be joined to any other arbitration, and no class arbitration proceedings shall be permitted.

(viii) Except as may be required by law, neither a party nor any arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(ix) The arbitrator may not modify the terms of this Agreement and may not award punitive, exemplary or other damages excluded by paragraphs 9.2 and 9.3.

Notwithstanding the foregoing, nothing in this paragraph 10.7 will be construed to waive any rights of timely performance of any obligations existing under this Agreement through the Closing. Licensor's sole and exclusive remedy in the event of any claim, dispute, or controversy under this Agreement will be the recovery of money damages, subject to the disclaimer and limitations set forth in this Agreement, including, without limitation, those in paragraphs 9.1 through 9.3.

***10.8 Notices and Payment Delivery***

All notices required or permitted to be given hereunder will be in writing, will make reference to this Agreement and will be delivered by hand, or dispatched by prepaid air courier to the addresses set forth on the cover page of this Agreement. Such notices will be deemed given when received by addressee or, if delivery is not accomplished by reason of

some fault of the addressee, when tendered for delivery. Either party may give written notice of a change of address to the other. After notice of such change has been received, any notice or request will thereafter be given to such party at such changed address.

***10.9 Sovereign Immunity***

Licensee acknowledges that nothing in this Agreement shall constitute a waiver of sovereign immunity by Licensor.

***10.10 Severability***

If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

***10.11 Waiver***

Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

***10.12 Miscellaneous***

This Agreement, including its exhibits and appendix, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. This Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any party), and no action may be commenced or prosecuted against a party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement. No oral explanation or oral information by either party hereto will alter the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties. The terms and conditions of this Agreement will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any letter, email or other communication or other writing not expressly incorporated into this Agreement. The following appendix and exhibits are attached hereto and incorporated herein: ***Appendix 1*** (entitled "Definitions"); ***Exhibit A*** (entitled "Form of Invention-Specific Agreement") and ***Attachment I*** (entitled "Assignment Agreement").

***10.13 Counterparts; Electronic Signature***

This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument. Each party will execute and promptly deliver to the other parties a copy of this Agreement bearing the original signature. Prior to such delivery, in order to expedite the process of entering into this Agreement, the parties acknowledge that a Transmitted Copy of this Agreement will be deemed an original document. "Transmitted Copy" means a copy bearing a signature of a

party that is reproduced or transmitted via email of a .pdf file, photocopy, facsimile, or other process of complete and accurate reproduction and transmission.

### *10.14 Indemnification*

Licensee shall defend (with legal counsel selected and retained by Licensee and approved by Licensor, which approval shall not be unreasonably withheld), indemnify and hold harmless Licensor, UT, The University of Texas System and their Regents, officers, employees, agents and their respective successors, assigns and heirs and Licensor's inventors and sponsors (in their role as sponsors only) of the research that led to the Patents ("***Indemnitees***") against any and all claims, suits and legal actions by any third party ("***Claims***"), based upon any theory of liability (including, without limitation, warranty, strict liability or tort, and regardless of any factual basis), arising out of the exercise of any rights under this Agreement to the Patents or any licensee of Licensee or any of its Affiliates, successors or assigns, all subject to the following:

(a) Indemnitees shall give Licensee written notice of the Claim which any Indemnitee desires Licensee to defend, indemnify and hold harmless under this Agreement promptly after any Indemnitee receives notice thereof. Indemnitees shall not settle or compromise any such Claim without the prior written consent of Licensee. Indemnitees shall cooperate and provide such assistance (including, without limitation, testimony and access to documentation within the possession or control of any Indemnitee) as Licensee may reasonably request in connection with Licensee's defense, settlement and satisfaction of the Claim; provided that Licensee shall pay or reimburse all of the costs and expenses reasonably incurred by Indemnitees to provide any such cooperation and assistance in accordance with Licensee's written request. Licensee may not admit liability or wrongdoing on the part of an Indemnitee without the Licensor's written consent, giving such consent, if requested, will be considered in light of the Licensor's status as a public university as well as the facts of the case.

(b) As part of Licensee's obligation to defend, indemnify and hold harmless Indemnitees, Licensee will pay any and all (i) costs and expenses reasonably incurred by Licensee in connection with the defense, settlement or satisfaction of any Claim (including, without limitation, any amounts agreed to by Licensee in settlement of the Claim) and (ii)amounts required by any judgment or order of any court to be paid by Indemnitees as damages or other relief based on the Claim; provided that Indemnitees have complied with their obligations under clause (a) above with respect to the Claim.

