IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

EMPIRE TECHNOLOGY                )   CAUSE NO. 2:23-CV-427-JRG
DEVELOPMENT, LLC.,               (
                                 )
        Plaintiff,               (
                                 )
vs.                              (
                                 )
SAMSUNG ELECTRONICS CO., LTD., (
et al.,                          )   MARSHALL, TEXAS
                                 (   JUNE 26, 2025
        Defendants.              )   8:00 A.M.
_____

VOLUME 4

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:      MILBANK, LLP - NEW YORK
                        55 HUDSON YARDS
                        NEW YORK, NEW YORK 10001
                        (212) 530-5096
                        BY: MR. NATHANIEL BROWAND
                            MS. ALANA MATTEI
                            MS. HANNAH JUGE
                            MS. RACHEL WOLF

                        MILBANK TWEED HADLEY &
                        McCLOY, LLP
                        1 CHASE MANHATTAN PLAZA
                        45Th FLOOR
                        NEW YORK, NEW YORK  10005
                        (212) 530-5000
                        BY:  MR. ANDREW LICHTENBERG

                        MILBANK TWEED HADLEY &
                        McCLOY - NEW YORK
                        28 LIBERTY STREET
                        NEW YORK, NEW YORK  10005
                        (212) 530-5019
                        BY:  MR. CHRISTOPHER GASPAR

                        CAPSHAW DERIEUX, LLP
                        114 E. COMMERCE AVENUE
                        GLADEWATER, TEXAS   75647
                        (903) 845-5770
                        BY:  MS. ELIZABETH DeRIEUX

FOR THE DEFENDANTS:     O'MELVENY & MYERS -
                        SAN FRANCISCO
                        TWO EMBARCADERO CENTER
                        28TH FLOOR
                        SAN FRANCISCO, CA 94111
                        (415) 984-8700
                        BY:  MR. DARIN SNYDER

                        O'MELVENY & MYERS, LLP
                        2801 NORTH HARWOOD STREET
                        SUITE 1600
                        DALLAS, TEXAS  75201-2692
                        (972) 360-1900
                        BY:  MR. TIMOTHY DURST

GILLAM & SMITH, LLP
303 SOUTH WASHINGTON AVENUE
MARSHALL, TEXAS  75670
(903) 934-8450
BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546

914

THE COURT:  Be seated, please.

Yesterday after the close of the evidence, the Court heard motions under Rule 50(a) of the Federal Rules of Civil Procedure from both Plaintiff and Defendants.  Having heard and ruled on those motions, the Court then proceeded to conduct an informal charge conference off the record with counsel for the parties wherein the Court and the parties discussed and reviewed the most current iteration of the final jury instructions and verdict form.

After a lengthy and fulsome discussion, the Court concluded the informal charge conference, took the input from the parties and their discussions with the Court into account, and over the evening last night the Court prepared what it believes to be the appropriate and proper final jury instruction and verdict form for use in this case.

The Court's furnished those documents to the parties with an opportunity for them to review and consider the same, and the Court will now proceed to conduct a formal charge conference on the record to review both the final jury instructions and the verdict form on a page-by-page basis allowing either party to lodge such objections as they feel both the interests of their clients and the law requires.

So with that, counsel, we'll begin the formal charge conference.  Whoever's going to speak for Plaintiff and whoever's going to speak for the Defendants, if you would go

to the podium and remain there, we'll begin with the final jury instructions.

And as indicated, we'll walk through that document page by page, and any page along the way or any point along the way if you have an objection to something that's been included or excluded, please state your objection on the record and the Court will then issue a ruling on your objection.

Beginning with the final jury instructions, is there any objection from either party to page 1 or the cover page of those final jury instructions?

MR. BROWAND:  Good morning, Your Honor.  Nathaniel Browand on behalf of Plaintiff.  No objection on page 1.

MR. PENSABENE:  Good morning, Your Honor.  Mark Pensabene for the Defendants.  No objection from the Defendants.

THE COURT:  All right.  We'll turn then, counsel, to page 2 of the final jury instructions.  Are there any objections here?

MR. BROWAND:  No objections to page 2 from the Plaintiff.

MR. PENSABENE:  None from Defendants.

THE COURT:  Turning to page 3, are there any objections?

MR. BROWAND:  No objections to page 3 from the Plaintiff.

MR. PENSABENE:  Same for the Defendants.  No objection.

THE COURT:  Turning to page 4, are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

07:01

THE COURT:  Next is page 5.  Any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 6.  Are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 7.  Are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 8.  Are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning to page 9, are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

917

THE COURT:  Next is page 10.  Are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning then to page 11, are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning to page 12, are there any objections?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 13.  Are there any objections from either party?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 14.  Are there any objections?

MR. BROWAND:  Yes, Your Honor.

THE COURT:  State your objection, counsel.

MR. BROWAND:  Plaintiff objects to the instructions on this page for its failure to include a single sentence which would read, "An accused product infringes the claim if it satisfies the claim elements even though it may be capable of non-infringing modes of operation."  The reason for this is

that it's a correct statement of the law and it's applicable to the facts in this case based on the evidence that has been presented.

THE COURT:  All right.  That objection is overruled. Anything further on this page before we continue?

MR. BROWAND:  Nothing further, Your Honor.

MR. PENSABENE:  No objection.

THE COURT:  All right.  Turning then to I believe it's page 14, any objections here?

MR. BROWAND:  No objection, Your Honor.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 15.  Any objections here?

MR. BROWAND:  Your Honor, I realize I may have stated my objection a couple of pages early and I think that my objection to page 13 should have been an objection to page 15.

THE COURT:  All right.  But the objection is substantively the same.

MR. BROWAND:  Substantively identical, Your Honor.

THE COURT:  And the Court's ruling is the same as well.

MR. BROWAND:  Thank you.

THE COURT:  All right.  We are on page 15, counsel, of the final jury instructions.  Are there any other objections that need to be lodged at this juncture?

919

MR. BROWAND:  No other objection.

MR. PENSABENE:  No objection from Defendants.

THE COURT:  Then we'll turn to page 16.  Are there any objections here?

MR. BROWAND:  No objection, Your Honor.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 17.  Are there any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning to page 18, are there any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.  Sorry.

THE COURT:  Next is page 19.  Are there any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning then to page 20, are there any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning to page 21, are there any objections here?

MR. BROWAND:  No objection.

920

MR. PENSABENE:  No objection.

THE COURT:  Counsel, pages 20 and 21 include all 15 of the *Georgia-Pacific* factors.  Do both sides agree that it's appropriate for the Court in this case under these facts to charge this jury with all 15 of those factors?

MR. BROWAND:  Yes, Your Honor.  On behalf of the Plaintiff, we believe it is.

MR. PENSABENE:  We have no objection.

THE COURT:  All right.  Then let's turn to page 22 of the final jury instructions.  Any objections here, counsel?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning then to page 23, any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 24.  Any objection here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Next is page 25.  Any objections here from either party?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning then to page 26, which is the final page of the final jury instructions, any objections

here?

                    MR. BROWAND:  No objection.

                    MR. PENSABENE:  No objection.

                    THE COURT:  All right.  We will next turn, counsel, to the verdict form.  We'll follow the same approach here. Beginning with the cover page or page 1 of the verdict form, are there any objections here from either Plaintiff or Defendants?

                    MR. BROWAND:  No objection.

                    MR. PENSABENE:  No objection.

                    THE COURT:  Turning to page 2 where certain definitions are included, are there any objections here?

                    MR. BROWAND:  No objection.

                    MR. PENSABENE:  No objection.

                    THE COURT:  Turning to page 3 where various instructions are included, are there any objections here?

                    MR. BROWAND:  No objection.

                    MR. PENSABENE:  No objection.

                    THE COURT:  Turning to page 4 where the infringement questions are located, are there any objections here?

                    MR. BROWAND:  No objection.

                    MR. PENSABENE:  No objection.

                    THE COURT:  Turning to page 5 where additional instructions to the jury are included, are there any objections here?

922

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  Turning to page 6 where the willfulness question is included, are there any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  Your Honor, Defendants just voice one concern about page 6.

THE COURT:  All right.

MR. PENSABENE:  In the parties agreed instructions on willfulness, it was made clear that the jury is only being asked about post-suit willfulness since pre-suit wilfulness has already been ruled on by the Court prior to trial.  We have no objection to the combining of the willfulness questions and having one instead of separate ones for each patent, but we do think that it should make explicit reference to post-suit since that's the only issue before the jury.

THE COURT:  All right.  Is that not adequately covered in the instructions as a part of the Court's final jury instructions or charge?

MR. PENSABENE:  It is.  I think Your Honor did remove a number of references to the time limitation in the instructions and left it in other places, and we think the instructions are okay.  But as far as the verdict form goes, we think that it would be appropriate to also include that in the verdict form because there is a very high likelihood the

923

jury won't again look at the instructions, but they will definitely be looking at the verdict form.

THE COURT:  Well, the jury will be carefully and thoroughly instructed by the Court orally and the jury will each have their own printed copy of the Court's final jury instructions.  If they ignore them, there's nothing I can do about that, but they're certainly going to be exposed to them.

What, counsel, would you specifically suggest with regard to Question 2 on page 6 of the verdict form?  Do you have specific wording you would propose or just raising this topically?

MR. PENSABENE:  We do.  The language we propose is what the parties agreed to just without splitting it up among the different patents, something along the lines of did Empire prove by a preponderance of the evidence that since the time this lawsuit was filed, Samsung willfully infringed, or something along those lines.

THE COURT:  All right.  What's Plaintiff's position on this, Mr. Browand?

MR. BROWAND:  Your Honor, we believe that your proposal is sufficient given the fact that the jury instructions have made clear that the only issue for the jury is post-suit willfulness.  So we believe that, as written or as proposed in Question 2, the language is sufficient and correct.

924

THE COURT: All right. I'm looking at what the parties actually submitted as their proposal in the verdict form as to the willfulness question, and the question as proposed by the parties and submitted to the Court previously reads, "Did Empire prove by a preponderance of the evidence that Samsung willfully infringed any of the asserted claims of" -- in this case it's on the '120 Patent and then separately the '331 Patent, but it says "willfully infringed any of the asserted claims of the '120 Patent that you have found were infringed?" There's no reference in the submitted question by the parties about pre-suit or post-suit.

MR. PENSABENE: Perhaps -- maybe it didn't get included in the copy sent to the Court. I thought it did, though, Your Honor. The version I had that was sent was, did Empire prove by a preponderance of the evidence that since the time the lawsuit was filed, Samsung willfully infringed. And I apologize if we didn't get the right -- if the wrong version was sent to chambers.

And I think, Your Honor, we would be fine with just inserting since the lawsuit was filed in Your Honor's proposed query.

THE COURT: Well, the Court previously granted summary judgment of no pre-suit willfulness. I think the instructions are carefully drafted to make that clear that any willfulness would be limited to conduct post-complaint. But I

925

07:10   don't have a serious problem with modifying this question to read as follows:  "If you found infringement, did Empire prove by a preponderance of the evidence that such infringement by Samsung was willful since the lawsuit was filed."

Does either party object to that?

MR. BROWAND:  No objection to that language, Your Honor.

MR. PENSABENE:  No objection, Your Honor, and thank you.

THE COURT:  All right.  I'll make that change on
07:10   Question 2, and I'll add after the word 'willful' "since the lawsuit was filed."

All right.  Then we'll turn to -- that's all that exists on page 6, but just for clarity any other objections to page 6 before we proceed?

MR. PENSABENE:  No.  Thank you, Your Honor.

THE COURT:  Then let's turn to page 7 of the verdict form where Questions 3A and 3B are located.  Is there any objection here from either party?

MR. BROWAND:  No objection, Your Honor.

MR. PENSABENE:  No objection, Your Honor.