(c) Licensee will not be obligated to defend, indemnify or hold harmless any Indemnitee against any Claim or related costs and expenses if and to the extent the Claim arises out of any material breach of this Agreement by Licensor (including, without limitation, any breach of Licensor's representations and warranties set forth in Section 7).

(d) Licensee will be entitled to treat as IP Group Expenses all Amounts paid or incurred by or on behalf of Licensee in the specific defense of claims levied against Licensor, or Licensee where the claimant names Licensor as a party in the claim.

(e) Except as specifically provided in clauses (a) and (b) within this paragraph 10.14 or as provided in paragraphs 4.4 and 5.5, Licensee will not have any obligation to pay or reimburse any costs or expenses (including, without limitation, any fees or expenses of any legal counsel retained by any Indemnitee), unless otherwise agreed in writing by Licensee.

(f) The obligations under this paragraph 10.14 shall not be subject to paragraph 9.2.

***10.15 Exercise of Duties of Texas Attorney General***

For the avoidance of doubt, it is understood and agreed that nothing in this Agreement will be construed to limit the ability of the Texas Attorney General to exercise its duties under the Texas General Appropriations Act.

***10.16 Use of Unique UT Identifier***

Whenever Licensee submits any payments or correspondence or other information to Licensor in connection with this Agreement, Licensee's obligations hereunder or any Selected Invention Disclosure under an Invention-Specific Agreement, Licensee shall include the applicable unique UT identifier (i.e., UT tech ID as set forth in the applicable Invention-Specific Agreement).

***10.17 Reservation of Rights; Ownership***

Except for the rights granted under the terms of this Agreement, as between Licensor and Licensee, Licensor shall own all rights, title and interest in and to the Inventions and Patents, including all intellectual property rights therein.

[Remainder of page left blank intentionally.]

# APPENDIX 1
## TO
## MASTER LICENSE AGREEMENT
## DEFINITIONS

***"Affiliate"*** means, with respect to any Person, any Entity in whatever country organized that controls, is controlled by or is under common control with such Person. The term "control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an Entity, whether through the ownership of voting securities, by contract or otherwise.

***"Amounts"*** as generally used in this Agreement refers to cash amounts and amounts that are not cash; provided that amounts that are not cash will be valued by Licensee at their cash equivalent under customary valuation techniques.

***"Assignment Agreements"*** mean the agreements assigning to Licensor ownership of the Inventions and the Patents from the Inventor and/or any prior owners to Licensor, in substantially the form attached as Attachment I to Exhibit A hereto.

***"Closing"*** has the meaning set forth in paragraph 4.2.

***"Confidential Information"*** means (a) in the case of Licensor, each Invention Disclosure unless and until such time as it becomes a Selected Invention Disclosure and Closing has occurred, plus any other information disclosed by Licensor to Licensee, in writing or orally, which is designated as "Confidential," "Proprietary" or some similar designation, and (b) in the case of Licensee, (i) any information disclosed by Licensee to Licensor concerning Licensee's or its Affiliates' business, business plans, strategy, patent portfolio finances and the like, in writing or orally, which is designated as "Confidential," "Proprietary" or some similar designation and (ii) each Selected Invention Disclosure; provided, that if Closing does not occur with respect to a Selected Invention Disclosure, such Selected Invention Disclosure shall not be deemed Confidential Information of Licensee. Where there is an obligation to mark "Confidential" or "Proprietary", information communicated orally will be considered Confidential Information if such information is confirmed in writing as being Confidential Information within thirty (30) days after the initial disclosure. Confidential Information may also include information disclosed to a disclosing party by third parties. Confidential Information will not, however, include any information that (A) was publicly known and made generally available prior to the time of disclosure by the disclosing party; (B) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (C) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (D) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (E) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession.

***"Confidentiality Term"*** means a period of five (5) years from the time of disclosure of the Confidential Information.

***"Effective Date"*** means the date set forth as the Effective Date on the cover page of this Agreement.

***"Entity"*** means any corporation, partnership, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, governmental entity (or any department, agency, or political subdivision thereof) or any other legal entity.



CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY 

***"Initial Term"*** has the meaning set forth in paragraph 10.3.

***"Invention"*** means the inventions and discoveries disclosed in an Invention Disclosure and claimed in the patent applications filed by Licensee in accordance with Section 1.3 of the Agreement (or that could have been claimed in such patent application based on the written specification actually contained therein).