THE COURT:  All right.  Turning then to page 8,
07:11   which is the final page of the verdict form, any objections here?

MR. BROWAND:  No objection.

MR. PENSABENE:  No objection.

THE COURT:  All right.  Thank you, counsel.  That completes the formal charge conference.

As I've indicated, I'll prepare and print eight individual copies of the final jury instructions so that I can send them back to the jury when they retire to deliberate, and I will tell the jury that they will each have their own printed copy of these final jury instructions when they retire.

If you will give me a few minutes to do that, it's 10 or 11 minutes -- it just changed.  It's 12 minutes after 8:00.  I don't see any reason we can't start promptly at or near 8:30.

Anything from either party before the Court recesses?

MR. PENSABENE:  Nothing from the Defendants, Your Honor.

MR. BROWAND:  Your Honor, just exhibits from yesterday.

THE COURT:  Yes.  Are the parties prepared at present to read into the record the exhibits used during yesterday's portion of the trial?

MR. BROWAND:  Plaintiff is.

MR. PENSABENE:  Unfortunately, Defendants are not.  Ms. Smith will be addressing that.

THE COURT:  All right.  Well, I'll do that when I return and before I bring the jury in.  Be prepared to do that

927

when I return to the bench.

MR. PENSABENE:  We will, Your Honor.

THE COURT:  Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MS. SMITH:  Yes, Your Honor.

MR. BROWAND:  Yes, Your Honor.

THE COURT:  Please go to the podium and read those records into the record, please -- or those exhibits into the record, rather.

MR. BROWAND:  Your Honor, the exhibit that was used yesterday during trial on behalf of Plaintiff Empire is JX 22.

THE COURT:  All right.  Any objection from Defendants to that offer?

MS. SMITH:  No objection, Your Honor.

THE COURT:  Do the Defendants have a similar rendition to make?

MS. SMITH:  Yes, Your Honor.  Melissa Smith on behalf of Samsung.  We used DTX 14, DTX 15, DTX 16, JX 37, and JX 47.

THE COURT:  All right.  Any objection to that, Mr. Browand?

928

MR. BROWAND:  No objection, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Counsel and those present, I'm about to bring in the jury and proceed to instruct them orally with the Court's final instructions on the law, followed by counsels' closing arguments.

I'd like to make it clear to everyone present that the Court considers its final instructions to the jury and counsels' closing arguments to be the most serious part of an inherently serious process.  Consequently, I don't want any disruptions, I don't want any distractions.

If you have any kind of a device that is capable of sounding or making a noise, either remove it from the courtroom or make double sure it's silent.  If you have anything to pass back and forth, if you have anything to whisper to each other, do it before I bring the jury in because once the jury enters the courtroom, I want complete, respectful silence while I give them my final instructions and counsel proceeds to give them or present to them closing arguments.

All right.  With that, let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please have a seat.

Ladies and gentlemen of the jury, you've heard all the

929

07:34    evidence in this case, and I'm about to instruct you on the law that you must apply.

I want you to understand that you're each going to have your own printed copy of these final jury instructions that I'm about to give you orally.  I do that so that you'll have the ability to review them in the jury room while you're deliberating, and I do that so you won't feel compelled to take written notes but you'll be able to give me your full and complete attention while I read these and present them to you orally.

07:35    It's your duty to follow the law as I give it to you.  On the other hand and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make as a part of these instructions that I have any opinion about the facts in this case.

You are about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments
07:35    of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They're intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form to the jury room with you.  And when you have reached a unanimous agreement as to the verdict and

930

those questions in the verdict form, you'll have your foreperson fill in those answers reflecting your unanimous decisions, sign and date the verdict form on the final page, and then advise the Court Security Officer that you've reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be. Do not decide who you think should win this case and then answer the questions to reach that result. Your answers to the questions in the verdict form, ladies and gentlemen, must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits presented during the trial, regardless of who may have introduced them.

Now, some of the testimony that you heard was translated from Korean. In consideration of a witness' testimony, it is not relevant whether his or her testimony was in English or translated into English from Korean. You should consider the translated testimony in the same way as you would consider testimony given in English.

Ladies and gentlemen, you, the jury, are the sole judges of the credibility and believability of all the witnesses and the weight and effect to give to all the evidence. In deciding the facts in this case, you may have to decide which

931

testimony to believe and which testimony not to believe.  You alone are to determine questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.  Has the witness been contradicted by other evidence?  Has he or she made statements at other times and other places contrary to what they said on the witness stand?  You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement is an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to raise objections when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to the question

932

addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate about what the witness said if the Court had allowed them to answer the question.  If the objection was overruled, however, then you must treat that answer to that question just as you would any other question and answer as if no objection had been made.  And by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion about the weight or effect of that evidence.

Now, at various times during the trial, it's been necessary for the Court to talk with the lawyers outside of your hearing, either here at the bench or by calling a recess and talking to them while you were outside of the courtroom. This happens during trials like this because there are things that arise that do not involve the jury.  You should not speculate or guess about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may properly consider in finding the truth as to the facts in this case.  One is direct evidence, such as the evidence or the testimony, rather, of an eyewitness.  The other is indirect or circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.  As a general rule, ladies and gentlemen,

933

the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, during the course of this trial, you may have been shown some documents with some portions of those documents redacted or blacked out.  In those situations, you should not speculate about what was redacted or why it was redacted.  Those redactions were approved by the Court prior to when the trial began.

Also, certain testimony in this case has been presented to you through depositions.  As we've mentioned, a deposition is the sworn, recorded answers to questions asked of a witness in advance of the trial.  If the witness cannot be present to testify in person or if the rules of procedure otherwise permit, then the witness' testimony may be presented under oath in the form of a deposition.

Now, before the trial began, the attorneys representing the parties questioned these deposition witnesses under oath.  At that time a court reporter was present, the questions and the answers were transcribed and taken down.  This deposition testimony, ladies and gentlemen, is entitled to the same consideration by you as testimony given by a witness in-person from the witness stand.  And you should judge the credibility and importance of deposition testimony to the best of your

934

ability, just as if the witness had testified in person in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case. However, you should not base any decision on any evidence not presented by the parties during the trial, including your own personal experiences with any particular products that might be at issue in the case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence you believe that single witness.

Also, when knowledge of a technical subject may be helpful to the jury, a person who has special training or experience in that technical field--we call them an expert witness--is permitted to offer his or her opinions on those technical matters to the jury. However, ladies and gentlemen, you're not required to accept those opinions. As with any other witness, it is solely up to you to decide whether to

935

rely upon that testimony or not.

Now, certain exhibits have been shown to you over the course of the trial that were illustrations.  We call these types of exhibits demonstrative exhibits or simply demonstratives.  Demonstrative exhibits are a party's depiction, picture, or model to describe something involved in the trial.  If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection of the evidence and not the demonstratives.

Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits, ladies and gentlemen, are not evidence, but a witness' testimony concerning a demonstrative is evidence.  Let me be clear.  Demonstrative exhibits are not going to be available for you to review during your deliberations in the jury room.

Now, any patent holder has the right to file a suit in a United States District Court and the right to a trial by jury if it believes that its patent rights are being infringed.  However, you should make no inference from the fact that a suit was filed or brought to trial.  You are to consider this suit as a dispute between parties of equal worth and standing in the community and render your verdict based solely on the evidence presented during the trial.

In any legal action, facts must be proved by a required amount of evidence known as the burden of proof.  The burden

936

of proof in this case is on the Plaintiff, Empire Technology Development, LLC, who you've heard referred to consistently throughout the trial simply as Empire or as the Plaintiff. Empire has the burden of proving patent infringement by a preponderance of the evidence.

Empire also has the burden of proving willful patent infringement by a preponderance of the evidence.  Empire also has the burden of proving damages for any patent infringement by a preponderance of the evidence.  A preponderance of the evidence means evidence that persuades you that a claim is more likely true, more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, as I've previously told you, ladies and gentlemen, this burden of proof is not to be confused with a second, different, and altogether unrelated burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and which has no application whatsoever in a civil case like this.

In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who called them, and you may consider all the exhibits received into evidence during the trial, regardless of who may have produced them.

Now, as I did at the beginning of the trial, I'll give you a summary of each side's contentions in the case, and then I'll provide you with detailed instructions on what each side must prove to win on each of its contentions.

As we've previously discussed, this is an action for patent infringement. Empire contends that Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc., which you've heard referred to consistently during the trial and collectively simply as Samsung or as the Defendants, that they infringe certain claims of the two patents-in-suit.

And remember, there are two issued United States patents at issue in this case. They are United States Patent No. 8,798,120, which you've heard referred to as the '120 or the '120 Patent during the trial, and United States Patent No. 8,565,331, which you've heard referred to as the '331 Patent. And these have been referred to and I may refer to them in these instructions collectively as the asserted patents. You've also heard them sometimes called the patents-in-suit. Now, Empire has the right to enforce these two patents. Samsung does not challenge the validity of these two patents.

Empire contends that Samsung infringes the following claims of the two asserted patents: Claims 25 and 29 of the '120 Patent and claim 1 of the '331 Patent. These are collectively referred to and you've heard them referred to during the trial as the asserted claims.

938

Empire contends that Samsung has infringed the asserted claims by making, using, importing, selling, and/or offering to sell in the United States certain Samsung smartphones and tablets.  And I'll refer to these Samsung smartphones and tablets as the accused products.  Empire contends that the accused products infringe the asserted claims.

Empire also alleges that Samsung's infringement is and has been willful since the filing of this lawsuit.

Empire also contends that it is entitled to a reasonable royalty in the form of a running royalty for all past infringement of the asserted claims.  Empire has the burden to prove these issues by a preponderance of the evidence.

Now, Samsung denies that the accused products infringe any of the asserted claims of the patents-in-suit.  Samsung also denies that any alleged infringement was willful.  And Samsung denies that it owes Empire any money damages.

Now, your job, ladies and gentlemen, is first to decide whether Samsung has or has not infringed any of the asserted claims.  If you decide that any claim has been infringed, you'll then need to decide whether Samsung's infringement has been willful since the time this lawsuit was filed, and you'll need to decide in that case the amount of any appropriate money damages, and those money damages, if awards, are meant to compensate Empire for the infringement that you have found.

Now, if you decide that there was any infringement of the

939

asserted claims and that such infringement was willful, your decision as to willfulness should not affect or impact the damages that you might award in this case.  The Court will take willfulness into account later, if you find it.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims are those numbered sentences at the end of each patent.  The claims define Empire's rights under the law.

The claims are important because it is the words of the claims, ladies and gentlemen, that define what a patent covers.  The figures and the rest of the text in the patent provide a description and/or examples of the invention, and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage.

As a result, what a patent covers depends, in turn, upon what each of its claims covers.  Each claim is effectively treated as if it were its own separate patent, and each claim may cover more or may cover less than any other claim. Therefore, what a patent covers depends upon what each of its claims covers.

And you'll first need to understand what each claim covers in order to decide whether or not there is infringement of that claim.  The first step is to understand the meaning of the words used in the patent claim.  Now, the law says it's my role to define the terms of the claims and it's your role to

940

apply my definitions as to that claim language to the issues that you are asked to decide.

As a result and as I explained to you at the beginning of the case, I have already determined the meanings of certain language from the asserted claims, and I've provided those definitions or constructions they're sometimes called, to you as a part of your juror notebooks, and you must accept my constructions or definitions of these words from the claims as being correct. And it's your job to take these definitions that I have supplied to you and apply them to the issues that you are asked to decide, including the issue of infringement.

And you should disregard, ladies and gentlemen, any evidence presented at the trial that contradicts or is inconsistent with these definitions or constructions that you've received from the Court.