***"Invention Disclosure"*** means a document, in substantially the form posted on the website of the University's technology commercialization office from time to time for disclosure of inventions by its inventors, describing the Invention.

"***Invention-Specific Agreement***" means a document in the substantially the form attached as Exhibit A.

***"Inventor"*** means the inventor and/or co-inventors of an Invention, which are set forth in an Invention Disclosure.

***"ISA Effective Date"*** means the date set forth under the Licensee's signature on an Invention-Specific Agreement.

***"ISA Term"*** has the meaning set forth in paragraph 10.3.

***"IP Group Expenses"*** means the Amounts paid, incurred, accrued, or allocated by or on behalf of Licensee in respect of acquiring, holding, prosecuting, maintaining, managing, protecting, or enhancing the Patents, including, without limitation, all such Amounts (other than Profit Participation) paid under this Agreement to Licensor and all fees, costs, commissions and expenses for legal, technical, advisory, and consulting services and filing, issuance, annuity and maintenance payments. "IP Group Expenses," as used in this Agreement refers to IP Group Expenses of the Patents.

***"Monetization Expenses"*** means the Amounts paid, incurred, accrued, or allocated by or on behalf of Licensee in respect of commercializing, asserting, litigating, licensing, managing, or otherwise capturing value in connection with the Patents or a Portfolio Monetization, including, without limitation, fees, costs, commissions and expenses for legal, technical, advisory, consulting and licensing services. "Monetization Expenses," as used in this Agreement, may refer to Monetization Expenses of either a monetization event involving solely the Patents or a Portfolio Monetization.

"***Open Submission Program***" means a program under which Licensor may submit Invention Disclosures to Licensee on a variety of topics.

***"Patents"*** means all (a) patents or patent applications claiming the Inventions or any portion thereof; (b) reissues, reexaminations, extensions, continuations, continuations-in-part (but only to the extent that the claims in the continuations-in-part are entitled to a priority date from a patent application otherwise included in this definition), continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in the foregoing category (a); and (c) foreign patents, patent applications and counterparts that claim priority to any item in any of the foregoing categories (a) and (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

***"Person"*** means any individual or Entity.

***"Portfolio Monetization"*** has the meaning set forth in paragraph 2.3.

***"Portfolio Profit"*** means Revenue from, minus Monetization Expenses of, a Portfolio Monetization.

***"Primary Warranties"*** means, collectively, the representations and warranties of Licensor set forth in paragraphs 7.1, 7.2, 7.3, 7.4, and 7.5 hereof.

***"Profit"*** means

> the total of the Portfolio Profit that is allocated under paragraphs 2.3 through 2.5 to the patents and patent applications among the Patents included in a Portfolio Monetization;
>
> plus Revenue from, minus remaining Monetization Expenses of, monetization events involving solely the Patents and which are not a Portfolio Monetization;
>
> minus any remaining IP Group Expenses.

***"Profit Participation"*** has the meaning set forth in paragraph 2.2.

***"Renewal Term"*** has the meaning set forth in paragraph 10.3.

***"Reporting Period"*** has the meaning set forth in paragraph 2.6.

***"Revenue"*** means Amounts received by or on behalf of Licensee and recognized as revenue under generally accepted accounting principles from (a) licensing and/or (b) damages awarded in litigation or other proceedings, and/or (c) sale of the rights granted to Licensee under this Agreement. "Revenue," as used in this Agreement, may refer to Revenue from either a monetization event involving solely the Patents or a Portfolio Monetization.

"***Review Period***" has the meaning set forth in paragraph 1.2.

"***RFI***" means an "Invitation for Inventions" document that may be circulated by Licensee and/or its Affiliates from time to time seeking potential Inventions.

"***Selected Invention Disclosure***" means an Invention Disclosure accepted by Licensee under Section 1 of the Agreement.

***"Term"*** has the meaning set forth in paragraph 10.3.

***"Transmitted Copy"*** has the meaning set forth in paragraph 10.13.

***"UT"*** means The University of Texas at Austin.

**EXHIBIT A**
**TO**
**MASTER LICENSE AGREEMENT**
**FORM OF INVENTION-SPECIFIC AGREEMENT**

This Invention-Specific Agreement is made and entered into as of ____________________, 200__ (the "***ISA Effective Date***"), by and between Invention Development Management Company, LLC., a company having a principal place of business at ____________________("***Licensee***"), and The Board of Regents of the University of Texas System ("***Licensor***"). For and in consideration of the foregoing and the mutual promises and covenants herein contained, the parties hereto agree as follows:

1. **MASTER LICENSE AGREEMENT; DEFINITIONS.** Licensor and Licensee are parties to that certain Master License Agreement dated as of _______, 20__ (the "***Master License Agreement***"). This Invention-Specific Agreement shall be subject to the terms of the Master License Agreement in all respects. Any capitalized terms not defined herein shall have the meanings set forth in the Master License Agreement.