For claim limitations or language that I have not construed or defined, you're to apply and use the plain and ordinary meaning of those limitations as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent, at the time of the alleged invention. And you've been provided with copies of both of the asserted patents in your juror notebooks, and you may review them and consider them during your deliberations.

Now, several times during these instructions I have and I will refer to a person of ordinary skill in the field of the

invention, or a person of ordinary skill in the art.  As I mentioned earlier, a person of ordinary skill in the art is a hypothetical person who is presumed to have known all the relevant prior art that was available to the public, or publicly in use at the time of the claimed invention.

In deciding the level of ordinary skill in the field, you should consider all the evidence produced and introduced at trial, including but not limited to:

1.  The levels of education and experience of the inventor and other persons actively working in the field;

2.  The types of problems encountered in the field;

3.  Prior art solutions to those problems;

4.  The rapidity with which innovations are made; and

5.  The sophistication of the technology.

A person of ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant art -- relevant prior art at the time of the claimed invention.

The claims are intended to define, in words, ladies and gentlemen, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description nor any of the drawings or figures in the patent can be infringed.  Each of the claims is to be considered by you individually.

And I'll now explain to you how a claim defines what it

942

covers.

A claim sets forth, in words, a set of requirements, and each claim sets forth its requirements in a single sentence. If a device or a method satisfies each of these requirements, then it is covered by and infringes the claims. And there can be several claims in a patent and each claim may be narrower or broader than any other claim by setting forth more or fewer requirements. So the coverage of a patent is assessed on a claim-by-claim basis.

And in patent law, the requirements of a claim are often referred to as the claim elements. They're also referred to as the claim limitations. And when a product meets all the requirements of a claim, that claim is said to cover that product, and that product is said to fall within the scope of that claim. In other words, a claim covers a product where each of the claim elements or limitations is present in that product. And if a product is missing even one limitation or element, the product is not covered by that claim. And if the product is not covered by that claim, that product cannot infringe that claim.

Now, the beginning portion or preamble of a claim often uses the word 'comprising'. The asserted claims use the word 'comprising' in this case. And the word 'comprising' means including but not limited to, or containing but not limited to. And when comprising is used in the preamble of a claim,

if you decide that an accused product includes all the requirements of that claim, that claim is infringed, and that's true even if the accused product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue, would be infringed by any table that includes a tabletop, legs, and glue, even if a table also contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the ends of the legs. That's a simple example using the word 'comprising' and what it means. In other words, ladies and gentlemen, it can have other additional features over and above what is required or covered by the patent.

Now, this case involves one type of patent claim which are independent claims. An independent claim sets forth all the requirements that must be met in order to be covered by that claim. It's not necessary to look at any other claim to determine what an independent claims and each of the asserted claims in this case are independent claims.

Now, I'll now instruct you on infringement in more detail. If a person or a corporation makes, uses, sells, or offers to sell within the United States, or imports into the United States what is covered by a patent claim without the patent holder's permission, that person or corporation is said to infringe the patent. For any claim of infringement, an

944

accused infringer's ownership of its patent is not -- of its own patents is not a defense to infringement.

Now, in reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed, and you must compare the asserted claims as I may have defined any of the language in them, to the accused products.  This is the only correct comparison.  You should not compare the accused products with any specific example set out in a patent in reaching your decision on infringement.  In deciding infringement, again the only correct comparison is between the accused products and the limitations of the asserted claims as the Court may have construed any of the claim language.

Now, you must reach your decision as to each assertion of infringement based on my instructions about the meaning and the scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the parties over the course of the trial.

I'll now instruct you on the specific rules you must follow to determine whether Empire has proven that Samsung has infringed one or more of the asserted claims at issue in this case.

In order to prove direct infringement, Empire must prove by a preponderance of the evidence that Samsung made, used, sold, or offered for sale within the United States, or imported into the United States, a product that meets all the

requirements of a claim.

A claim element is present if it exists in the accused product as it is described in the claim language, either as I have explained that claim language to you or if I did explain or construe it, according to its plain and ordinary meaning as understood by a person of ordinary skill in the art.

In making your determination, ladies and gentlemen, you must consider each claim separately. Not all of the claims of a patent must be infringed for infringement to exist. If an accused product omits any element recited in a claim, then you must find that the product in question does not infringe that claim. If you find that each and every element of a claim is found in an accused product, then the claim is infringed, even if the accused product includes additional features or functions not required by the claims.

Now, a patent can be directly infringed even if the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it was doing is infringement. A patent may also be directly infringed even if the accused infringer believed in good faith that what it was doing is not infringement.

I'll now instruct you on indirect infringement.

In this case Empire has accused Samsung of indirect infringement by actively inducing Samsung's U.S. distributors and users of the accused products to directly infringe the

asserted claims.  As with direct infringement, ladies and gentlemen, you must determine whether there has been active inducement on a claim-by-claim basis.

Samsung is liable for induced infringement of a claim only if Empire proves by a preponderance of the evidence that:

1.  Acts have been carried out by Samsung's U.S. distributors or users of the accused products that directly infringe that claim;

2.  Samsung has taken action during the time the asserted patents were in force intending to cause the infringing acts by Samsung's U.S. distributors or users of the accused products; and

3.  Samsung has been aware of the accused patents and has known that the acts of Samsung's U.S. distributors or users of the accused products constitute infringement of the asserted claims or was willfully blind to that infringement.

Willful blindness, ladies and gentlemen, is established if Samsung subjectively believed there was a high probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately took steps to avoid learning the facts.

Empire also contends that Samsung willfully infringed the asserted claims.  If you decide that Samsung has infringed any claim, you must go on to separately address the additional issue of whether or not that infringement was willful since

the time this lawsuit began -- or since the lawsuit was filed. Empire has the burden of proving willful infringement by a preponderance of the evidence.

Now, you may not determine that infringement was willful just because Samsung knew of the asserted patents and infringed them.  Instead, you must find that Samsung deliberately or intentionally infringed the asserted patents. Your determination as to willfulness should incorporate the totality of the circumstances based on all the evidence presented during the trial.  Willfulness can be established by circumstantial evidence and knowledge of the existence of a patent can be relevant to the question of willful infringement.

Now, to determine whether Samsung acted willfully, consider all the facts and assess Samsung's knowledge at the time of the challenged conduct.  Facts that may be considered include but are not limited to the following:

1.  Whether or not Samsung acted consistently with the standards of behavior for its industry;

2.  Whether or not Samsung intentionally copied a product of Empire that is covered by the asserted patents;

3.  Whether or not Samsung reasonably believed that it did not infringe;

4.  Whether or not Samsung made a good-faith effort to avoid infringing the asserted patents; for example, whether

Samsung attempted to design around the asserted patents; and

5.  Whether or not Samsung tried to cover up its infringement.

If you decide that any infringement was willful, that decision should not and must not affect any damages award that you would give.  The Court will take willfulness into account later, if you find it, as I've mentioned.

Now, if you find that Samsung has infringed any asserted claim, you must then consider what amount of damages, if any, to award to Empire for that infringement.

I'll now instruct you, ladies and gentlemen, about the measure of damages.  But by instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that Samsung has not infringed any of the asserted claims, then Empire is not entitled to any patent damages.

Any damages that you might award in this case must be adequate to compensate Empire for any infringement.  And you must not award Empire more damages than are adequate to compensate it for the infringement.  You should also not include any additional amount in any damages award for the purpose of punishing Samsung or for the purpose of setting an example.  Empire has the burden to establish the amount of its damages by a preponderance of the evidence.

I'll now instruct you on how to calculate reasonable royalty damages.

The patent law specifically provides that damages for infringement may not be less than a reasonable royalty. Empire must prove the amount of its damages with reasonable certainty but need not prove the amount of its damages with mathematical precision. But Empire is not entitled to damages that are remote or that are only speculative.

A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and an alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the infringement first began.

Reasonable royalty awards can take the form of a running royalty or a lump-sum royalty. If you find that Empire is entitled to damages, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

A running royalty is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold. If there are additional units sold in the future, any damages for these sales will not be addressed by you.

If you decide that a running royalty is appropriate, then the damages you award, if any, should reflect the total amount

950

necessary to compensate Empire for Samsung's past infringement from the date of first infringement through the date of the trial, understanding that Samsung will still have to pay Empire for each infringing product that it sells after the date of the trial and throughout the remaining life of the patent even though you will not have to factor those future amounts into any award that you may make in your verdict in this case.

By contrast, a lump-sum royalty is when the infringer pays a single price for a license covering both past and future infringing sales for the life of the patent.  Now, if you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Empire for Samsung's past and future infringement.

In considering this hypothetical negotiation, you should focus on what the expectations of Empire and Samsung would have been had they entered into an agreement at that time and acted reasonably in their negotiations.  In determining this, you must assume that both parties believed the asserted claims were infringed and were willing to enter into an agreement. The reasonable royalty that you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

In contrast -- excuse me.  In the context of the

951

hypothetical negotiation, it's not necessary -- it's not necessarily the case that each infringed patent in the hypothetical negotiation contributes equally to the amount that Samsung would pay for that license, or that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

Now, the law requires that any damages awarded to Empire correspond to the value of the alleged inventions within the accused product, as distinct from other unpatented features of the accused products, or other market factors.  This is particularly true where the accused product has multiple features and multiple components not covered by the patent or where the accused product works in conjunction with other non-patented items.  Therefore, the amount you find as damages must be based on the value attributable to the patented technology.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began.

Some of the factors that you may consider in making your determination are as follows:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other

patents comparable to the patent-in-suit.

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory, or with respect to whom the manufactured product may be sold.

4.    The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.    The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

6.    The effect of selling the patented specialty in promoting sales of other products of the licensee, that existing value of the invention to a licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

7.    The duration of the patent and the term of the license.

8.    The established profitability of the product made under the patent, its commercial success, and its current popularity.

9.    The utility and advantages of the patented property over the old modes or devices, if any, that had been used for

953

working out similar results.

10.    The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

11.    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.    The opinion testimony of qualified experts; and

15.    The amount that a licensor (such as Empire) and a licensee (such as Samsung) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement--that is, the amount which a prudent licensee, who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention, would have been willing to pay as a royalty and yet be able to make

954

a reasonable profit, and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Now, you may have heard these factors during the trial referred to as the *Georgia-Pacific* factors.  No one of these factors is dispositive, and you can and should consider all the evidence that's been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the royalty Samsung would have been willing to pay and Empire would have been willing to accept if both were acting as normally prudent business people.

Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.  If a license agreement is not sufficiently comparable, you may not rely on it in determining damages.

Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between the license agreement and the hypothetical license, you must take

955

those into account when you make your reasonable royalty determination.

In determining a reasonable royalty, you may consider whether at the time of the hypothetical negotiation Samsung had acceptable, non-infringing alternatives to taking a license.  To be an acceptable non-infringing alternative, a product must have the advantages of the patented invention that were important to people who purchased an alleged infringer's product.  A non-infringing alternative is a way of providing the same or comparable functionality or achieving the same or a comparable result that does not require using the asserted claims.  Samsung bears the burden to show by a preponderance of the evidence that this non-infringing alternative would have been available at the time of the hypothetical negotiation and during the damages period.

Now, the damages period for the issues related to infringement of the '120 and the '331 Patents in this case begins on April the 1st, 2019.

Now, with these instructions, ladies and gentlemen, we'll proceed to hear closing arguments for the attorneys in the case.

Plaintiff may now present its first closing argument to the jury.

Would you like a warning on your time, Mr. Gaspar?

MR. GASPAR:  Yes, Your Honor.  Five minutes, please.

956

THE COURT:  Five minutes from the end?

MR. GASPAR:  Yes.

THE COURT:  All right.  I'll warn you when you have five minutes remaining.

MR. GASPAR:  In the first presentation, five minutes.  Thank you.

THE COURT:  Let me be clear.  How much time do you intend to use in your first closing?