2. **INVENTIONS.** The parties hereby agree that upon counter-signature of this Invention-Specific Agreement by Licensee, the Invention Disclosures indicated as "Accepted" below shall be considered Selected Invention Disclosures for purposes of the Master License Agreement, subject to the terms of the Master License Agreement, and the Invention Disclosures indicated as "Not Accepted" shall not be subject to the Master License Agreement.

| Invention Disclosure (title, unique UT identifier, inventors) | Reported Publications (not reported on Invention Disclosure) | NDA Disclosures | Legal Disclosures | RFI or Open Submission | Accepted | Not Accepted |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

IN WITNESS WHEREOF, the parties hereto have entered into this Invention-Specific Agreement as of the ISA Effective Date.

LICENSOR:

**BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM**

By:____________________________________

Name: Juan M. Sanchez, Ph.D.

Title: Vice President for Research
The University of Texas at Austin

LICENSEE:

**INVENTION DEVELOPMENT MANAGEMENT COMPANY, LLC**

By:____________________________________

Name:__________________________________

Title:___________________________________

ATTACHMENT I
TO
INVENTION-SPECIFIC AGREEMENT

FORM OF ASSIGNMENT AGREEMENT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on this _______ day of ________________, 20__, _____________, residing in _______________, _____________, residing in ______________, _____________, residing in ________________,, and _____________, residing in ________________, ("Assignors"), hereby sell, assign, and transfer to Board of Regents, The University of Texas System with offices at The University of Texas at Austin, 3925 West Braker Lane, Suite 1.9A, Austin, Texas 78759 ("Assignee"), the full extent of all right, title, and interest in and to any and all of the following (collectively, the "Rights"):

1. U.S. Patent Application No. ___________ entitled "____________" filed on _____________, 20____ (the "Application") and Assignors hereby authorize and request legal representative ___________________ [*Fill in law firm name. and address*], to insert on this Assignment the filing date and Application Number of the Application when known;

2. All inventions claimed or described in the Application (collectively, "the Inventions");

3. All rights with respect to the Inventions, including all U.S. patents or other governmental grants or issuances that may be granted with respect to the Inventions or from any direct or indirect divisionals, continuations, continuations-in-part, or other patent applications claiming priority rights from the Application ("Potential Patents");

5. All reissues, reexaminations, extensions, or registrations of the Potential Patents;

6. All non-United States patents, patent applications, and counterparts relating to any or all of the Inventions, the Application or Potential Patents, including, without limitations, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances ("Foreign Rights"), and including the right to file foreign applications directly in the name of Assignee, its successors and assigns;

7. The right to claim priority rights deriving from the Application;

8. All causes of action and remedies related to any or all of the Application, the Inventions, and Potential Patents, or Foreign Rights (including, without limitation, the right to sue for past, present, or future infringement, misappropriation or violation of rights related to any of the foregoing and the right to collect royalties and other payments under or on account of any of the foregoing); and

9. Any and all other rights and interests arising out of, in connection with, or in relation to the Application, the Inventions, Potential Patents or Foreign Rights.

Assignors will not sign any writing or do any act conflicting with this Assignment, and will sign all documents and do such additional acts as Assignee, its successors, legal representatives, and assigns deem necessary or desirable to perfect enjoyment of the Rights or perfect title to the Rights. Assignors request the respective patent office or governmental agency

in each jurisdiction to issue any and all patents, certificates of invention, utility models, or other governmental grants or issuances that may be granted upon any of the Rights in the name of the Assignee, as the assignee to the entire interest therein.

The terms and conditions of this Assignment will inure to the benefit of Assignee, its successors, legal representatives, and assigns and will be binding upon Assignors, their successors, legal representatives and assigns.

By: ______________________________
[inventor name]

## NOTARIZATION

STATE OF )
) ss
COUNTRY OF )

On __________2008, before me, ______________________________, Notary Public in and for said State, personally appeared [inventor name], personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature: ______________________________ (Seal)

By: ______________________________
[inventor name]