MR. GASPAR:  20 minutes, Your Honor.

THE COURT:  So you'd like a warning at 15 minutes.

MR. GASPAR:  Thank you.

THE COURT:  All right.  You may proceed with your first closing argument.

MR. GASPAR:  May it please the Court.

Ladies and gentlemen of the jury, Empire wanted me to begin by thanking you for your hard work and your service so far in this trial.  You have a lot of other places to be, and it's very much appreciated.  This is an incredibly important matter to Empire.  We hope we've put that across to you by being respectful of your time, and we certainly hope that we have presented the evidence to you that you would want to see.

We have started at the beginning of the trial with my opening statement by suggesting that we would provide evidence of three simple facts in this case.  I'd like to quickly move through the evidence.

957

This is just a summary of where we believe we have presented evidence that Professor Heath and his colleagues created inventions for cell phones of the future, the Patent Office awarded them two patents.  No. 2, Samsung knew about those two patents.  And, No. 3, Samsung chose to use the two patents without permission and without paying Empire for them.

So simple fact No. 1.  You've seen a lot of the two patents, JX 1 and JX 3.  You also saw at the very beginning of them, the invention disclosure forms that Professor Heath testified about at JX 5 and JX 6.  This is where it really all began.

Professor Heath testified, among many other things, that he's not only proud of the two inventions, he thinks they're quite nice, but it's something that we saw in the future would become really valuable and he also said that he thinks both of these patents are very strong and quite relevant for today's wireless systems.

When asked to describe the '120 Patent and what problems he was trying to solve, he explained that he recognized that there could be an advantage to actually effectively turning off this MIMO capability and maybe just using one of the antennas instead of both.  And maybe the data rate wasn't quite as high, but the battery lifetime could be much longer and so users would actually be happier to have a phone that they didn't have to charge as much.  This is one of the

problems and solutions that Professor Heath talked about and that was with respect to the '120 Patent.

With respect to the '331 Patent, he was asked, when he was describing the invention disclosure document at JX 6, what's set forth on that page, and he explained that the invention is really about a way of doing channel estimation better.

So after getting that initial estimate, we also look at the replicated data symbols, replicated data symbols in the transmitted stream.  And then that replicated data is decoded, and then it's treated as if it was like a pilot and is used to update the estimate of the channel.  This provides a better channel estimate for the receiver that it can decode and everything is better as a result.

When Mr. Kang was questioned about why Empire is in the business that it's in, the business of inventions, he explained that the key thing about the technology that Empire developed or helped to develop, as the case may be, were that these technologies were way in the future.  The technologies that we developed weren't, for example, if we developed a technology, it was like we thought it was going to be -- it wasn't as if we thought it was going to be used in the next 12 months.  It was for technology of the future.

Simple fact No. 2.  Samsung knew about the two patents. You've seen this timeline many, many times, supported by PTX

959

4, 5, 20, 21, and 22.  I don't have to go through the timeline again, but you know that the patent issued in 2014.  There was a 2016 indication of it by the Patent Office.  Samsung began infringing in April of 2019, and then there were the communications again that happened thereafter.

Mr. Steger approached Samsung with a request, which was to begin a negotiation about potentially selling the portfolio that Empire had in the wireless space to Samsung.  He didn't pound the table, he didn't make a phone call that was angry, he didn't send a threatening email or a letter in a particular way that suggested that it was aggressive or that a lawsuit was coming or that there were any accusations.  He simply said, Can we talk?

And he also sent an agreement, a non-disclosure agreement, that would allow that discussion to happen confidentially for the protection of both parties.  He wasn't asking for a fight; he was asking for a negotiation.  And he approached it exactly that way.

You've heard from the evidence, PTX 5 and PTX 4, not only of that email but also the list of patents that certainly included the two in this case.

Simple fact No. 3.  And we'll spend a little bit more time on this one.  Samsung chose to use the two patents without permission and without paying Empire for them.

Professor Akl testified, Professor Rangan testified, too,

and I think what we all came to know very quickly in the trial is that there were really only disputes about the '120 Patent with regard to the last two claim elements within both claim 25 and also claim 29.  And so I'm going to go right to the heart of the issue right now.  We all know there's no dispute about whether or not Samsung's accused products include these first four.  They, in fact, do, and both witnesses on either side confirmed that.

So when it came to this fourth element, fifth element, Dr. Akl was asked, "Based on your analysis, do you have a conclusion regarding whether the Galaxy S20 Ultra satisfies the claim element of whether the control signal is based, at least in part, on a power consumption of the first and second circuitry?"  Based on the evidence, it does, so we can put a checkmark.  That was Dr. Akl's testimony.

But he didn't just stop with his word.  He went on and he discussed evidence, evidence that he had looked at in the form of many different things, but in this example a document that Samsung had created and sent to the FCC, to the U.S. government, it was such an important document, to explain in Samsung's own words how Smart Transmit technology worked.

And so what he was asked, Professor Akl, is, how does the Galaxy Ultra satisfy this claim limitation?  And Dr. Akl explained the Smart Transmit technology, as Samsung represented to the FCC, it controls the power management and

the instantaneous transmit power, that's how Smart Transmit works.  And this is the figure representing it in the middle right here, and that's what goes out to the base station.

But he didn't stop there.  He then went on to explain the envelope tracking technology that's also part of this submission to the FCC.  And what he explained is that envelope tracking aligns the voltage of the circuitry in the phone to just above the voltage of the signal that's being transmitted. So that amplifier inside of the phone, the first circuitry, is being aligned, the power of it, to match almost exactly what the signal coming out of Smart Transmit has been told to be.

So the combination of Smart Transmit creating a signal and then envelope tracking creating the circuit power to match that signal is what he had talked about in PTX 29.  And that's exactly what was shown with both Professor Rangan and with Professor Akl.

Now, Dr. Rangan did not want to admit this.  It took a little while.  He tried to avoid it, but ultimately he did have to concede that the two are, in fact, related--the green line and the blue.

So I asked, You would not necessarily say that the blue line is following the red line, that the red columns -- and that the red -- excuse me.  I said, You would not necessarily say that the blue line is following the red line.  You wouldn't necessarily say that, when we were talking about his

962

particular diagram.

But what he did say is, In this illustration they are, they are following.  But when we're actually talking about an actual power amplifier, what we're talking about is a supply voltage, and we're talking about the radiated signal which is not even a voltage.  It's like an electric field at the output of the antenna.  So they'll be related and one becomes more closely dependent.  They will be related.

Professor Rangan, even not wanting to concede this point, had to say that they will in fact be related, the blue and the green.

Professor Akl explained what really is going on in the patent that would cause this relationship to really matter, and he was asked, What is the highlighted language of the part of the patent here that describes sort of what the base station is thinking when it's getting these signals?

And he said, This is a part of the specification--which is this part right here--that the -- in the patent itself, it says that the base station, when it gets this, may determine an approximation of the power consumption of the circuitry. And then Dr. Akl said, Which is exactly what happens in the accused products.

This is testimony that you heard from him to put into context that when that signal, the blue with the green, is communicating what is going on internally within the device.

963

The control signal must be based at least in part on circuit power consumption. That is what the claim says. And so Professor Akl clarified: Does the specific way that a mobile device informs the base station of the circuit power matter for these claims? Dr. Akl's answer was, It does not. The specific way does not matter. As long as the information is relayed or used in part, that's all the claim requires.

And that is, in fact, all that the claim requires.

Professor -- Dr. Rangan also had to concede that the power consumption information doesn't need to be sent from the phone to the base station. He was asked, Is sending this power consumption information required by the claim?

He said, Not explicitly, but if the downlink that is to say the downlink control information is to come from the base station, then the base station must just have some way to know that power consumption information. It just has to have some way to know it. It does not need to be sent.

So that's claim 25, this aspect of it.

Now we'll move on to the bottom, which is the idle power consumption.

So Professor Akl again concluded and was asked the following and gave the following -- asked the following question and gave the following answer: So based on your analysis, what conclusion did you draw with respect to whether the Galaxy satisfies the element 'wherein the control signal

964

is based, at least in part, on idle power consumption?'  It does.  And so we can put a checkmark, and so all the elements are checked now.  That was his testimony.

But, again, he didn't stop there.  He went to the evidence and explained why based on evidence his conclusion is supportable.  So he said that -- he was asked, What did Mr. Woo from Samsung confirm about the state of the phone during the call drop test?

Professor Akl explained that Mr. Woo confirmed that the transmitter is off and that the phone is on.  And so it is in the idle mode, which is also consistent with the Court's claim construction.

Mr. Woo over here, in fact, did confirm that.  What happened when the call was dropped?  The transmission stopped.  Was it your understanding that when the call was dropped, the mobile device was still powered on?  The transmitter is off, he said.  The phone is still on.  That's exactly what idle is, and that's exactly consistent with what the Court has said.

So this is an important part of the story, but not the entire part of the story, what Mr. Woo testified.

In addition, Professor Akl went and explained evidence at PTX 7.  He said, When a call is dropped, which is actually shown here in PTX 7, there's no transmission.  The phone is still on, and it is taking idle power consumption into account as it generates the average that has to be shown below the red

965

line.

So this is a document here from Samsung.  It's a document that they sent to the FCC.  There's a circle right here that Samsung itself made identifying the call drop test and the significance of when you are in idle and the transmission line is off but the phone is still on, Smart Transmit is still measuring the idle transmission capability of the phone, the idle circuitry of the phone, the idle mode of the phone. There's still a measurement going on when Smart Transmit is -- because Smart Transmit has to read it the entire time even when idle is the case.  When a call drops, the transmit -- the phone goes into idle mode and nevertheless Smart Transmit is still measuring what's going on.

Dr. Kowalski was asked, Does this Samsung document -- which is the one that we just showed -- show how Smart Transmit is determining transmit power partly based on idle power?

Yes, it does because when the call is dropped, for example, the handset is still idling.  He confirms this.

Dr. Rangan, And Smart Transmit takes into account the transmission power when the device is in idle.  Right?

The transmission power, yes.

Dr. Rangan, would you please read for the jury the comment right here that begins with, still need to add exposure?

966

So this is a very important part.  Even after further confirmation of the idle power limits that are present in the accused products, I asked Dr. Rangan to take a look at and read one particular part of the Qualcomm source code.  And I asked him to identify you this piece of code that he had failed to mention.  And so I asked him, Can you please read to the jury the comment part of the code that begins --

THE COURT:  Fifteen minutes have been used.

MR. GASPAR:  Pardon me?

THE COURT:  Fifteen minutes have been used.

MR. GASPAR:  Thank you.

And I asked him to read this comment portion that says you still need to add exposure even if 0.  So you still need to add exposure is part of the Smart Transmit technology that is saying that you are still reading what the circuit is doing, the power, even if you are not transmitting, even if you're in zero.

That is what the source code for the Smart Transmit module says?

He said, Right.

And this is an instance where they're talking about where the transmitter is idling?

And he said, Correct.

For claim 29, Dr. Akl similarly concluded that this control signal is based, at least in part, on the number of

users.  Dr. Rangan confirmed that the base station knows the number of users.  And Professor Akl explained that for the control signal being based, at least in part, on the number of users, you look to the component carriers where you've got the number right here for uplink and for SISO and for MIMO.  No question about that.

Now, back to the '331 Patent, a different patent, there were three issues.  But first Professor Akl concluded that Samsung infringes claim 1.  He's testified to that right here, and then he walked through the analysis to get there.

This is a pretty simple slide.  We've seen it before.  It is absolutely clear that PTRS is replicated data.  It's here -- replicated here and here.  It's also absolutely clear that it is being transmitted on more than one data stream, here, here, one data stream; another data stream right here, one, two.  This was Dr. Akl's testimony.  JX 48 is the exhibit that proves that.

Now, can replicated data symbols -- can replicated data be symbols that are known to the transmitter and receiver?

Of course, said Dr. Akl.

But please do on this point take a look at the claim constructions.  The claim constructions from Judge Gilstrap do not say that replicated data is limited to something other than pilots.  It just says plain and ordinary meaning.  So the defense that there's no replicated data because PTRS is a

pilot is simply not something that is part of the instructions that Judge Gilstrap provided.

Now, Dr. Rangan, when talking about whether two data streams are providing PTRS, acknowledged that he had for this trial generated some new evidence that he didn't have, you know, before he provided his report.  It was not found in his report, and it was not part of his deposition.  So this second stream over here is something that was not part of the record until Dr. Rangan created it for this particular trial.

Now, the last item that they mention they think is missing is that there's no decoding using replicated data.  What Professor Akl said is, how do you know -- or was asked, How do you know that the PTRS, which is shown here in orange, is decoded?

And his answer was absolutely simple:  I know it's decoded because every symbol in this grid is actually going to be decoded.

And that makes sense.  Data cannot move from the base station down to the phone without that information being received by the phone and then decoded to be used.  There's no physical movement.  The base station doesn't physically hand something to the phone.  It's sent wirelessly.  And when it hits the phone, everything that comes in has to be decoded.  That's the simple answer that Professor Akl provided, and it seems to, we would submit, align with common sense.

969

08:38    We also saw even in Samsung's own diagram that when you start with 9:00 in the morning, you get something after the communication channel has been experienced that's 11:00, and then you have to do something with it.  I added this, but you definitely have to decode before you can start comparing again over here.  Otherwise, you're not going to know what to compare.  If you haven't decoded it to know that it's 11:00, how do you know it's 11:00?  It's pretty simple, it's pretty

08:38    straightforward.

    And in the source code, Dr. Akl confirmed that PTRS is indeed being used and that it's replicated data.

    Just a very, very quick point on damages.  Ms. Hall calculated based on this number, which wasn't her choice. This was something that Samsung provided, 72.5 million units sold.  That's where she started, with Samsung's own data.  She determined that less than $2 per unit for the '120 Patent

08:39    would be appropriate, less than a dollar per unit for the '331 Patent would be appropriate.  And then the math brings you to the number that she provided.

    Now, how did she get to the less than $2 and less than $1?  She started with the difference between two very different phones, one with 5G capable and one without, one with the inventions, one without, and determined that the profit differential was about $58.  The profit differential was about $58.

She then only took a portion of that profit and attributed it to the patented features. Only a portion. Very little of that profit was driven by the patented features, and then she didn't even stop there. She further reduced down the amount that would have been something that reasonably would have been negotiated between the parties.

She negotiated -- or she determined that it was a 50 percent amount that Empire would have in the hypothetical negotiation achieved and she ended up at less than $2 and less than $1. All of this information from PTX 31 and then JX 15 and then JX 18 through 27 is the set of exhibits that support her analysis.

So, in conclusion, we think the evidence has shown that Samsung infringes the patents, that Samsung knew about those patents, and that Samsung owes a substantial money -- amount of money damages due to infringement and the proper royalty calculation by Ms. Hall.

Thank you, Your Honor.

THE COURT: All right. Defendants may now present their closing argument to the jury.

Would you like a warning on your time, Mr. Snyder?

MR. SNYDER: At 10 and 5, Your Honor, please.

THE COURT: 10 minutes remaining and 5 minutes remaining.

MR. SNYDER: Yes, Your Honor.

THE COURT:  All right.  You may proceed with Defendants' closing argument.

MR. SNYDER:  What does somebody do when they've been wrongly accused?  What does somebody do when they're proud of their employees and the creative products that they've developed that delight consumers around the world?  What does somebody do when they're accused of infringing two patents that they do not need and they do not use?  They fight back, and that's why we're here.

This is the only way that Samsung has to fight back, because it has been wrongfully accused.  This is Samsung's only chance to show to you the evidence that it does not infringe these patents, that it does not need these patents. This is Samsung's only chance to say to Empire, no, you do not deserve nearly $190 million for technology that Samsung does not need and does not use.

But this process only works because of you.  We know that this has been a major disruption in your lives.  No one woke up Monday morning and said, I want to spend my week listening to people talk about details of cellular phone technologies.

So, please, on behalf of Samsung, on behalf of me, our entire team, really on behalf of everybody involved in this process, thank you very much because truly this process, this system, the jury trial system, does not work without you, and for that we are very grateful.  And we are very grateful for

the opportunity to come here this week and to show you the evidence that Samsung does not infringe.

I told you from the very beginning when I first had a chance to talk to you what this case was going to be about and what the evidence was going to show.  Samsung uses something that is called the 5G standard.  The 5G standard represents an enormous jump, a leap in technology.  It enables all kinds of things that you can do on your cell phone, including downloading high speed video, high resolution video, even without a land line.

You also heard evidence that 5G represents the contributions of an enormous number of people and companies. Literally tens of thousands of patented inventions have been declared essential to the 5G standard.  Several thousands of those are from Samsung itself.  Several thousands of those are from Qualcomm, the company that makes the chips that go -- the modems that go into the Samsung phones that are accused of infringement.

Now, we are not saying that Samsung does not infringe because Samsung uses the 5G standard, but we are telling you that Samsung does not need to infringe because it has the 5G standard.  That standard allows it to communicate with devices made by all kinds of manufacturers all over the world.

Samsung is not the only company that thinks it does not need to use these patents when it uses the 5G standard.  You

heard from Mr. Kang, Empire's CEO.  He was asked, Do you agree that Empire is not in any way claiming that the two patents in this suit are part of the 5G standard?  And he answered, Yes. If you use the 5G standard, you do not need these patents.

Samsung is not the only company that has concluded that it doesn't need these patents.  You heard specifically about Empire's outreach to Qualcomm, and this is in DTX 24.  Mr. Kang confirmed that Qualcomm was not interested in these patents when Mr. Steger reached out to them and asked them to purchase them.  And the language that Qualcomm used in responding to that inquiry is interesting.

They said--and this is on DTX 24--"Qualcomm has reviewed the opportunity and has decided to pass on it at this time."  Well, what does that mean?  Well, you heard from Ms. Kim, an experienced licensing professional, and she testified about that kind of language.  She said she has used that language before.  And what does that mean?  It means we don't need, we don't use that technology.

Qualcomm wasn't the only company that decided they don't need to use this technology.  There were a number of people in the 5G -- companies in the 5G industry that reached the same conclusion.  You heard evidence that Empire had reached out to a number of companies, and we've put their logos on this slide, companies like Ericsson, Verizon, Google, Apple, HTC, the largest and well-known 5G providers of devices and

carriers known in the world.  And what did every one of them say?  No, thank you, we're not interested.

In fact, not only did the entire 5G industry say we're not interested, nobody was interested.  You heard Mr. Kang confirm that no one has taken a sale or a license of these patents.  As I told you the first day we were here, there is no evidence that anyone has ever paid a penny specifically for these two patents, and you heard no evidence to the contrary.

Now, let me take some time, because this is my only chance, to talk to you about what the evidence has shown on the specific issue of infringement, and the infringement of the three claims that you've now heard so much about over the last few days.

Every single claim, every single element of each claim has to be found to be met for a specific claim to be infringed.  Let me say that again.  For each claim, every element has to be met for that claim to be infringed.  If three out of four of those elements are met, it doesn't three-quarters infringe, it doesn't 75 percent infringe; it's 0 percent infringes.  Every single claim element has to be met.

So the fact that there's no dispute about certain claim elements, that doesn't mean anything.  If Samsung -- if Empire, if Empire has not met its burden of showing that there is infringement by every single element, that every element is

met, then there is no infringement of that claim.

So let's talk for a moment about what the evidence has shown about the first of those claims. I'm going to start with the '120 Patent. And you've seen this text so many times over the last few days. There's two elements that are particularly important, and we've marked them elements [d] and [e]. I don't want there to be any confusion. This is a slightly different format than the patents you have in your binder. If you look at those, they are not broken up with the letters on the side. It is just one long sentence. We put it in this format for everybody to see and understand exactly what parts of the claim that we are talking about.

And the two parts that are relevant to this claim 25 are at the end. It says that the control signal must be based, at least in part, on power consumption of the first and second circuitry. The last part says the control signal must be based, at least in part, on idle power consumption of the mobile station. In other words, it must be based on what the internal power consumption, either the antenna circuitry when it's operating or the mobile device when it's in idle mode. And it's the control signal that has to be based on that information.

You heard from Dr. Rangan who came and explained to you why Samsung's devices do not infringe. As Professor Rangan explained to you, the base station is the thing that sends the

976

control signal.  There is no dispute about that.  It's a control signal called DCI, download control information.  It comes from the base station down to the mobile device, and it is the thing that makes the decision between SIMO and MIMO.  That's the decision we are talking about.

And as he explained, there is no information that is about internal power consumption, either when it's transmitting or when it's in idle mode, that is being sent up to the base station.  So the base station can't base it on that information because it doesn't have it.

So as a result, claim 25 is not infringed.  Those last two elements cannot be met.

Now, what does Empire say in response to that?  One of the things you heard Empire say several times during the last few days is that, well, don't worry about the base station, don't worry about what the base station is doing because the base station, the words 'base station' aren't in the claim.  Well, it's true that the words 'base station' aren't in the claim, but the control signal is mentioned repeatedly in the claim, and the control signal comes from the base station.  There is no dispute about that.

This is Empire's expert, Professor Akl, and I asked him, That control signal you say is DCI.

Answer:  Yes.

Question:  So the DCI that you're referring to comes from

977

the base station and goes to and is received by the mobile phone.

Answer:  Yes.

So the claim may not use the words 'base station', but there is no dispute that we're talking about something that is done in the base station.  The base station has to make the decision between SIMO/MIMO mode.  And according this claim, that decision must be based, at least in part, on the internal power consumption of the device.

Now, what does Empire show you to suggest that Samsung infringes?  They do not show you that any information about internal power consumption is sent to the base station.  Instead, what they tried to show you is that there is somehow some relationship between internal power consumption and these -- and Smart Transmit or envelope tracking.  And they showed you these two diagrams several times.  In fact, you just saw them again.  The diagram on the left is from PTX 7.

But what does that diagram show you?  Does that diagram show input internal power consumption being met?  No.  You can see it right here.  It says output power.  It's not showing internal power consumption.

And the diagram on the right, what does that show?  It's also showing output power.  Tx is an abbreviation for transmission.  That's from PTX 10.  Both of those are showing output power.  Smart Transmit does not send internal or idle

978

power consumption information to the base station.  That is output power.

As I told you in the opening, there is a big difference between what they're pointing to, which is output power, and what the patent requires, that the signal -- the decision between MIMO and SIMO has to be based, at least in part, on internal power consumption.  They have never shown you that that information is sent.

You also heard from Professor Rangan how this -- the proof of this was confirmed in the source code.  And we actually showed you the source code in PTX 30 that has that evidence.

What is the other thing that Empire wants you to look at? They want you to look at something called envelope tracking and they showed you a diagram that looked just like this again.

But what did Professor Rangan explain?  He explained that envelope tracking doesn't change the way that the signal that is sent to the base station.  All that envelope tracking does is change the power of the power amplifier.  And as Professor Rangan explained, the signal is identical whether envelope tracking is on or off.  The base station has no idea whether envelope tracking is being used.

And as Dr. Akl confirmed, it also doesn't know anything about the power amplifier.  I asked him, Now, thank you

979

Professor.  Would you agree that the base station cannot base a control signal on information that it does not have?

That's fair.

So then I asked him, Is the power that is used by the power amplifier ever communicated to the base station?

Not directly.

Their whole point about envelope tracking is that it somehow changes the amount of power in the power amplifier. But that's never -- that information is never sent to the base station, as Dr. Akl confirmed, and that is exactly what it has to be based on according to the claim.

What is Empire really trying to tell you?  They're trying to suggest that because there is some information that the base station receives, well, maybe they could kind of figure out or maybe the -- it's that information that is sort of related in some way to the elements of the claim.

Professor Rangan gave you a simple analogy that I think makes the difference very clear between that and what the claim actually requires.  Assume, for example, that you have a police officer and they're on the side of the road and they've got a speed trap.  They're looking for speeders.  And the speed limit is something well below 60 miles an hour.  A car comes by and it's going 60 miles an hour.  It might get a ticket.

Now, whether it gets a ticket or not is based on how fast

980

it's going.  It's not based on how much fuel it's using.  But it might be a small car.  It might be very fuel efficient.  Suppose another car comes along a monster truck.  It's also going 60 miles an hour.  It also might get a ticket because that's what the police officer is looking for.  The decision of whether or not to get a ticket is based on the speed of the car.

Now, the police officer might know a Prius is probably getting better fuel economy, better miles per gallon than a monster truck.  But that does not mean that the decision to give a ticket is based on the fuel economy.

In our -- in this claim, the decision to select between MIMO and SIMO is based in the -- is done in the base station.  The claim says it has to be based on internal power consumption information.  That is never sent to the base station.  And you have not heard any evidence, any evidence, about a base station actually basing the decision between SIMO and MIMO either on internal power consumption information when it's transmitting or internal power consumption information when it's in idle.

And based on that information, you should conclude that claim 25 is not infringed.  Those last two elements that refer to internal power consumption are not met because it is information that the base station simply does not have --

There is another, of course, claim from the '120 Patent

981

that is part of this case, and you've heard a lot about it. That's claim 29. As you know very well by now, claim 29 is very similar. The first four parts that we've labeled here [a], [b], [c], and [d] are all the same. And claim 29 is not infringed because that element [d], basing the decision between SIMO and MIMO, at least in part, on internal power consumption of those antenna circuits, that is not met. So claim 29 is not infringed.

But there is an additional element to claim 29, and thus an additional reason why claim 29 is [sic] infringed, and that's the very last part of claim 29. What does it say? It says that the control signal must be based, at least in part, on a number of users of the communications system. And as Professor Rangan explained, the decision between MIMO and SIMO is never based on the number of users and, therefore, it is not infringed.

What did Professor Rangan tell us? Well, Empire pointed to something called component carriers to say that this part of the claim was met. And Professor Rangan explained what component carriers are, what they do, and how they could not meet this part of the claim.

As Professor Rangan explained, component carriers are just telling the phone what frequency to transmit on. It's like tell the phone what part of the FM dial you should actually be listening to or using to send your signal. As

982

Professor Rangan also explained, multiple phones can use the same component carriers.  It's just telling them which ones to use, just like more than one person can listen to the same radio station by tuning it in.  So multiple -- and, of course, this is a little different than a radio station because the base station knows how many users there are.  It can keep track of that information.

But that's where it ends, and that is not what the claim is about.  The claim language says that the decision between SIMO and MIMO must be based on the number of users.  And you did not hear any evidence whatsoever during the trial or earlier this morning that connected this use of component carriers to the decision between MIMO and SIMO.  No evidence at all.

And so the conclusion you should reach is that the '120 Patent, both claims 25 and claim 29 are not infringed.

You're going to get a verdict form, as the Court has already explained to you, and the first question on the verdict form is whether Empire has proved by a preponderance of the evidence that Samsung infringed any of the following claims of the '120 Patent.  And you're going to have a separate question for claim 25 and for claim 29.

And I believe the evidence that we have presented shows that the answer to both of those questions should be no.  And please remember, Empire has the burden of proving that each

and every element of those claims has been met, and if you don't conclude that Empire has met its burden of proving that each and every element of a claim has been met, then the answer is no.

Now, let me turn for a few minutes to talk about the evidence related to the '331 Patent. As you all know very well by now, there's only one claim at issue regarding the '331 Patent, and that's the parts of the claim that we've labeled [c], [d], and [e] even though it's in a slightly different format than you have in your notebooks. Each one of those refers to receiving replicated data and doing different things with it.

There are three reasons, three reasons, why Samsung does not infringe this claim, and I want to show -- review with you briefly the evidence that you've already heard about each of those three reasons.

What is the first reason? Well, the first reason is that Samsung and the Qualcomm modems it uses, they comply with the 5G standard, and it does not use replicated data. And I want to talk about that for a few minutes now.

As Professor Rangan explained, Samsung's use of 5G and 5G generally uses something called pilot symbols. And we spent some time talking about what pilot symbols are. According to the Court's construction, and we put that right here on this slide, you can find them in tab 3 of your notebook, pilot

symbol means a symbol that is known to the transmitter and receiver.

There are two types of symbols that you've heard talked about today that are pilot symbols.  One of them is DMRS.  And Professor Rangan, Professor Akl, they both agree that those are pilot symbols, and they agree that that is a pilot symbol as it's used in the claim.  And why is DMRS a pilot symbol?  Because it is known to the transmitter--the base station--and it is known to the mobile phone that receives it in advance.  So when the communication channel distorts the value of that symbol, the mobile station already knows what the value is supposed to be, and so it can correct it.  It can do this process called estimating the channel.

As Professor Rangan explained, the thing that Dr. Akl points to as the replicated data, well, that's actually a pilot symbol as well called PTRS.  Its value is known to the transmitter--the base station--and the mobile phone that receives it.  It's known in advance, it is known to both the transmitter and receiver, and therefore meets the definition of a pilot symbol.

Professor Rangan showed you evidence that DTRS -- I'm sorry, DMRS and PTRS are even treated as pilot symbols in the 5G standard literature.  He showed you JX 37, which is a document from the 5G standard.  It refers to demodulation reference signals.  It's literally in the name in the same way

985

as phase tracking reference signals PTRS which also has reference signal right in the name, those are two different types of reference signals.

And Professor Rangan was asked, Reference signals, are those pilot symbols?  He said, they are the same.  You never heard anything to the contrary.

Professor Rangan showed you additional evidence about how PTRS and DMRS are treated differently in the 5G standard from other types of data.  This is a diagram, you've seen it very many times, from JX 48.  And in this diagram it identifies three different colors, three different types of information.  There is data--DMRS and PTRS.  The DMRS and PTRS, those are both reference signals.  They are both pilot symbols.

Even Dr. Akl, Empire's expert, agrees that PTRS meets the Court's definition of a pilot symbol.  He was asked, in your opinion, are the PTRS symbols, do they meet the definition of the Court's -- do they meet the definition of pilot symbol as construed by the Court?

"They meet the claim construction."

Just to be clear because I didn't ask a particularly great question, I asked him again, "They meet the claim construction in that they are symbols that are known to the transmitter and receiver.  Correct?"  And you can see the Court's claim construction.  I am using the words exactly.

And he answered, "Yes, sir."  Dr. Akl agrees that PTRS

are pilot symbols.

But what does Empire want you to believe?  They want you to believe that it's okay that it's a pilot symbol and it can also be the replicated data.  As Professor Rangan explained, that would completely defeat the purpose of the '331 Patent.  As you've heard over and over, including from the inventor, the purpose of the '331 Patent is to reduce the use of pilot symbols.  The idea is to get rid of some pilot symbols that you might otherwise need, use data instead so that you can send more data.

If I take some things out of my shopping cart, I have room for other things.  Okay.  That makes perfect sense.  But what Dr. Akl wants you to believe, what Empire wants you to believe, is that you can just change the name a little bit and pretend that you've met the purpose.

No, it's the same things in there.  The pilot symbols, PTRS, are still being used.  And so their theory of infringement wouldn't meet the purpose of the '331 Patent at all.

So that's the first reason.  There is no replicated data in the 5G standard, and, therefore, Samsung does not infringe this claim.

What is the second reason?  There is no replicated data over multiple data streams.  Dr. Akl admitted that it has to be transmitted over the first antenna and the second antenna

987

to meet this requirement.  He was asked specifically whether or not the same, your opinion assumes that PTRS symbols are transmitted by both a first antenna and a second antenna.

Answer:  Yes, to meet the multiple data streams required.

Well, as Professor Rangan explained, PTRS are not sent over multiple antennas.  You saw this diagram on the left that is labeled stream 0.  And then Professor Rangan created a second diagram using the material that's described in JX 48, and he showed the output directly from that program to you.

There was never any suggestion that he did that wrong. There was never any suggestion that this was improper or misleading.  And he showed you that the first stream, the stream from one antenna, it has PTRS, the yellow boxes in it. But the second stream, the stream on the right that is labeled stream 1, you can see for yourself there are no yellow boxes. There are no PTRS symbols.

Professor Rangan then confirmed that in the source code in PTX 30.  And we showed you that source code, and he explained how the source code proves that it cannot use more than one antenna to send or receive PTRS symbols.  So this second claim element is not met.  That's the second independent reason why this claim is not infringed.

What is the third reason?  There is no decoding of replicated data.  You heard a description from both of the experts, Dr. Akl and Professor Rangan, of what decoding means.

988

It means taking this estimate of how the channel, the air, the distance, everything between the base station and the mobile station, the handset, your mobile phone, figuring out that estimate using the pilot symbols, and then adjusting the data to decode the data to try and correct for the changes that occurred, the distortions that occurred as it was being sent through the air.

Well, because PTRS is a pilot symbol, it is not decoded. As Professor Rangan explained, PTRS, the pilot symbol which is shown here in gray, it is known by the base station and the mobile phone before it is sent. Therefore, when it is sent and a different value is received, it knows how -- it knows in advance how much difference there is and it knows how to create it.

So in an example, if something is sent from California at 10:00 a.m. but on my clock here in Texas it shows that it was received at 12:00 p.m., because PTRS already knows that it was sent at 10:00 a.m., I know how to correct it, I know what that time difference is.

Now, Empire's attorney just stood up here and said, no, no, no, that's decoding. That's not decoding. That's applying the whole purpose of pilot symbols because you know by looking at what you receive versus what you know to already be true because you know the value of the symbol in advance.

THE COURT: Ten minutes remaining.

MR. SNYDER:  So that is the third reason why Samsung does not infringe the '331 Patent.  There is no decoding of replicated data, and, therefore, you should conclude that Samsung does not infringe the '331 Patent.

The second question on the verdict form that you're going to receive has this question on it:  "Did Empire prove by a preponderance of the evidence that Samsung infringed the following claim of the '331 Patent?"  You should answer that no.

Please remember, Empire has the burden of proving that each and every element of claim 1 of the '331 Patent has been met.  And if you conclude that Empire has not met its burden of proving that each and every claim of that element has been met, then you should find in Samsung's favor.  You should answer this question no.

Now, I need to take just a few minutes to talk about a couple of other issues.  I don't want to spend a lot of time on it, but this is literally my only chance to talk to you. And Empire's attorney is going to get up and they're going to talk for about 20 minutes more, and they're going to respond to some of the things that I had to say, they're going to spend some more time talking about some other topics.  I have no opportunity to respond.  This is my last chance.

So I want to spend a few minutes talking about a couple of other issues, and in particular, damages and willfulness

990

and what the evidence you've seen actually shows on both of those.

I know everyone was listening very intently during the Court's rendition of the jury instructions, and there were all of them were very important, but there was one thing about them that really struck me.  The Court instructed that you, the jury, determine the weight and credibility of the evidence.  Respectfully, ladies and gentlemen of the jury, a lot of the evidence that you've heard should not have very much, if any, weight at all.

And let me just give you one example--Dr. Kowalski's testimony.  Dr. Kowalski came up and told you about meeting FCC regulations.  Dr. Kowalski seems like a perfectly qualified and professional gentleman.  But he also admitted that his testimony is not helpful to any of the questions that you have to answer.  He was asked, Dr. Kowalski, are you offering the jury -- you are offering the jury no help on the '331.  That's fair, isn't it?

Answer:  Fair enough.

He was asked about the other patent:  On the other half of the case, the jury can set aside your opinion when they assess infringement on the '120 Patent, too, can't they?

Answer:  "Well, I haven't rendered an opinion, so I don't understand how they can set something aside that it doesn't exist."

991

Dr. Kowalski also acknowledged that what he was testifying about was meeting health and safety regulations and that those were not relevant to the case.  He was asked, One of the points in your testimony is that Samsung products are safe.  Right?

Answer:  Yes.

Question:  So everyone in this lawsuit agrees there is no safety issues with the Samsung products.  Right?

Answer:  As far as I know."

Now, when it comes to the issue of damages, Empire is trying to do something very similar.  They are trying to tell you that these patents and Samsung's alleged use of them is somehow worth nearly $190 million.  And, respectfully, what they are telling you does not jibe with what happens in the real world.  They are talking about some different theoretical world that doesn't exist and never has existed.  And all we have to do is think about the evidence that has been shown about the history of Empire and these patents to confirm that that's true.

You heard from Professor Kang, and he described that how even at its peak when it had even more than a hundred employees, it never produced any products, it never produced any devices, it didn't do any R&D for any products.  That was his own testimony.

You heard from Mr. Kang how they had bought patents and

their goal was to try and monetize them.  And so they hired another law firm, Mr. Steger.  He reached out to a number of companies.  And what was the answer they got?  Every time the answer was no; no one saw value in these patents.

THE COURT:  Five minutes remaining.

MR. SNYDER:  So then what did they do?  They reduced their head count, they became a small company of a few employees, and then they sent this email.  Even Empire saw no value in the '331 Patent.  This is DTX 29 where their own lawyer sent a message to the patent's owner and said, We must notify you of our intent to abandon any of the IP rights licensed under the agreement.

Now, Mr. Kang told you this was a mistake.  But in the real world did he show you that they had ever communicated that this was a mistake?  Did he show you a follow-up email that said, Change that, that was a mistake?  This is the only thing that you saw.  Empire saw no value in the '331 Patent.

So what happened next?  2023 rolls around and Empire decides they want to do something with these patents, and so they file a lawsuit against Samsung.  And they go and they hire the inventor, and they gave the inventor a contract that had a non-refundable retainer of $400,000 to come and testify.

Now, we all heard his testimony.  Professor Heath could barely describe what the patents do.  He didn't even remember who funded the research that led to the '120 Patent.  And he

was asked, Are you aware of any devices that ever incorporate the inventions of the '120 Patent?

And I think we all remember the very uncomfortable pause before he finally answered, No, I am not aware of anyone ever using the technology of the '120 Patent --

That difference between the real world and a made-up theoretical world extends to their damages -- to Empire's damages analysis and the request that they are making.  Empire ignores all of the real-world evidence, the comparables.

In the Court's instructions to you, he even described how comparable licenses are similar to real estate comps.  They are literally called comps.  And if you ever sold a house or a trailer or other property, then you know what comps are.  If you want to know what something is worth, what do you do?  You go and you look at the comps.

Well, that's exactly what Ms. Salters did.  She looked at licenses that were found to be technologically and economically comparable, and she came up with an estimate of no more than $5 million.

What is Empire asking for?  They're not looking at any comparables.  They're asking for something that is ▮▮▮▮▮ as much as the highest comparable license.

There's another way in which they ignore the real-world evidence and that is the type of license.  They're trying to tell you that it should be a running royalty instead of a lump

994

sum even though basically all of the evidence suggests that both Empire and Samsung use lump sum agreements.

Now, there's one other topic that I want to address briefly, and that's the issue of willfulness.  Empire suggests to you that any infringement by Samsung, and there isn't any, has been willful.  And what do they point to?  They point to an email -- two emails that were sent by Empire's lawyer, Mr. Steger, to Samsung.  Unsolicited emails that never accuse Samsung of infringement and never even mention a Samsung product.

What else do they point to?  They point to some references to the '120 Patent that are found in some patent applications that Samsung made for patents that the Patent Office actually granted to Samsung.  Those references made by the Patent Office do not suggest that Samsung infringes in any way the '120 Patent.  They don't identify any Samsung products.  And, in fact, Dr. Akl was asked and confirmed on the stand that they wouldn't be expected to because that's not the point.

Ladies and gentlemen, you should find that Samsung does not infringe these patents.  We ask that when you go back to the jury room, you acknowledge that Samsung has been wrongfully accused and that you find that Samsung has not infringed these patents so that Samsung can get back to the work that it is known for--providing innovative devices that

delight its consumers around the world.

Thank you very much.

THE COURT:  All right.  Plaintiff may present its final closing argument.  You have 18 minutes and 6 seconds remaining, Mr. Gaspar.  Would you like a warning?

MR. GASPAR:  At three minutes, please, Your Honor.

THE COURT:  I'll warn you with three minutes remaining.  You may proceed to offer Plaintiff's second closing argument.

MR. GASPAR:  Thank you.

May it please the Court.

Ladies and gentlemen of the jury, I would like to touch on a summary of the infringement and the damages evidence.  But before doing that, I'd like to center ourselves a little bit on the witnesses and you are certainly supposed to and we invite you to determine the credibility and the content of what the witnesses have said.  You're also entitled to ask yourself why are these witnesses saying what they're saying.

I'd like to highlight that Professor Akl has relied on a broad range of evidence for his opinions.  He didn't just come in here and tell you I'd like you to trust me, although he is a quite capable professor and he is a person of ordinary skill in the art; he walked through a mountain of evidence that included Samsung's own testimony, Samsung's circuit documents, Qualcomm's engineering documents, Samsung's FCC submissions,

and even Qualcomm source code.

By comparison, Professor Rangan did not discuss testimony, did not show circuit documents, did not show Qualcomm engineering documents.  He even said that he was a master at the 5G standard.  I think he said he reads it day and night.  But you didn't see any standards displayed other than the one page that you saw in this closing by Samsung's attorney where it just said DMRS means this, PTRS means that, demodulation reference signal, phase tracking reference signal.  That's the entirety of the standard that Dr. Rangan based his entire testimony on, and you saw one page of it.

And that page is, of course, not in any way disputed. Professor Rangan did not rely on any FCC submissions that Samsung made.  He did say he relied on Qualcomm source code, and what I really have to emphasize here is that he left out a very important part, didn't he, that I had to bring up, which is that when Smart Transmit is idling, it is still measuring the circuit power that is there.  That is the exposure that was highlighted in that piece of code that I read to him and he didn't offer that initially.  I had to point that out to him.

Other than his omission in that regard, I've just got to say we completely agree with what he said about the source code.  That's exactly how Smart Transmit works.  Nothing surprising there, nothing in dispute.  The way the source code

works is the way Smart Transmit works.  He showed you almost all of it but not most [sic].

Finally, Professor Akl doesn't have any grants from Samsung, and he's not an Empire employee.  He's never testified for them before.  This is the first time he's been connected to Empire at all.  By contrast, Professor Rangan is supported by Samsung in his research.  In fact his entire center at NYU, his wireless center, relies on Samsung grant money.  He also, importantly, testifies for Samsung regularly, which he testified to.

So when you are weighing the evidence, please weigh not only what it is, how much of it there is, what you find credible, but why particular opinion evidence is being offered to you.  And if you were convinced by Dr. Akl's testimony that there is infringement of the claims, you are entitled to find that there is infringement.  You certainly are.  That is up for you to decide.  But his testimony was informed by an awful lot of evidence in addition to just what he was saying.

Now, when it comes to evidence, I should point out that Professor Akl identified all kinds of circuitry, how exactly envelope tracking which is very important works, how exactly Smart Transmit works, and PTX 10, 8, 11, 29, 30, JX 14, 48, a mountain of actual evidence.

And what we saw on the other hand, not only from Samsung in its closing but throughout the course of this trial, is

998

some attempt to sort of minimize, trivialize the inventions by sort of using cartoons to explain them, and that we don't think is helpful. We think the evidence is something that you are entitled to look at and to weigh and that cartoons don't count. Facts which Professor Akl provided or cartoons which Professor Rangan relied on instead?

Now, this is something that I'm going to build as a diagram for us so that we are, my hope is, crystal clear about what we are trying to explain about what's going on inside of the Samsung phones with respect to circuit power and transmit power.

I believe there is no dispute that the base station talks to the phone. I think we've got that covered. I believe there is also no dispute that the DCI is sent from the base station to the phone and that that is the control signal of the claim. I don't believe there's any dispute there.

Furthermore, I haven't heard a dispute that within the phone there is the Smart Transmit algorithm and also the envelope tracking algorithm. I've heard no dispute that those are in there. And also I've heard no dispute about how they work.

And so what happens with Smart Transmit is that it is constantly monitoring what's going on for transmit power, and that point has been made by Samsung and that point has been made by Empire. And then when transmit power is determined,

because it could be high like here or it could be regulated by Smart Transmit to have to be lower, that transmit power.  And we're not running away from that.  We're not trying to fool you.  We're not trying to make you think that transmit power is something that it's not.  We're not trying to suggest that transmit power is what is inside the phone.

Please do not understand this to be trying to fool you on this.  Transmit power is what comes out, no question.  And that's what Smart Transmit generates as it's running its algorithm.  I've shown that in blue right here, and I've shown it in blue right here for the other antenna.  Once that blue signal that comes out of Smart Transmit hits the envelope tracking, the circuitry and the algorithm, it is then affecting the circuit power.

The circuit power is then being hugged, being matched in green right here and right here to that blue signal that is coming out of Smart Transmit.  So Smart Transmit starts, it regulates the output right here, and then it sends out that blue signal.  Then envelope tracking hugs that blue signal with the green, and then that is what goes up to the base station.

The base station knows exactly or very, very close as an approximation what it is that that internal circuit power is, the internal circuit power.  Then the base station makes its decision about DCI based, at least in part, on circuit power

1000

consumption.  It doesn't say it has to be based directly on, it doesn't say it has to be based only on, the claim does not say it has to be based on a measurement of, the claim does not say it has to be based on a value that is sent between the phone and the base station.  It simply says based, at least in part, on circuit power consumption of the first and second circuitry.  We want to be absolutely clear about that.

With respect to idle, Dr. Kowalski was here and he, I don't believe, at least we respectfully hope, was wasting your time.  He was trying to impress upon you the benefit and the absolute sort of importance of how the Smart Transmit algorithm works and why it is so important within Samsung's phone.  There is nothing else like it.  Samsung chose that technology, they put it in their phone for this very important safety and also battery life benefit.  And we thought it would be helpful for Professor Kowalski to let you know about that.

With regard to idle power periods, Professor Kowalski explained it pretty simply which he said you look at over a 30-minute period what the exposure is coming out of the phone, what the exposure to the phone's transmission is going to be, and over that 30 minutes there are going to be plenty of periods when the mobile device is idle.

And Smart Transmit takes into account what's going on even during those idle periods.  It doesn't just shut off because then it wouldn't be doing its job.  It doesn't just

1001

reset every time a call is dropped or every time, you know, you don't need to be talking on the phone.  It has to be monitoring the entire time because if you aren't monitoring the entire time, then you really aren't achieving this here.  You aren't really making sure you stay below the red over an average long period of time.

So that is a lot about the '120 Patent.  I should say about the '331 Patent very, very little because I believe the evidence speaks for itself on that.  But you will go back, if you would, please, and look at JX 48.  JX 48 is the centerpiece of the '331 Patent discussion.  It's that big blue chart that has a bunch of green pilot symbols running up and down and then just a few, just a few, orange symbols running side to side in one vertical and then a bunch of blue, and then one other line of orange symbols.  So where all that blue is not taken up by orange, unlike the green ones that are everywhere, that's your replicated data and that's your savings that the patent had talked about.  If that orange was all over the place like the green symbols, well, it wouldn't be achieving the invention and I think Samsung would have a good point.  But please do take a look at JX 48.  There are big blue spaces with no extra orange, and that's achieving the invention.

So let me see if I can move right to some of the criticisms.  I think we were accused of not operating in the

real world.

What happened during I think Ms. Salters' examinations was pretty illustrative.  Ms. Salters I think had to admit that when analysis she was challenging of Ms. Hall was the topic of discussion, that maybe she hadn't told you the whole story, so she had shown you a slide where some number of phones were being compared to the phone that Ms. Hall decided would be a fair one to look at.  And Ms. Salters decided to show that price, $999, in comparison to a bunch of lower priced phones that were -- that are accused in this lawsuit.

What ended up happening is, though, she had to admit that that $999 is basically right in the very, very middle of what the cost of these phones across the accused product line is.  I think you might have remembered that.  I certainly did.  It was hard to miss.  And so we're not operating outside of the real world.  We're using basically a midpoint when starting to figure out this damages calculation.  Again, we're not trying to hide anything here; we're being very up front that this is where we are starting, and we were very up front from a damages infringement perspective with why we're starting there.

It's also worth noting that, you know, Ms. Salters kind of gave us a way to think about the licenses that she was given.  The licenses that are these comparables, by the way, these are not licenses that Empire picked out of Samsung's

files.  Samsung delivered a handful of licenses that they picked.  And guess what?  Ms. Salters, of course, found the three lowest value licenses and focused in on them.

But I think she realized, wait a second, ▮▮▮▮▮ just doesn't sound right, and so I've got to find a way to multiply that to get it up somehow; otherwise, it's just not going to be credible.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ to match the number of years left.

And so Mr. Lichtenberg asked her, okay, let's just say we pick another license that Samsung gave us, again a super low license, and use your same math.  This was astonishing because it was certainly not planned.  We didn't know this until after we saw Ms. Salters' report which was way after Ms. Hall did her calculation.  But using Ms. Salters' own math on one of the low value licenses brought another low value license to basically exactly what we've asked for here.

And so even using some sort of cherry-picking, we would say, of licenses, you can't run away from the fact that we're talking about a real figure when we're talking about our request.  This was the hand-drawn figure that you might remember from that particular part of the testimony.

Also, inescapable, both sides admit we're talking about a lot of product sales here.  This is, again, not Empire's fault.  72.5 million accused products have been sold.  72.5.  Again, Empire had nothing to do with that.  That's just a

number that was given to us.

One of the final thoughts I'll try to explain and explain quickly. If you are coming in to defend yourself as Samsung's counsel suggested, because you're wrongly accused, do you get to evidence? Do you get to facts or do you use cartoons? Do you stick to what counts which is an element-by-element comparison of the claim language to the accused products or do you start talking about stuff that doesn't matter, that's a distraction.

What did we hear? We heard evidence of three simple facts, and we could have heard from Samsung counterevidence to each of those three simple facts.

THE COURT: Three minutes remaining.

MR. GASPAR: Thank you, Your Honor.

Instead, we heard distractions like Empire did not declare the patents standard essential, but every witness that was asked said the same thing--it doesn't matter if they weren't declared standard essential because you have to look at the element-by-element comparison. Judge Gilstrap said the element-by-element comparison is what you need to look at.

They also say that Qualcomm made Smart Transmit. Well, Samsung selected the parts that went in its phones, and the witnesses said exactly that as well. They said the USPTO didn't say that Samsung infringed the patents. It just simply raised the patent to the attention of Samsung. But the USPTO

1005

is not in the business of explaining infringement.  On and on and on, more and more and more excuses.

Why are we talking about 5G?  The experts agree it doesn't matter.  Why are we talking about standard essential?  It doesn't matter.  Why are we talking about Qualcomm?  It doesn't matter.  Samsung sells the accused devices in the United States.

So let me bring you to no more distractions.  Let's get right to the verdict form.  So we would submit that the evidence has shown, oh, 80,000 patents.  That's right.  Ms. Kim, if the accused products infringe the two patents in this case, it doesn't matter if Samsung has 80,000 thousand patents.  Isn't that fair?  Yes.  Distraction.

So now let's get to the verdict form.  The only test in deciding infringement is the -- in deciding infringement the only correct comparison is the one between the accused products and the limitations of the claims.  His Honor just explained that.

And the preponderance of the evidence just means that the evidence has to persuade you that the claim, the argument that we're making, the evidence that we're showing you, is more probably true than not true.

On the verdict form, we respectfully would request that you check yes, both claim 25 and claim 29 have been infringed. We would respectfully ask you to do the same for the '331

1006

Patent.

We would respectfully ask you to find that it was willful. They did it on purpose. They knew about the patents, certainly from the lawsuit, which was filed in 2013 [sic] because they kept releasing products, one product after another after another, even though the lawsuit was going on.

And then we ask you to award the licensing fee that is proper based on Samsung's sales of these products.

So I will conclude with one final point. I mentioned when we met on Monday that I really like being a patent lawyer, and I mentioned it's because I like learning about technology and I like working with inventors.

There's another reason, and it's this: I tell my kids this when they run up to me with something on their phone or something that they heard at school and they say, you know, this is what some member of the, you know, sports team said or this is what somebody in politics said.

THE COURT: Mr. Gaspar, your time's expired. Take just a couple of the seconds and finish up.

MR. GASPAR: Thank you, Your Honor.

My point is this: There is no better system anywhere for getting to the truth than the one we are participating in now. Look at the evidence from both sides, listen to both sides, and then please decide.

Thank you so very much, so very much, for your hard work

1007

on this.

Thank you, Your Honor.

THE COURT:  All right, ladies and gentlemen.  I'd like to now provide you with a few final instructions before you begin your deliberations.

You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form from the facts as you find them to be, following the Court's instructions on the law.  Do not decide who you think should win the case and then answer the questions to reach that result.  Once again, let me remind you, your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true even if one party is small and the other party is large.  This applies in patent cases between corporations, partnerships, and individuals.

A patent owner is entitled to protect his rights under

1008

the laws of the United States, and this includes bringing a suit in a United States District Court for money damages based on allegations of infringement.  But by the same token, an accused infringer is entitled to defend itself against assertions of infringement, including arguing that it does not infringe the asserted patents.

The law recognizes no distinction between types of parties.  All corporations, partnerships, other business organizations, and individuals stand equal before the law regardless of their size, regardless of who owns them, and they are to be treated equally.

Now, when you retire to the jury room to deliberate on your verdict, as I mentioned, you're each going to have your own individual printed copy of these final jury instructions to take with you.

If during your deliberations you desire to review any of the exhibits that the Court has admitted into evidence and have been shown to you during the trial, then you should advise me by a written note signed by your foreperson and given to the Court Security Officer.  He will then bring the note to me, and I will then send that exhibit or those exhibits to you.

However, ladies and gentlemen, demonstratives as opposed to exhibits are not evidence, and I will not be able to send demonstratives to you to review in the jury room during your

1009

deliberations.

Now, once you retire, you should select your foreperson and then conduct your deliberations. If you recess during your deliberations, you should follow all the instructions the Court has given you about your conduct during the trial.

After you have reached a verdict, your foreperson is to fill in those answers in the verdict form reflecting your unanimous agreement, sign the verdict form on behalf of the jury, date it, and then advise the Court Security Officer that the jury has reached a verdict. Do not reveal your answers until you are -- unless you are discharged by me, or otherwise directed. And you should never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial are aids to your memory only. If your memory should differ from your notes, then rely on your memory and not your notes. Notes are not evidence, and a juror who has not taken notes or not taken very many notes should rely on his or her own independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If during your deliberations you want to communicate with me, then you should give a written message or a question signed by your foreperson to the Court Security Officer who

will bring it to me, and I will then respond as promptly as possible either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always first disclose to the attorneys in this case your question and my intended answer before I give you a written response.

Now, after you've reached a verdict and after I have discharged you as jurors in this case, I want you to understand at that point you are not required to speak or talk with anybody about your experience as a juror in this case.  But by the same token, at that point you will be completely free to talk about and discuss your experience as a juror in this case with anyone of your choosing.  At that point, after I've discharged you as jurors, it will be 100 percent your decision to make.

I'm now going to hand one clean copy of the verdict form and eight copies of the final instructions to the Court Security Officer who will deliver it to you in the jury room.

Members of the jury, you may now retire to the jury room to deliberate on your verdict.  We await your decision.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are free to wait here in the courtroom.  You are free to leave one or more representatives monitoring things here in the courtroom.  You're free to leave the premises.  If you leave the premises,

don't go far.  Make sure we have an open line by way of cell phone to contact you if we get a question or once the jury returns their verdict.

Awaiting either a question from the jury or the return of their verdict, the Court stands in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury.  It reads as follows:  "We request the PTX 21, PTX 20, PTX 10, JX 5."  And it's signed -- that's exactly how it's written.  It's dated with today's date and it's signed by Lydia Lepic, No. 6 on the jury, as the foreperson.

I'm going to mark it with a '1' in the upper right-hand corner, and I'll deliver the original note to the Courtroom Deputy.

And counsel, I've prepared the following written response.  I'll read it to you and then receive any comments you might have.  "Members of the jury, in response to Jury Note No. 1, I am sending you the following exhibits:  PTX 21, PTX 20, PTX 10, and JX 5."

And I have asked the Courtroom Deputy to pull those exhibits and I have them in my hands.  Is there any reason I shouldn't send those exhibits with a written response to the jury?

MR. GASPAR:  From the Plaintiff, no reason you

1012

shouldn't send.

MR. SNYDER:  From the Defendant, no objection to the response, Your Honor.

THE COURT:  All right.  I'll hand the exhibits themselves and the written response to the Courtroom Deputy--excuse me--to the Court Security Officer and direct him to deliver them to the jury.

I'll also hand a duplicate of the written response from the Court to the jury to the Courtroom Deputy to be included in the papers of this cause.

Counsel, awaiting either another note from the jury or the return of their verdict, we stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

All right, counsel.  I've received the second note from the jury.  The jury's note reads as follows:  "The jury requests PTX 29 and PTX 22."  Signed Lydia Lepic, foreperson.

I'll put a '2' in the upper right-hand corner of the note for identification and hand the original to the Courtroom Deputy.  I asked the Courtroom Deputy to locate and she's given to me PTX 22 and PTX 29.  PTX 22 is a copy of the '175 Patent that apparently has the reference to the '120 Patent in the cited references, and PTX 29 is a document entitled "Software Overview Qualcomm Technologies."

Is there any objection from either Plaintiff or Defendant

with regard to the Court sending those two exhibits to the

jury as requested?

MR. GASPAR:  No objection from Plaintiff, Your

Honor.

MR. SNYDER:  Defendants have no objection.

THE COURT:  All right.  I prepared the following

written response to send with those two exhibits to the jury.

I'll read it to you.  "Members of the jury, in response to

Jury Note No. 2, and as you requested, I am sending you the

following exhibits:  PTX 22 and PTX 29."

Without objection, I'll execute that written response,

I'll hand it along with the actual two exhibits to the Court

Security Officer and direct him to deliver them to the jury.

I'll also hand a duplicate of the written response to the

Courtroom Deputy for her files.

Counsel, I have two Xeroxed copies of both Note No. 1 and

Note No. 2 if you want them for your files.  I've leave them

with the Courtroom Deputy.  If you want them you can get them

from her.

Awaiting either another note from the jury or a return of

the verdict, we stand in recess.

(Deliberations continue.)

(Jury released for the day.)

I HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

COURT AND THE JUDICIAL CONFERENCE OF THE

UNITED STATES.


S/Shawn McRoberts                06/26/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER